# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

EDMONDSON COMMUNITY
ORGANIZATION, INC.
    2114 Edmondson Avenue
    Baltimore, Maryland 21223
BONITA ANDERSON
    2801 Roslyn Avenue
    Baltimore, Maryland 21216
    *Plaintiffs*,

      v.

MAYOR AND CITY COUNCIL OF
BALTIMORE
    100 Holliday Street
    Baltimore, Maryland 21202
MICHAEL MOCKSTEN
    *In his official capacity as the*
    *Director of Finance for*
    *Baltimore City*
    200 Holliday St.
    Baltimore, Maryland 21202
TEMPEST LLC
    5555 E Olympic Blvd, Los
    Angeles, California 90022
EAST COAST TAX AUCTION, LLC
    300 Main St.
    Fifth Floor
    Stamford, Connecticut 06901
    *Defendants*.

**AMENDED COMPLAINT FOR MONETARY, INJUNCTIVE, AND DECLARATORY RELIEF**

**JURY TRIAL REQUESTED**

**Civil Action No. 1:24-cv-01921-BAH**

## Nature of the Action

Last year, in *Tyler v. Hennepin County*, the Supreme Court unanimously reaffirmed the longstanding rule that when the government seizes property to satisfy a debt, the taxpayer is entitled to the surplus value of the property "in excess of the debt owed." 598 U.S. 631, 642 (2023) (citing *United States v. Taylor*, 104 U.S. 216 (1881)).

1

So, if the government seizes a $100,000 home to satisfy a $1,000 debt, it must give the homeowner the excess value. This case concerns how Baltimore City and large—often out-of-state—"tax-lien investors" systematically violate this centuries-old principle when seizing property to satisfy past-due property taxes.

When Baltimore City taxpayers fall behind on their property taxes, Maryland law gives the City a lien on their property. But rather than perform its role as a tax collector and enforce those liens itself, the City sells them to private parties in an auction that the City has designed to attract institutional tax-lien investors. When an investor buys a lien from the City, it pays the City the outstanding taxes and gains the right to collect them—with interest—from the property owner. If the property owner cannot repay the debt within a limited "redemption" period, the investor can take the property, with the City's help.

Under the surplus-value rule *Hennepin* reaffirmed, once the City and investor take the deed, the original property owner is entitled to the difference between the value of the property and the past-due taxes. But that's not what happens in Baltimore. Instead, the City and the investor hand over only the difference between the auction price for the *lien* and the past-due taxes. That distinction is substantial: The auction price of the lien is far lower than the value of the property itself.

Making matters worse, the City designed its auction to drive down the price of the liens. It did this in several ways. First, the City charges a "high bid premium"— essentially, a fee—for bids above 40% of the property value. Second, regardless of the value of the property, the City sets no minimum bid for the property lien except that it

must be at least the amount of taxes owed. Third, the City sells thousands of liens at a time, making due diligence on the listed properties virtually impossible. Finally, the City fails to meet even the minimal state-law public notice requirements that are designed to attract potential bidders, thus largely limiting participation in the auction to a few sophisticated institutional investors.

This system ensures that Baltimore residents whose property is taken to pay back taxes do not receive just compensation, and that tax-lien investors get a windfall. This is not only devastating to property owners and their communities. It is unconstitutional.

That's exactly what happened to Edmondson Community Organization and Bonita Anderson.  ECO is a non-profit community organization that represents the residents of Midtown-Edmondson, one of Baltimore's historically Black, redlined, and disinvested communities. Its most important asset was its community center, where it hosted back-to-school gatherings, Thanksgiving dinners, Christmas toy drives, job trainings, and arts programs for community members. When the organization fell behind on its property taxes by just $2,543, a California-based tax investor, Tempest LLC, purchased the City's lien on ECO's property for $5,115—knowing the property was worth far more. When ECO was unable to timely redeem the property, Tempest foreclosed on it, and the City transferred ECO's deed to the property to Tempest. Tempest then turned around and auctioned the property, without making any improvements, for $139,500—a 2,600% profit. Of that, ECO was entitled to only $2,572—the difference between the lien price and its tax debt. Tempest kept the rest.

Ms. Anderson's story is similar. When she fell behind on the property taxes for

3

her home, the City took a tax lien on the house and sold it at auction to a tax-lien investor, East Coast Tax Auction, LLC. In levying taxes, the City had assessed the value of Ms. Anderson's home at $185,000, and she owed only about $5,400 in taxes—a difference of $179,600. But under Baltimore's tax sale system, she was only entitled to, at most, the difference between what East Coast paid the City for the lien on her property and her tax bill: $64,100. East Coast knew that Ms. Anderson's property was worth far more than it paid.

Thus, Tempest and East Coast worked jointly with the City to take ECO and Ms. Anderson's property without just compensation. The Takings Clause prohibits this massive, City-facilitated transfer of wealth from Baltimore residents to institutional tax-lien investors. This action seeks recompense for the plaintiffs—who have been deprived of the just compensation the Constitution requires—and an end to the system that accomplishes this unconstitutional wealth transfer away from some of the community's most vulnerable residents.

## THE PARTIES

1.      ECO is a Maryland 501(c)(3) corporation with its principal place of business in Baltimore. ECO owned the building at 2114 Edmondson Avenue in Baltimore from 1995 until a California-based tax-sale purchaser, Tempest LLC, took it with the City's help. ECO's mission is pursuing rapid, equitable, transformational revitalization of the disinvested areas in Midtown-Edmondson—or put differently, "Taking the Community to Another Level," as a sign on ECO's building read before the City and Tempest took it. This mission also includes protecting members of the Midtown-Edmondson neighborhood

from the tax sale process, which, by leaving people without just compensation, drives them from the neighborhood. ECO's 11-person board is made up of Midtown-Edmondson community homeowners, small-business owners, and faith leaders.

2.      The Midtown-Edmondson community is bordered roughly by Fulton Avenue on the east, Mulberry Street on the south, N. Bentalou Street on the west, and Lafayette Avenue and the Amtrak tracks on the north.

3.      Bonita Anderson purchased the property at 2801 Roslyn Avenue in Baltimore City in May of 2009, and both she and her daughter have occupied it since. She owned that home until a Connecticut tax investor, East Coast Tax Auction, LLC, took it with the City's help.

4.      The Mayor and City Council of Baltimore is an incorporated municipality in the State of Maryland.

5.      Michael Mocksten is the Director of Finance for Baltimore. Mr. Mocksten is responsible for executing the deeds that transfer title from Baltimore property owners to tax-lien purchasers. Mr. Mocksten is also ultimately responsible for the decision to impose a high-bid premium, advertise in the Daily Record, sell thousands of liens in a single auction, and impose no minimum bid above the lien.

6.      Tempest LLC is a limited liability company with its principal place of business in California. With the City's assistance, it took ECO's property.

7.      East Coast Tax Auction, LLC is a limited liability company with its principal place of business in Connecticut. With the City's assistance, it took Ms. Anderson's property.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343, and 1367.

9.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in this district.

## BACKGROUND

### I.      *The tax sale framework in Baltimore.*

10.     Maryland's Tax-Sale laws are codified in Title 14, Subtitle 8 of the Tax Property Article of the Maryland Code ("TP").

11.     Under that Title, "all unpaid taxes on real property" are treated as liens on the property. TP § 14-804(a)(1).

### A. The Auction

12.     State law, as a general matter, requires Maryland's municipalities to sell their liens in a public auction, but gives each municipality discretion to decide when to conduct the auction. TP § 14-808(a)(1). Until 2023, every municipality other than Baltimore was required to sell each lien within two years of when the taxes became past due. But Baltimore alone retained complete discretion to determine when to sell the lien. State law imposed (and continues to impose) no deadline by which this had to be done, and therefore no limit on the amount of time Baltimore may give its residents to become current on their taxes before risking losing their property.

13.     In addition to controlling when liens are auctioned, state law also explicitly allows the City to refrain entirely from auctioning properties owned by people over age 65,

properties owned by "low income" individuals, and properties owned by disabled individuals. TP § 14-811(h)(2).

14.     When it chooses to conduct an auction, the City must advise the general public by publishing at least twice in newspapers of general circulation in the City a notice of the date and place at which each lien will be auctioned. TP § 14-813(a)(1).

15.     Under Section 14-817(a)(2), when the City auctions a lien, it must sell the lien to the person who makes the highest "good faith accepted bid."

16.     Section 14-817(b)(2) permits—but does not require—the City to impose a high-bid premium that is 20% of the amount the winning bid exceeds 40% of the property's "full cash value" or, if it's greater, the value of the lien.  To take an example, if a property with a lien for $5,000 in past due taxes is listed as having a full cash value of $100,000 and the winning bid is $80,000, the investor must pay an additional $8,000 penalty. That's because the bid exceeds 40% of the property's listed value ($40,000) by $40,000, and 20% of $40,000 is $8,000.

17.     The City has discretion to set a minimum bid for each lien so long as the minimum is not less than the amount of taxes due on the property, together with penalties and interest. TP § 14-817(b)(1).

18.     When a tax investor places the winning bid on a tax lien at auction, it need not turn over to the City the full amount of its bid. TP § 14-818(a)(1). Instead, it is required to pay only the amount of the outstanding tax bill and the high bid premium. *Id.*  It only needs to pay the rest of its bid if and when the property owner fails to redeem the property and the investor chooses to obtain a deed from the City.  § 14-818(a)(4).

7

**B. Redemption**

19.     Following the tax sale, a "redemption" period begins during which the original property owner can extinguish the lien—now held the by the winning bidder—by paying not only the past due taxes but also the interest, penalties, and costs of the sale claimed by the City, plus the investor's attorneys' fees and costs. TP § 14-828.

20.     Redemption is not complete unless the taxpayer pays interest to the lien purchaser. TP § 14-828(a)(1)(i). Although state law sets the interest rate at 6%, it gives municipalities discretion to set a higher rate. TP § 14-820.

21.     The interest on the lien, if redeemed, goes to the investor, not to the City.

22.     Because of the post-sale redemption period, tax-sale investors know that, at the auction, they are not bidding on—and the City is not selling—title to the property. Investors are buying the right to collect the property-owner's debt with interest, secured by a lien on the property. In other words, they are buying the lien from the City, not the property itself. See https://taxsale.baltimorecity.gov (explaining that the City auctions its "lien interests on properties").

**C. Foreclosure and Deed Transfer**

23.     If the property owner is unable to redeem within the time provided, the investor may bring an action to foreclose the right of redemption. Before doing so, the investor, not the City, is responsible for providing notice to the property owner of their rights, including how to redeem the property to prevent foreclosure. TP § 14-833(a-1).

24.     A judgment foreclosing the right of redemption does not give title to the investor. Rather, it is the City that gives title to the investor. And the City will transfer clear legal

title to the investor only in exchange for the investor paying the remainder of its bid, plus any accrued taxes. TP § 14-818(a)(3). If the investor fails to fulfill these requirements within 90 days of the judgment, the original owner may file a motion to strike the judgment of foreclosure. TP § 14-847(d)(1).

25.     If the investor fulfills its obligations to obtain title, the original property owner loses title and is entitled to only the difference between the tax bill and the winning bid. TP § 14-818(a)(4).

## II.     *Through the tax sale, the City and tax-sale investors take Baltimore residents' property without paying just compensation.*

26.     The auction price of a tax lien is routinely substantially less than the value of the property on which the lien is imposed. But when the City and investor take Baltimore residents' property, the property owner gets, at most, whatever is left over from the sale price of the *lien* after their tax bill is paid—not the difference between the value of the *property* and their outstanding taxes. The rest of the property's value—the difference between the price of the lien and the value of the property—goes to the tax investor, not the property owner.

27.     The City has chosen to exercise the substantial discretion afforded to it under state law with little regard to its residents' equity in their homes and other property. Its overriding concern has been to attract the interest of institutional tax-lien investors and spread the available investor capital across as many liens as possible—thereby maximizing its revenue collection and the investors' opportunity for windfall profits—rather than achieving fair bids for its struggling residents.

28.     Despite its discretion to space out its lien sales or to give residents additional time to pay off their taxes, the City chooses to sell all of the liens that arise in January, when taxes become delinquent, in a single auction held in May—even liens on property owned by taxpayers who have only recently fallen behind on their taxes for the first time.

29.     Before the 2022 tax sale, the City chose to not exercise its discretion to refrain from selling liens on residential properties owned by low-income individuals, people over 65, or disabled individuals.

30.     Baltimore has also elected to raise the interest rate lien investors are entitled to collect from property owners from the statutory floor of 6% to 12% if the property is owner-occupied or 18% if it is not. The City established those rates to attract more tax-lien investors at the expense of its low-income residents.

31.     The City has also adopted several additional practices that drive down bids on tax liens:

> a. The City charges a high-bid premium. It imposes a 20% surcharge on any bid for a tax lien that exceeds 40% of the underlying property's assessed value, thereby actively encouraging bidders to keep their bids to less than 40% of the property's value. The City thus elevates its interests above its residents' by inducing bidders to make low bids on a large number of liens rather than higher bids on fewer liens. With that practice, the City sells more liens, satisfying its interest in recovering tax revenue, while making its property-owner residents the victims of low winning bids that provide

unjustly small compensation for the owner's lost equity.

b. The City is required by TP § 14-813 to advertise its tax sale auction "two times, once per week in alternate weeks" in "1 or more newspapers that have a general circulation in the [City] in which the property is located." The plain purpose of this requirement is to make the tax sale, and the properties in it, widely known to a large number of potential bidders—that is, to attract demand. The City, however, fails to advertise the tax sale auction twice in a paper of "general circulation," instead providing its second notice of the auction in *The Daily Record*, which is directed only to the business, legal, and government communities. Its total circulation is under 16,000, and ECO leadership has never seen a copy available in the Midtown-Edmondson community. The City also does not conduct any of the routine marketing normally used to sell a house, like posting on websites such as Redfin or Zillow, listing the property on MLS, or even putting a for-sale sign on the property.

c. Although it is permitted to do so, the City requires no minimum bid at tax auctions other than the amount of the tax lien. Thus, if there is a $2,000 tax lien on a $100,000 property, a tax sale investor can buy it for $2,001. And if the property owner does not redeem the property, the investor will then get the $100,000 property, having paid only $2,001. And the property owner will be entitled to only

$1. The absence of any minimum bid requirement, much less one that bears some relation to the value of the property, again reflects the City's elevation of its own interest in promptly recovering on the maximum number of tax bills over its constitutional obligation to provide property owners just compensation when their property is taken.

d. The City lists every lien in the sale in the same notice on the same day, typically listing between 15,000 and 20,000 properties in a single notice. As a result, potential bidders have no meaningful opportunity to determine the value of the property underlying the liens on the list. And average people cannot join the process, do their homework, and provide competing bids that reasonably approach a property's true value. This necessitates highly conservative bidding, particularly from large-scale institutional investors of the kind that seek to purchase and hold tax liens.

32.     Based on the system's design, the bidders necessarily consist of a small number of professional tax-sale investors. In 2024, for example, approximately 75% of the nearly 4,000 liens auctioned were purchased by one of ten bidders.

33.     The foregoing practices systematically undervalue properties. In the seven annual Baltimore City tax sales from 2017 through 2023, the winning bids on occupied properties in the Midtown-Edmondson community averaged only 36% of the assessed value of the properties sold. In ECO's case, the winning bid was only 5% of the property's assessed

value. Tempest bought the lien on ECO's property for $5,115 and then sold the property, at a public auction, for $139,500. In Ms. Anderson's case, it was approximately 33% of the property's assessed value. East Coast Tax Auction paid $69,500 for the lien on her property, which the City assessed at $185,500.

34.     The assessed value is significant because it is the basis on which taxes were charged and the tax lien was imposed in the first place. By selling the liens for far less than the assessed value of the property—and, in fact, penalizing bids that approach even half the assessed amount—the City values the property much higher for purposes of assessing taxes than it does for purposes of paying just compensation when the property is taken for failure to pay those same taxes.

35.     In sum, instead of a public auction following a widely circulated notice at which numerous members of the public bid competitively to acquire real property, Baltimore City's practice encourages a few professional investors to buy large numbers of tax liens for bids bearing no connection to the value of the properties.  Together, the City and those investors ultimately take Baltimorean's properties for far less than just compensation.

###     III.     *The City and Tempest took ECO's property without just compensation.*

36.     ECO was incorporated on June 17, 1993, as a community organization to represent the interests of the members of the Midtown-Edmondson community, one of Baltimore's most disinvested communities. The organization began by providing back-to-school gatherings and school supplies, Thanksgiving dinners, Christmas toy drives, job trainings, and arts programs to community members.

37.     In 1995, Baltimore City assigned ownership of 2114 Edmondson Avenue to ECO.

The City had obtained title to the building, a two-story, brick, commercial-use structure, as part of an asset seizure by the United States Attorney's Office arising from the conviction of one of Baltimore's most notorious 1980's drug dealers.

38.     ECO put the building to good use, making it the place where the Edmondson community convened and emblazoning it with ECO's name and slogan, "Taking the Community To Another Level":



39.     But ECO fell behind on its property taxes, and the City sold the tax lien on the building at the City's 2018 tax sale.

40.     On May 14, 2018, the date of the 2018 tax sale, the tax lien on ECO's building

totaled $2,543.47. The winning bid on the property, made by a California-based professional tax-sale investment company named Tempest LLC, was $5,115. Tempest paid the City the amount of the tax lien on May 15, 2018.

41.     All of the City's practices alleged in paragraphs 26 to 31 were in place during the 2018 tax sale: The City listed approximately 20,000 properties in its single listing of properties in the 2018 tax sale.

42.     The City advertised the liens once in *The Sun* and once in *The Daily Record*. The City charged a high-bid premium. And the City did not require a minimum bid beyond the lien amount on ECO's building. That enabled Tempest to bid $5,115 for a building on which the City listed the "Base Value" as $101,200 and which Tempest later sold at public auction for $139,500 without making any improvements to the property.

43.     At the time it placed its bid, Tempest knew that the property was worth far more than $5,115.

44.     Tempest is a professional tax sale investor that bought 85 properties in the 2018 sale. Ninety-four percent of those properties were redeemed at interest rates of either 12% or 18%—all paid to Tempest. On the five unredeemed properties to which Tempest took title, it paid a total of $55,045 for the liens on properties it has now sold for a total of $642,970. Tempest's extraordinary gain—a greater than 1100% return on its $55,000 investment—was made on the backs of the Baltimore City residents who lost their equity in their properties, which the City essentially gave away in the tax sale.

45.     When Tempest won the bid for ECO's tax lien, it paid the City only the amount of the lien, $2,543.47. It did not pay the balance of its bid.

46.     Tempest filed suit to foreclose ECO's right of redemption on February 21, 2019. On July 9, 2021, the Circuit Court for Baltimore City entered a judgment foreclosing ECO's right of redemption.

47.     By 2022, ECO acquired new leadership, when Joe Richardson became its President and Jonathan Sacks became Executive Director of its development division. Upon becoming President of ECO, Mr. Richardson raised money to buy back the organization's building at 2114 Edmondson Avenue. He raised $65,000 for that purpose and offered that sum to Tempest.

48.     Tempest refused his offer, although the offer represented a 1,270% return on Tempest's $5,115 tax-sale bid.

49.     From June 10 to June 14, 2022, Tempest conducted a public auction of the building using the Ashland Auction Group. At that public auction, which was conducted in a fashion that attracted multiple competing bidders, Tempest sold the same building that it acquired from Baltimore City for $5,115 to Crown Quality Concept, LLC for $139,500.

50.     In the meantime, Tempest made no improvements to the building. It simply did what the City had failed to do: It sold the building in a fashion intended to attract a fair price.

51.     Tempest did not immediately pay the balance of its bid to the City and complete all other necessary steps to secure a transfer deed. Instead, Tempest delayed and did not obtain the deed from the City until October 27, 2022. The Director of Finance transferred the deed on behalf of the City to Tempest.

52.     Tempest recorded its deed from the City on February 2, 2023. It recorded its deed transferring the building to Crown Quality Concept Tax Investor the same day. Legal title

to the building passed from ECO to Tempest, and then from Tempest to Crown Quality Concept, on that same day.

53.     ECO never had a mortgage on the building. It owned the building outright, and therefore the loss of its equity was a direct loss of its property.

54.     For its equity in the building, ECO was only entitled to receive from the City $2,571.53 (the difference between the tax lien and Tempest's winning tax-sale bid of $5,115)—approximately 1.8% of its equity in the building, as measured by Tempest's public auction of the building.

55.     By transferring ECO's property to Tempest to pay off a tax bill without compensating ECO for the surplus value, the City and Tempest took ECO's property for public use without just compensation.

**IV.**     ***The City and East Coast Tax Auction took Ms. Anderson's property without just compensation.***

56.     Just as the City and Tempest took ECO's property without providing it just compensation, the City and East Coast Tax Auction took Ms. Anderson's property without just compensation.

57.     Ms. Anderson purchased her home at 2801 Rosyln Ave. in 2009. It occupies a corner lot in a residential neighborhood:



58.    She lived in the property with her daughter, and it served as a gathering place for her other children as well as her grandchildren.

59.    In 2019, Ms. Anderson was diagnosed with cancer. She fell $5,428 behind on her taxes over the next year.

60.    The City sold its tax lien on her property at the 2020 auction. At that time, Ms. Anderson occupied the property, was over 65 years old, and was low income—all bases for the City to decline to sell the lien on her property. It chose to sell it anyway.

61.    All of the City's practices alleged in paragraph 26 to 31 were in place during the 2018 tax sale: The City listed approximately 13,000 properties in small print in a 48-page single spaced list in the 2020 tax sale. The City advertised the liens in 2020 once in *The Sun* and once in *The Daily Record.* The City charged a high-bid premium. And the City did not require a minimum bid beyond the lien amount on Ms. Anderson's home. That enabled East Coast Tax Auction to bid $69,500 for a building on which the City listed the

"Base Value" as $185,500.

62.     At the time it placed its bid, East Coast Tax Auction knew the property was worth significantly more than its bid.

63.     Ms. Anderson was unable to immediately redeem her property, though she attempted to do so.  In July 2020, she made $400 in payments. And beginning in July 2022, Ms. Anderson was able to make more substantial payments. Over the next six months, she paid the City more than $18,900—nearly four times her delinquency. The City accepted these payments, including more than $16,000 before her right of redemption was foreclosed, but applied them solely to taxes that became due *after* the tax sale even though those are not part of the redemption requirement. TP § 14-828(a)(2). As a result, Ms. Anderson was unable to redeem her property, and East Coast Tax Auction was relieved of having to pay those taxes.

64.     East Coast Tax Auction obtained a judgment foreclosing the right of redemption in December 2023. It then completed the steps necessary to obtain a deed, and the City deeded clear title to East Coast Tax Action in March 2024. The Director of Finance transferred the deed on behalf of the City to East Coast Tax Auction.

65.     By transferring Ms. Anderson's home to East Coast Tax Auction to pay off a tax bill without compensating Ms. Anderson for the surplus value, the City and Tempest took ECO's property for public use without just compensation.[1]

---

[1] Ms. Anderson has listed 2801 Roslyn Ave. as her address in the caption of the complaint because she temporarily resides there. She is required to leave the house within the next 30 days.

**V.     *These unconstitutional practices continue to harm ECO and its members.***

66.     The City's practices continue to harm both ECO's members, the people of the Midtown-Edmondson community, and ECO itself in its capacity as a non-profit pursuing its mission of revitalizing the Midtown-Edmondson community.

67.     ECO has a close relationship with, and represents the interests of, its members— residents of the Midtown-Edmondson community. It holds monthly meetings for its members to educate them about issues affecting the community, from transit projects to redevelopment projects to the tax sale system. Dozens of community members attend each meeting and over 100—nearly ten percent of the neighborhood's total population—have participated in ECO's programming.

68.     The City itself recognizes that ECO represents the interests of its members. It has appointed ECO to prepare a "community managed" master plan for the Midtown-Edmondson community. That master plan will eventually be submitted to the City Planning Commission for formal adoption, at which point it will become the official City planning document. As part of this work, ECO is required to hold three public meetings to assure that community members' interests are represented and to meet with stakeholders in the community. ECO has also established an advisory board of community members to guide its work in developing the master plan. The City has awarded ECO $125,000 to pursue this work as the representative of the community.

69.     The City Department of Housing and Community Development has also partnered with ECO to further the Midtown-Edmondson community's new designation as a Community Asset Builder Neighborhood. This work involves ECO reviewing the

neighborhood—parcel by parcel and block by block—with DHCD to generate a development plan and identify potential developers. Success in this endeavor is critical to ECO's ability to fulfill its mission.

70. ECO routinely reviews the City's list of tax liens subject to the annual tax sale, and has done so for years. ECO identifies the properties within the boundaries of the neighborhood that appear on the list.

71. Approximately 80 properties within the neighborhood appear on the tax sale list each year. In 2023, there were 82; in 2022, there were 78, in 2021, there were 83.

72. The City frustrates ECO's organizational mission—the revitalization of an historically disinvested Midtown-Edmondson community—through its unconstitutional tax sale system. ECO has diverted time and resources to combatting the tax-sale system, including notifying community members who are on the tax-sale list, helping them redeem properties, and working with government entities to reform the system. And it has diverted time and resources to adjusting its approach to the master plan and struggling to attract developers.

73. ECO also represents the interests of the members of the Midtown-Edmondson community who are on the tax-sale list each year and are thereby directly harmed by the City's unconstitutional system. The community members who lose their properties would have standing to sue in their own right; a system that provides just compensation for the City's taking of their properties is germane to ECO's interest in revitalizing Midtown-Edmondson; and their participation is not required to prove ECO's claim or achieve ECO's requested prospective relief.

**Count I**

**All plaintiffs against all defendants**

(42 U.S.C. § 1983 Claim for Violation of the Fifth Amendment to the United States Constitution)

74.    All of the foregoing allegations are incorporated in this paragraph.

75.    As described in paragraphs 40-65, the City, Tempest, and East Coast Tax Auction violated the Fifth Amendment to the United States Constitution, by seizing the plaintiffs' properties without paying just compensation.

76.    Tempest and East Coast Tax Auction took the deeds for the plaintiffs' properties, with the City's assistance, but paid only the auction price of the lien at the auction, which does not measure the value of the property.

77.    Further the City drove down the auction price of the liens on the plaintiffs' properties by designing its tax auction to depress bids. It did not provide public notice of the sale twice in a newspaper of general circulation, as it was required by statute to do. It listed tens of thousands of liens to be sold in a single auction that included the liens to the plaintiffs' properties. And the City imposed a high-bid premium when it sold the liens on the plaintiffs' properties.

78.    Neither the City nor Tempest ever paid ECO the difference between the amount of the winning bid and the value of ECO's property.

79.    Neither the City nor East Coast Tax Auction ever paid Ms. Anderson the difference between the amount of the winning bid and the value of her property.

80.    At the time that it bid $5,115 for the lien on ECO's property, and at the time that it

foreclosed on ECO's property and eventually auctioned it to another purchaser, Tempest knew that the property was worth far more than $5,115.

81. At the time that it bid $69,500 for the lien on Ms. Anderson's property, and at the time that it foreclosed on Ms. Anderson's property, East Coast Tax Auction knew that the property was worth far more than its bid.

82. ECO seeks damages for the violation of its rights against the City and Tempest.

83. Ms. Anderson seeks damages for the violation of her rights against the City and East Coast Tax Auction.

84. In addition, ECO seeks injunctive relief against the City and its Director of Finance, Michael Mocksten.

85. As the community organization representing the members of the Midtown-Edmondson community, ECO seeks injunctive relief to protect itself and the members of the community from the unconstitutional tax sale system described above.

86. ECO has been injured, and continues to be injured, as described in paragraphs 66 through 73.

87. In addition, the members of the Midtown-Edmondson community would have standing to seek the injunctive relief that ECO seeks here on their behalf. The prospective relief that ECO seeks is fundamental to its purpose of equitably revitalizing the Midtown-Edmondson community by protecting the generational wealth of community members, avoiding the loss of long-standing property owners in the community, and preventing the creation of additional vacant neighborhood properties through the tax sale process. ECO can prove the claims it asserts here without the participation of individual members of the

community.

## Count II

### All plaintiffs against all defendants

(Claim brought under the Fifth and Fourteenth Amendments to the United States Constitution)

88.     All of the foregoing allegations are incorporated in this paragraph.

89.     As described in paragraphs 40 to 65, the City, Tempest, and East Coast Tax Auction violated the Fifth Amendment to the United States Constitution, by seizing the plaintiffs' properties without paying just compensation.

90.     Tempest and East Coast Tax Auction took the deeds for the plaintiffs' properties, with the City's assistance, but paid only the auction price of the lien at the auction, which does not measure the value of the property.

91.     Further the City drove down the auction price of the liens on the plaintiffs' properties by designing its tax auction to depress bids. It did not provide public notice of the sale twice in a newspaper of general circulation, as it was required by statute to do. It listed tens of thousands of liens to be sold in a single auction that included the liens to the plaintiffs' properties. And the City imposed a high-bid premium when it sold the liens on the plaintiffs' properties.

92.     Neither the City nor Tempest ever paid ECO the difference between the amount of the winning bid and the value of ECO's property.

93.     Neither the City nor East Coast Tax Auction ever paid Ms. Anderson the difference between the amount of the winning bid and the value of her property.

94.    At the time that it bid $5,115 for the lien on ECO's property, and at the time that it foreclosed on ECO's property and eventually auctioned it to another purchaser, Tempest knew that the property was worth far more than $5,115.

95.    At the time that it bid $69,500 for the lien on Ms. Anderson's property, and at the time that it foreclosed on Ms. Anderson's property, East Coast Tax Auction knew that the property was worth far more than its bid.

96.    ECO seeks damages for the violation of its rights against the City and Tempest.

97.    Ms. Anderson seeks damages for the violation of her rights against the City and East Coast Tax Auction.

98.    In addition, ECO seeks injunctive relief against the City and its Director of Finance, Michael Mocksten.

99.    As the community organization representing the members of the Midtown-Edmondson community, ECO seeks injunctive relief to protect itself and the members of the community from the unconstitutional tax sale system described above.

100.    ECO has been injured, and continues to be injured, as described in paragraphs 66 to 73.

101.    In addition, the members of the Midtown-Edmondson community would have standing to seek the injunctive relief that ECO seeks here on their behalf. The prospective relief that ECO seeks is fundamental to its purpose of equitably revitalizing the Midtown-Edmondson community by protecting the generational wealth of community members, avoiding the loss of long-standing property owners in the community, and preventing the creation of additional vacant neighborhood properties through the tax sale process. ECO

can prove the claims it asserts here without the participation of individual members of the community.

**Count III**

**ECO against the City and Michael Mocksten**

(Declaratory Relief Under 28 U.S.C. § 2201)

102.    The foregoing allegations are incorporated in this paragraph.

103.    An actual controversy exists between ECO, both individually and as an organization representing the members of the Midtown-Edmondson community, and The Mayor and City Council of Baltimore and Michael Mocksten, concerning the constitutionality of Baltimore City's tax sale practices.

104.    ECO has been, and continues to be, injured as described in paragraphs 66 to 73.

105.    In addition, the members of the Midtown-Edmondson community would have standing to seek the injunctive relief that ECO seeks here on their behalf. The prospective relief that ECO seeks is fundamental to its purpose of equitably revitalizing the Midtown-Edmondson community by protecting the generational wealth of community members, avoiding the loss of long-standing property owners in the community, and preventing the creation of additional vacant neighborhood properties through the tax sale process. ECO can prove the claims it asserts here without the participation of individual members of the community.

106.    ECO is entitled to a declaration that Baltimore City's tax sale practices violate the "Takings Clause" of the Fifth Amendment to the United States Constitution.

## Count IV

## All plaintiffs against Tempest and East Coast Tax Auction

(Unjust Enrichment)

107.    The foregoing allegations are incorporated in this paragraph.

108.    ECO and Ms. Anderson conferred a benefit on Tempest and East Coast Tax Auction, respectively, when their deeds were transferred to these investors.

109.    Tempest and East Coast Tax Auction understood that the properties they took were (and remain) far more valuable than the amounts paid.

110.    Tempest's and East Coast Tax Auction's retention of the value of the property in excess of the lien price is inequitable because it was accomplished in violation of the Fifth and Fourteenth Amendments and in violation of state law.

## PRAYER FOR RELIEF

ECO and Ms. Anderson respectfully request that this Court:

a.    Award ECO just compensation for the taking of its community center.

b.    Award Ms. Anderson just compensation for the taking of her home.

c.    Enjoin Baltimore City and Michael Mocksten from engaging in the practices identified in this complaint and any others proved at trial that depress winning bids at the Baltimore City tax sale to a level that denies Baltimore residents, including members of the Midtown-Edmondson community just compensation for the property they lose through the sale.

d.    Declare the City's practices identified in this complaint and any others proved at trial as being violations of Baltimore City's constitutional

obligation to provide just compensation to the Baltimore City property owners who lose their properties through the tax sale.

e.  Award ECO and Ms. Anderson attorneys' fees and the costs of this suit in accordance with 42 U.S.C. § 1988; and

f.  Award such other relief as the Court determines just.

## JURY DEMAND

ECO demands a trial by jury, under Federal Rule of Civil Procedure 38(b), of all issues triable of right by a jury.

/s/ LEE H. OGBURN
(SIGNED BY ROBERT D. FRIEDMAN
WITH PERMISSION OF LEE H. OGBURN)
LEE H. OGBURN (MD Bar No. 000118)
Maryland Legal Aid
500 E. Lexington Street
Baltimore, Maryland 21202
t: (410) 951-7777
f: (410) 951-7768
*logburn@mdlab.com*

/s/ROBERT D. FRIEDMAN
DEEPAK GUPTA*
ERIC F. CITRON**
ROBERT D. FRIEDMAN*
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
t: (202) 888-1741
f: (202) 888-7792
*deepak@guptawessler.com*

JENNIFER D. BENNETT*
GUPTA WESSLER LLP
505 Montgomery Street

Suite 625
San Francisco, CA 94111
t: (415) 573-0336
f: (202) 888-7792

*Admitted pro hac vice
**Application for admission pending