# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

EDMONDSON COMMUNITY
ORGANIZATION, Inc.
and
BONITA ANDERSON,

        *Plaintiffs*,

    v.

MAYOR AND CITY COUNCIL OF
BALTIMORE, et al.,

        *Defendants*.

**Civil Action No. 1:24-cv-01921-BAH**

# PLAINTIFFS' OPPOSITION TO
# DEFENDANTS' MOTIONS TO DISMISS

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................... i

TABLE OF AUTHORITIES .......................................................................................... iii

INTRODUCTION ............................................................................................................ 1

STATEMENT .................................................................................................................... 3

    I.      The tax-lien system in Baltimore ........................................................................ 3

          A.      The City chooses to sell its liens on property, thousands at a time. .......... 3

          B.      If the original property owner cannot pay off the taxes and penalties to clear the investor-held lien, the investor—with the City's assistance—can take the property. ........................................................... 5

    II.     The taking of ECO's and Ms. Anderson's properties ........................................... 7

ARGUMENT ..................................................................................................................... 9

    I.      ECO and Ms. Anderson have adequately alleged a violation of the Takings Clause. ................................................................................................... 9

    II.     The plaintiffs have a claim directly under the Fourteenth Amendment ............. 20

    III.    Tempest and East Coast are state actors ............................................................ 21

    IV.    The plaintiffs have stated a claim for unjust enrichment against Tempest and East Coast ........................................................................................................... 24

    V.     Neither the Tax Injunction Act nor principles of comity bar the plaintiffs' claims because the claims concern the surplus value of their properties, not taxes ........ 28

          A.      The Tax Injunction Act does not deprive this Court of jurisdiction because this case concerns the taking of property *beyond* that required to pay the taxes owed ................................................................. 28

          B.      The comity doctrine does not warrant dismissal for the same reason: This Case is not about taxes, but about surplus value ..................................... 33

    VI.    *Rooker-Feldman* does not bar the plaintiffs' claims because they do not ask this Court to conduct appellate review of their foreclosure orders ............................ 37

    VII.   TP § 14-845 does not bar the plaintiffs' claims .................................................. 42

    VIII.  The plaintiffs' claims are not barred by res judicata ........................................... 43

IX.     ECO's claims are timely ........................................................................... 47

X.      ECO has standing to seek declaratory and injunctive relief ............................. 49

        A.      ECO has organizational standing. ........................................................ 49

        B.      ECO also has associational standing to seek declaratory and
                injunctive relief on its members' behalf ..................................................... 51

XI.     The plaintiffs do not necessarily object to the dismissal of the
        Director of Finance ................................................................................. 54

XII.    The Court should grant leave to amend if it does not deny the defendants'
        motions ................................................................................................. 54

CONCLUSION ................................................................................................. 54

# TABLE OF AUTHORITIES

## Cases

*ACAS, LLC v. Charter Oak Fire Insurance Co.*,
  626 F. Supp. 3d 866 (D. Md. 2022) ....................................................................... 44

*Adkins v. Rumsfeld*,
  464 F.3d 456 (4th Cir. 2006) ................................................................... 39, 40, 41

*Anderton v. Bannock County*,
  2015 WL 428069 (D. Idaho Feb. 2, 2015) .............................................................. 28

*Association for Educational Fairness v. Montgomery County Board of Education*,
  560 F. Supp. 3d 929 (D. Md. 2021) ....................................................................... 54

*Association of American Physicians & Surgeons, Inc. v. Sebelius*,
  901 F. Supp. 2d 19 (D.D.C. 2012) ......................................................................... 52

*Barnett v. Inova Health Care Services*,
  2025 WL 37237 (4th Cir. Jan. 7, 2025) ................................................................. 13

*Boston Chamber of Commerce v. Boston*,
  217 U.S. 189 (1910) ................................................................................................ 14

*Brentwood Academy v. Tennessee Secondary School Athletic Association*,
  531 U.S. 288 (2001) ................................................................................................ 23

*Brusznicki v. Prince George's County*,
  42 F.4th 413 (4th Cir. 2022) ................................................................................. 24

*Chaires v. Chevy Chase Bank, FSB*,
  131 Md. App. 64 (2000) .......................................................................................... 45

*Chamber of Commerce of the United States v. Lierman*,
  90 F.4th 679 (4th Cir. 2024) ................................................................................. 29

*CIC Services, LLC v. Internal Revenue Service*,
  593 U.S. 209 (2021) ................................................................................................ 29

*Coleman v. District of Columbia*,
  70 F. Supp. 3d 58 (D.D.C. 2014) ...................................................................passim

*Continental Resources v. Fair*,
  317 Neb. 391 (2024) ...........................................................................................passim

*D'Ambrosio v. Wolf*,
  295 Va. 48 (2018) .................................................................................................... 43

*Davani v. Virginia Department of Transportation,*
    434 F.3d 712 (4th Cir. 2006)..................................................................................... 38, 42

*Devillier v. Texas,*
    601 U.S. 285 (2024) ..................................................................................................... 21

*Direct Marketing Association v. Brohl,*
    575 U.S. 1 (2015) ......................................................................................................... 29

*DIRECTV, Inc. v. Tolson,*
    513 F.3d 119 (4th Cir. 2008)......................................................................... 33, 34, 36

*District of Columbia Court of Appeals v. Feldman,*
    460 U.S. 462 (1983) ..................................................................................................... 38

*Dorce v. City of New York,*
    608 F. Supp. 3d 118 (S.D.N.Y. 2022)...............................................................passim

*Epcon Homestead, LLC v. Town of Chapel Hill,*
    62 F.4th 882, 888 (4th Cir. 2023) ................................................................. 47, 48, 49

*Exxon Mobil Corp. v. Saudi Basic Industries Corp.,*
    544 U.S. 280 (2005) ............................................................................................. 37, 38

*Fair Assessment in Real Estate Association v. McNary,*
    454 U.S. 100 (1981) ............................................................................................. 34, 36

*First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, California,*
    482 U.S. 304 (1987) ..................................................................................................... 21

*Fish Market Nominee Corp. v. G.A.A., Inc.,*
    337 Md. 1 (1994).......................................................................................................... 5

*Freed v. Thomas,*
    976 F.3d 729 (6th Cir. 2020).............................................................................passim

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.,*
    204 F.3d 149 (4th Cir. 2000)..................................................................................... 51

*Great Western Mining & Mineral Co. v. Fox Rothschild LLP,*
    615 F.3d 159 (3d Cir. 2010)....................................................................................... 41

*Gwozdz v. HealthPort Technologies, LLC,*
    846 F.3d 738 (4th Cir. 2017)..................................................................................... 29

*Hall v. St. Mary's Seminary & University,*
    608 F. Supp. 2d 679 (D. Md. 2009) .......................................................................... 43

*Harbor Bank of Maryland v. Hanlon Park Condominium Association,*
  153 Md. App. 54 (2003) ................................................................................................................ 3

*Harrison v. Montgomery County, Ohio,*
  997 F.3d 643 (6th Cir. 2021) ............................................................................................... passim

*Havens Realty Corp. v. Coleman,*
  455 U.S. 363 (1982) ............................................................................................................ 49, 50

*Heartwood 88, Inc. v. Montgomery County,*
  156 Md. App. 333 (2004) ...................................................................................................... 4, 13

*Hibbs v. Winn,*
  542 U.S. 88 (2004) .............................................................................................................. 28, 32

*Hill v. Cross Country Settlements, LLC,*
  402 Md. 281 (2007) ...................................................................................................... 24, 25, 26

*Hughes v. Insley,*
  155 Md. App. 608 (2003) ..................................................................................................... 43, 46

*Hulsey v. Cisa,*
  947 F.3d 246 (4th Cir. 2020) ............................................................................................... 37, 39

*Hunt v. Washington State Apple Advertisement Commission,*
  432 U.S. 333 (1977) ............................................................................................................ 51, 54

*Hutcherson v. Board of Supervisors of Franklin County, Virginia,*
  742 F.2d 142 (4th Cir. 1984) ..................................................................................................... 30

*Johnson v. Scott County School Board,*
  2012 WL 4458150 (W.D. Va. July 31, 2012) ............................................................................ 16

*Jonathan R. by Dixon v. Just.,*
  41 F.4th 316 (4th Cir. 2022) ..................................................................................................... 38

*Kelo v. New London, Connecticut,*
  545 U.S. 469 (2005) ................................................................................................................... 15

*Knick v. Township of Scott, Pennsylvania,*
  588 U.S. 180 (2019) ............................................................................................................ 21, 47

*La Union del Pueblo Entero v. Ross,*
  353 F. Supp. 3d 381 (D. Md. 2018) ........................................................................................... 52

*Lance v. Dennis,*
  546 U.S. 459 (2006) ............................................................................................................ 37, 38

v

*Legacy Funding LLC v. Cohn,*
    396 Md. 511 (2007) ................................................................................................ 6, 19

*Levin v. Commerical Energy, Inc.,*
    560 U.S. 413 (2010) ................................................................................................ 36

*Lugar v. Edmondson Oil Company, Inc.,*
    457 U.S. 922 (1982) ................................................................................................ 23

*Malley v. Briggs,*
    475 U.S. 335 (1986) ................................................................................................ 15

*Mann v. Haigh,*
    120 F.3d 34 (4th Cir. 1997) ................................................................................... 20

*Martz v. Day Development Company,*
    35 F.4th 220 (4th Cir. 2022) .................................................................................. 25

*Martz v. Day Development Company,*
    416 F. Supp. 3d 517 (D. Md. 2019) ...................................................................... 25

*Mass Transit Administration v. Granite Construction Co.,*
    57 Md. App. 766 (1984) ......................................................................................... 25

*Mayor & City Council of Baltimore v. Thornton Mellon, LLC,*
    478 Md. 396 (2022) ........................................................................................passim

*Mayor & City Council of Baltimore v. Vonage America Inc.,*
    544 F. Supp. 2d 458 (D. Md. 2008) ...................................................................... 36

*Midaro Investments 2020, LLC v. Johnson,*
    2024 WL 194134 (Md. App. Ct. Jan. 18, 2024) ................................................... 48

*Mildenberger v. United States,*
    643 F.3d 938 (Fed. Cir. 2011) ............................................................................... 47

*Moore v. Nissan Motor Acceptance Corp.,*
    376 Md. 558 (2003) ................................................................................................ 46

*Northwest Louisiana Fish & Game Preserve Commission v. United States,*
    446 F.3d 1285 (Fed. Cir. 2006) ............................................................................. 47

*Penegar v. Liberty Mutual Insurance Co.,*
    115 F.4th 294 (4th Cir. 2024) ................................................................................ 26

*Plemons v. Gale,*
    396 F.3d 569 (4th Cir. 2005) .................................................................................. 22

*Plitt v. Greenberg,*
    242 Md. 359 (1966) ................................................................................................ 26

*Republican National Committee v. North Carolina State Board of Elections,*
    120 F.4th 390 (4th Cir. 2024) .......................................................................... 49, 50

*Ritter v. Ross,*
    992 F.2d 750 (7th Cir. 1993) ................................................................................. 42

*Rowland v. Harrison,*
    320 Md. 223 (1990) .......................................................................................... 45, 46

*Sallie v. Tax Sale Investments, Inc.,*
    998 F. Supp. 612 (D. Md. 1998) ...................................................................... 24, 32

*Sharritt v. Henry,*
    2024 WL 4524501 (N.D. Ill. Oct. 18, 2024) ................................................... passim

*Shooting Point, L.L.C. v. Cumming,*
    368 F.3d 379 (4th Cir. 2004) ................................................................................. 42

*Sioux Nation of Indians v. United States,*
    448 U.S. 371 (1980) ............................................................................................... 10

*Sioux Nation of Indians v. United States,*
    601 F.2d 1157 (Ct. Cl. 1979) .......................................................................... 10, 14

*Skinner v. Switzer,*
    562 U.S. 521 (2011) ............................................................................................... 38

*Students for Fair Admissions v. United States Naval Academy,*
    707 F. Supp. 3d 486 (D. Md. 2023) ...................................................................... 52

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College,*
    600 U.S. 181 (2023) ............................................................................................... 49

*Summers v. Earth Island Institute,*
    555 U.S. 488 (2009) ............................................................................................... 52

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ............................................................................................... 51

*Tarrify Properties, LLC v. Cuyahoga County,*
    2020 WL 4043105 (N.D. Ohio July 17, 2020) ......................................... 15, 16, 18

*Thana v. Board of License Commissioners for Charles County, Md.,*
    827 F.3d 314 (4th Cir. 2016) ................................................................................. 38

*Timbs v. Indiana,*
  586 U.S. 146 (2019) ............................................................................................ 20

*Tulsa Professional Collection Services, Inc. v. Pope,*
  485 U.S. 478 (1988) ............................................................................................ 22

*Tyler v. Hennepin County, Minnesota,*
  598 U.S. 631 (2023) ......................................................................................passim

*United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.,*
  517 U.S. 544 (1996) ............................................................................................ 54

*United States v. Klamath & Moadoc Tribes,*
  304 U.S. 119 (1938) ............................................................................................ 10

*United States v. Miller,*
  317 U.S. 369 (1943) ......................................................................................... 9, 14

*United States v. Ruelas-Lugo,*
  2018 WL 6730924 (D. Neb. Nov. 5, 2018) ......................................................... 10

*Weckel v. Cole + Russell Architects, Inc.,*
  2024-Ohio-5111 (Ohio Ct. App. 2024) ............................................................... 44

*Wells Fargo Bank, N.A. v. UP Ventures II, LLC,*
  223 W. Va. 407 (2009) ........................................................................................ 22

*Wells v. Malloy,*
  510 F.2d 74 (2d Cir. 1975) .................................................................................. 32

*Wittstock v. Mark A. Van Sile, Inc.,*
  330 F.3d 899 (6th Cir. 2003) ......................................................................... 22, 23

*Won Bok Lee v. Won Sun Lee,*
  466 Md. 601 (2020) .............................................................................................. 3

*Wright v. Pappas,*
  256 F.3d 635 (7th Cir. 2001) ........................................................................ 32, 36

## Constitutions

U.S. Const., amend. V ............................................................................................ 9

## Statutes

28 U.S.C. § 1257 .................................................................................................. 37

28 U.S.C. § 1341 ............................................................................................ 28, 36

Md. Code, Real Prop. § 3-101 ................................................................. 6

Md. Code, Tax-Gen. § 3-103 ................................................................. 36

Md. Code, Tax-Prop. § 14-804 ............................................................... 3

Md. Code, Tax-Prop. § 14-808 ............................................................... 3

Md. Code, Tax-Prop. § 14-811 ............................................................... 3

Md. Code, Tax-Prop. § 14-817 ............................................................... 4

Md. Code, Tax-Prop. § 14-818 ........................................................ 4, 6, 10

Md. Code, Tax-Prop. § 14-820 ............................................................... 5

Md. Code, Tax-Prop. § 14-827 ............................................................... 5

Md. Code, Tax-Prop. § 14-828 ............................................................... 5

Md. Code, Tax-Prop. § 14-833 ........................................................... 5, 22

Md. Code, Tax-Prop. § 14-835 ........................................................... 5, 43

Md. Code, Tax-Prop. § 14-840 ............................................................... 5

Md. Code, Tax-Prop. § 14-842 ............................................................. 46

Md. Code, Tax-Prop. § 14-845 ............................................................. 42

Md. Code, Tax-Prop. § 14-847 ............................................................... 6

Md. Code, Tax-Prop. § 14-865 ............................................................... 3

Md. Code, Tax-Prop. § 14-867 ............................................................... 3

**Other Authorities**

Restatement (Second) of Judgments § 24 ................................................ 46

**Rules**

District of Maryland Local Rule 105.1 ................................................... 26

Maryland Rule 14-505 ...................................................................... 46

## INTRODUCTION

Just two years ago, the Supreme Court made clear that, if the government takes property to satisfy a tax debt, it must return to the taxpayer the value of the property above the taxes owed. *Tyler v. Hennepin Cnty.*, 598 U.S. 631 (2023). The Takings Clause mandates that when the government takes property, it must provide "just compensation." *Id.* at 639. That mandate is no different if a property owner owes taxes. The Takings Clause, the Supreme Court held, prohibits "us[ing] the toehold of the tax debt to confiscate more property than [i]s due." *Id.*

This case is about a massive transfer of wealth from Baltimore residents to institutional tax-lien investors that violates this constitutional mandate. Whenever a person falls behind on property taxes, the City takes a lien on that property. Although it has other options at its disposal, the City has consistently chosen to auction its liens to investors: In return for paying the past-due taxes immediately, the winning bidder gets the lien. The property owner has a limited opportunity to "redeem" by paying the past-due taxes and interest, which the investor pockets, at the City-set rate of 12 or 18%. But if the property owner is unable to pay that off, the investor can take the property outright by paying the balance of its winning bid—a process the City finalizes by issuing a deed to the investor that "extinguishes" the original owner's property rights. In the end, the City gets its taxes, the investor gets the property, and the original owner is left with the difference between the past-due taxes and the winning bid.

But that bid to buy the *lien* is no substitute for the value of the *property* lost—and so the original owner is denied the surplus value of the property that, as *Tyler* recognized, the Constitution guarantees. What happened to plaintiffs Edmondson Community Organization and Bonita Anderson illustrates just how drastic that difference is. When ECO—a nonprofit dedicated to revitalizing the Midtown Edmondson neighborhood of West Baltimore—fell just $2,543 behind in taxes, the City sold its *lien* on the property to California-based tax-investor Tempest for $5,115.

After Tempest took the property with a deed from the City, it auctioned the unimproved *property* for $139,500—2,600% of its bid for the lien. Ms. Anderson's experience wasn't far off. After being diagnosed with cancer, she missed $5,428 in taxes. The City told investors her property was worth $185,000, but East Coast Tax Auction purchased the lien for just $69,500—and like Tempest, it eventually (with the City's help) took the property, leaving Ms. Anderson with just a fraction of the value of her home.

Taking property without just compensation is unconstitutional, regardless of whether the City keeps the property for itself or, as here, bestows it on third parties. ECO and Ms. Anderson bring this action to recover the excess value of their property that the City, Tempest, and East Coast took from them. ECO also seeks injunctive and declaratory relief requiring the City to pay just compensation in the future to prevent the continued degradation of the Midtown Edmondson community and, with it, ECO's efforts to revitalize and develop the community.

In asking the Court to dismiss the case, the City, Tempest, and East Coast do not dispute that the plaintiffs are owed the surplus value of their property. Instead, the defendants contend that the plaintiffs received that surplus because they got the difference between what Tempest and East Coast paid for the *lien* on their property and their taxes. But the value of the *lien* is far less than the value of the *property*. ECO's experience proves as much: Tempest paid $5,115 for the lien, but auctioned the property for nearly $140,000—and kept the difference.

Unable to seriously dispute that the government cannot work with private investors to confiscate property and keep the surplus, the defendants try to manufacture reasons for this Court not to hear the case at all. But none have merit. The plaintiffs have plausibly alleged Baltimore

joined forces with Tempest and East Coast to take ECO and Ms. Anderson's property. The defendants therefore owe just compensation. This Court should deny the motion to dismiss.[1]

**STATEMENT**

**I.    The tax-lien system in Baltimore**

**A.    The City chooses to sell its liens on property, thousands at a time.**

When a Baltimore property owner doesn't pay property taxes, Baltimore takes a lien on the property. Md. Code, Tax-Prop. ("TP") § 14-804(a).[2] Because Baltimore wants the taxes, not the lien, it often chooses to sell the lien to third parties—trading its contingent right to take the property for immediate cash. First Am. FAC, ECF No. 22 ("FAC") at 2. It's up to the City to decide both whether to sell a lien at all and, if it chooses to, when to sell it (so long as at least $750 is owed). *See* TP § 14-808(a)(1) (providing the City with discretion to set the time for a sale "by local law"); TP § 14-811(h)(2) (allowing the City to choose not to ever sell property owned by a person who is "low-income," at least 65 years old, or disabled). Selling its lien is not the City's only option to recover back taxes; it has other, less drastic remedies at its disposal, including an ordinary enforcement action to recover the debt and garnishment. *See* TP § 14-865; TP § 14-867 (allowing use of attachment of any asset); *Harbor Bank of Md. v. Hanlon Park Condo. Ass'n*, 153 Md. App. 54, 58 (2003) ("[G]arnishment is a form of attachment.").

Notwithstanding those other options, until 2022, the City chose to sell every lien, sell them fast, and sell them together—tens of thousands at a time. FAC ¶¶ 28–29. Every May, it conducted

---

[1] Unless otherwise specified, all internal citations, quotation marks, and alterations are omitted from quotations throughout this brief.

[2] "[A] lien is a mechanism that allows a debt, such as a money judgment, to be satisfied out of a particular property." *Won Bok Lee v. Won Sun Lee*, 466 Md. 601, 641 (2020).

an auction of all liens that arose just months earlier. FAC ¶ 28. In other words, if a person fell behind on taxes even once, the City offered the resulting lien on that person's property for sale immediately, whether the property was commercial or a family home. FAC ¶ 28. And it sold the liens through a single mass auction, listing thousands of liens—as many as 20,000 at a time—in each sale. FAC ¶ 31(d). Despite the large volume of liens put up for auction at a single time, the City published only two advertisements, including one in a publication (the Daily Record) not read by the general public. FAC ¶ 31(b).[3]

At the auction, each lien goes to the highest bidder. TP § 14-817(a)(2). But the buyers—largely, institutional tax-lien "investors" that can navigate the mass auction process, FAC at 3—do not have to pay the full winning bid at that time. TP § 14-818(a)(1). Instead, the investor pays the amount of past-due taxes—thus allowing the City to immediately recoup the taxes—and a "high-bid premium" that the City has chosen to impose on any bid that exceeds 40% of the property's "full cash value."[4] TP § 14-817(b); FAC at 3. The premium drives down bids by adding to the investors' costs while simultaneously providing the City with capital that it does not have to return to the investor, if ever, until possibly years later and, even then, without interest. FAC ¶ 31(a); TP § 14-817(b)(2). The City can then "employ[]" that capital "in its operations or reinvest[]" it. *Heartwood 88, Inc. v. Montgomery Cnty.*, 156 Md. App. 333, 351 n.6 (2004).

---

[3] Although the City temporarily stopped selling its liens on owner-occupied homes from 2022 to 2024, it still put up the remainder of its liens with the same speed and in a single auction. FAC ¶¶ 28, 31

[4] An example helps illustrate how the premium works. If a lien is associated with a property listed as having a full cash value of $200,000, and the winning bid is $190,000, then the bid exceeds 40% of the property's listed value ($80,000) by $110,000, and the premium would be 20% of that $110,000 ($22,000). The investor must therefore pay an additional $22,000 "premium" upfront.

**B.    If the original property owner cannot pay off the taxes and penalties to clear the investor-held lien, the investor—with the City's assistance—can take the property.**

The sale of the lien is not, however, a sale of the property. The original property owner—the tax debtor—remains the "record title holder." *See Mayor & City Council of Baltimore v. Thornton Mellon, LLC*, 478 Md. 396, 420 (2022).

To stay that way, however, the property owner must "redeem" the property. TP § 14-827. That requires paying not just past due taxes, but also penalties and costs claimed by the City and attorneys' fees and costs claimed by the investor. TP § 14-828. It also requires paying interest on the past due taxes beginning on the date of the sale, called the "rate of redemption." TP §§ 14-820(b), 14-828(b). The default rate is six percent, TP § 14-820(b), but Baltimore has chosen to raise that to 12 percent for owner-occupied homes and 18 percent for all other properties, FAC ¶ 30. The reason for imposing this barrier to redemption is simple: The interest goes to the investor (not the City), and the "high rate of return encourages potential tax sale purchasers to invest." *Fish Mkt. Nominee Corp. v. G.A.A., Inc.*, 337 Md. 1, 5 (1994). If the property owner manages to make all the necessary payments and "redeem" the property, they receive a "certificate of redemption," which functions as a "release of a mortgage." TP § 14-828(c). That is, it clears the lien on the property.

If the owner does not redeem within the period allowed by law (six to nine months), the investor may bring an action to "foreclose all rights of redemption." TP § 14-833(a). The investor is responsible for providing notice (with help from the City in identifying interested parties and the contents of the notice) of the intent to foreclose that advises the owner of their rights, including how to redeem the property to prevent foreclosure. TP §§ 14-833 (a-1), 14-840. To prevail in the foreclosure action, the investor need only show that they are the winning bidder holding a tax-sale certificate, that the proper notice was provided, and that the original owner did not redeem. TP § 14-835. But just like purchasing a tax lien does not make the investor the property owner, neither

5

does obtaining a judgment foreclosing on the right of redemption. *See Thornton Mellon, LLC*, 478 Md. at 432. Under Maryland law, title and ownership passes with a deed, not by "operation of law" (here, the judgment of foreclosure). *Id.*

So, to take ownership, the investor must acquire a deed. *Id.* That requires paying the remainder of the bid (that is, the amount that exceeded the tax debt, which the investor already paid at the time of the tax sale) to the City's tax collector, defendant Michael Mocksten. TP § 14-818(a)(2). Once that happens, the collector issues a deed. *Thornton Mellon*, 478 Md. at 449; TP § 14-818(a)(2).

But even once a property-owner's right to redeem is foreclosed, it is "not uncommon" for investors to decline to take the steps necessary to get a deed to the property. *Thornton Mellon, LLC*, 478 Md. at 425. And if the investor fails to obtain the deed within 90 days, then the original property owner can move to strike the judgment foreclosing the right to redeem upon a showing of "good cause." TP § 14-847(d); *Thornton Mellon*, 478 Md. at 425–26.

If the investor does choose to pay the money necessary to obtain a deed, three things happen. First, the City issues a new deed to the investor and thus "extinguishes all prior titles," ending the ownership of the original property owner (i.e., the tax debtor). *Id.* at 437; *see also Legacy Funding LLC v. Cohn*, 396 Md. 511, 516 n.3 (2007) (explaining that, even after a foreclosure order, the debtor remains the "legal owner"). Second, with the new deed in hand, the investor takes title and full ownership of the property. *Thornton Mellon*, 478 Md. at 432; *see also* Md. Code, Real Prop. § 3-101 ("[N]o estate of inheritance or freehold . . . may pass or take effect unless the deed granting it is executed and recorded."). And third, the original property owner has the right to obtain the difference between their tax debt and the winning bid at the tax-lien sale. TP § 14-818(a)(4). Because the auction price of the lien is "far *lower* than the value of the property itself," the net

result for the tax debtor is that they end up losing far *more* than what they owed in taxes. FAC at 2 (emphasis added). So in the end, the investor gets a windfall, the City gets its taxes, and the original property owner gets the short end of the stick.

## II.    The taking of ECO's and Ms. Anderson's properties

ECO and Ms. Anderson had their properties taken through this process. ECO is a non-profit dedicated to "pursuing rapid, equitable, transformational revitalization of the disinvested areas in" Baltimore's Midtown-Edmondson community. FAC ¶ 1. That mission, focused as it is on the "equitable" development of the neighborhood, includes assisting long-time members of the community who are at risk of having the City and investors take their properties to satisfy tax debts and creating a redevelopment plan that would attract developers whose interests align with ECO's goals. FAC ¶¶ 1, 68–69. A group of 11 Midtown-Edmondson community homeowners, small-business owners, and faith leaders oversee ECO's work. FAC ¶ 1.

For over two decades, ECO operated out of a building in the community that it served. FAC ¶ 37. But in 2018, ECO fell $2,543.47 behind on the property taxes for the building. FAC ¶¶ 39–40. The City, following its standard practice, elected to place its resulting lien on ECO's community center on a list of 20,000 liens that the City would be selling at a mass auction that May. FAC ¶¶ 40–42.

Although the City listed the building as having a value of $101,200, California-based tax-lien investor Tempest won the tax-lien auction with a bid of just $5,115. FAC ¶ 42. Tempest filed suit to foreclose on ECO's right of redemption in February 2019, and two years later, in 2021, it secured an order of foreclosure. FAC ¶¶ 46. But Tempest did not obtain a deed from the City, and thereby "extinguish" ECO's title, at that point. Instead, it first conducted an auction of ECO's building in June 2022—with the winner in this auction paying $139,500 despite no improvements being made to the building. FAC ¶ 49. Then with that profit secured, on October 27, 2022,

Tempest paid the remainder of its winning bid to the tax collector, who issued a deed. FAC ¶ 51. By that point, ECO had raised enough money to pay its old tax debt and more, even offering more than $60,000 to Tempest to do so, but its right of redemption had been foreclosed, and Tempest refused. FAC ¶¶ 47–48. Under the City's tax-lien system, ECO had a right to recover only $2,571.53 of the surplus value taken from it. FAC ¶¶ 25, 54.[5]

While ECO lost more than $130,000 in equity, Tempest got a windfall: It purchased the *lien* on ECO's building for $5,115, sold the *building* itself for $139,500, and pocketed the difference (a more than 2,600% profit). That profit was high, but not out of the ordinary for Tempest. The company is no stranger to the Baltimore tax-lien system. FAC ¶ 44. It bought 85 liens in 2018 alone. FAC ¶ 44. And although the vast majority of the liens Tempest purchased in the 2018 lien sale were redeemed (at interest rates between 12% and 18%), Tempest took title to five properties (including ECO's) that it then flipped. FAC ¶ 44. It paid just $55,045 for the liens on those properties and sold the properties for $642,970. FAC ¶ 44.

Ms. Anderson experienced a similar ordeal. She had owned her West Baltimore home for ten years, where it served as a gathering place for her daughter and grandchildren, until she fell $5,428 behind on her taxes in 2019 after being diagnosed with cancer. FAC ¶¶ 57–59. Although Ms. Anderson was over 65 and low-income, the City still put its resulting lien on her home on the list of 13,000 tax liens to be sold at the next auction, in 2020. FAC ¶ 61.

The winning bid for the lien on Ms. Anderson's property—which the City listed as having a value of $185,500—came in at $69,500 from East Coast Tax Auction. FAC ¶ 61. East Coast eventually obtained an order foreclosing Ms. Anderson's right of redemption in December 2023.

---

[5] For reasons unrelated to this litigation, ECO did not actually recover that $2,571.53. But for the remainder of the brief, we assume that ECO was entitled to, and got, that money.

It then waited an additional four months, until March 2024, to obtain the deed to her home. FAC ¶ 64. Under the City's tax-lien system, Ms. Anderson is entitled to only $59,572 of the surplus value taken from her. FAC ¶ 25.

## ARGUMENT

## I.  ECO and Ms. Anderson have adequately alleged a violation of the Takings Clause.

**1.** "The principle that a government may not take from a taxpayer more than she owes" predates the founding. *Tyler*, 598 U.S. at 639. That basic right is enshrined in the Fifth Amendment's command, made applicable to the states through the Fourteenth Amendment, that "private property [shall not] be taken for public use, without just compensation." U.S. Const., amend. V. As the Supreme Court explained just two years ago, that language prohibits the government from "us[ing] the toehold of the tax debt to confiscate more property than [is] due." *Tyler*, 598 U.S. at 639. So, while the government has the power (assuming state or federal law provides it) to take property to satisfy a tax debt, the property owner has the corresponding right to receive back the value of the property "in excess of the debt owed." *Id.* at 642. When that surplus value is not returned, there is a "classic taking" in violation of the Fifth and Fourteenth Amendments' requirement that "just compensation" be provided. *Id.* at 639.

And "just compensation," the Supreme Court has explained, requires "full" compensation. *United States v. Miller*, 317 U.S. 369, 373 (1943). That constitutional mandate is obviously violated when the government takes the entire property without returning *any* surplus, as was the case in *Tyler*. But it is just as much violated when only a portion of the surplus value— that is, only a portion of what is "just"—is returned. *See id.* at 373 (holding that just compensation "means the full and perfect equivalent in money of the property taken," such that the property owner is in "as good position" as if the "property had not been taken"). The damages may be

9

smaller, but the violation is just as clear: "[P]artial compensation" is not "just compensation." *United States v. Ruelas-Lugo*, 2018 WL 6730924, at \*3 (D. Neb. Nov. 5, 2018) (providing $569 for the taking of $1,120 in property is not just compensation); *Sharritt v. Henry*, 2024 WL 4524501, at \*13 (N.D. Ill. Oct. 18, 2024) (statutory tax-sales scheme that provides property owners with at most $99,000 of surplus value violates the Takings Clause); *see also United States v. Klamath & Moadoc Tribes*, 304 U.S. 119, 124 (1938) (where amount Congress appropriated to pay for land taken was held inadequate, the United States had to pay the remainder of the just compensation); *Sioux Nation of Indians v. United States*, 601 F.2d 1157, 1170 & 1178 n.7 (Ct. Cl. 1979) (Takings Clause is violated when "no compensation was originally paid and where the initial compensation was grossly inadequate"), *aff'd*, 448 U.S. 371 (1980).

**2.** ECO and Ms. Anderson have each alleged a straightforward violation of their right to just compensation. Each owned property. FAC ¶¶ 1, 3. Each fell a few thousand dollars behind on taxes. FAC ¶¶ 54, 59. Each had their property—which even the City assessed as worth far more than their tax debts ($101,200 for ECO and $185,500 for Ms. Anderson)—taken as part of the process Baltimore uses to satisfy tax debts. FAC ¶¶ 45, 51, 61, 64. In ECO's case, Tempest took the property with the City's assistance; in Ms. Anderson's, East Coast took it with the City's assistance. FAC ¶¶ 51, 64. Because they were divested of their entire property to satisfy a minimal tax debt, *Tyler* makes clear that the Takings Clause entitles them to the difference between the value of their property and that tax debt. *See* 598 U.S. at 642.

Yet, neither received that full surplus value. Instead, each received only the difference between the tax debt and the amount that Tempest and East Coast bid on the City's *tax liens.* TP § 14-818(a)(4); *supra* at 6, 8–9. And the value of the tax liens is not equivalent to the value of the property—it's "far lower." FAC at 2; *supra* at 6–7. Just look at what happened with ECO's

community center: Tempest bought the tax lien for $5,115, but it sold the *property*—through an *auction*—for $139,500, without making any improvements in the interim. FAC at 2, ¶ 42. Because neither the City nor Tempest or East Coast made up the difference, ECO and Ms. Anderson ended up losing far more than they owed in taxes. That's an unconstitutional taking. *Supra* at 9–10.

**3.** The defendants' primary argument to the contrary is that, in the context of a tax sale, a property's value is the price it fetches at a public auction—even if that price is not the property's "fair market value." Tempest Br. 8; East Coast Br. 11–12; City Br. 20–21. And so, the defendants claim, the Takings Clause only entitles a property owner to the difference between the property's auction price and their tax debt. That, they argue, is precisely what ECO and Ms. Anderson got.

This argument fails on its own terms. The City provided ECO and Ms. Anderson the difference between what the *lien* on their property sold for at the City's auction and their tax debt—not the difference between the auction price of their *property* and their taxes. Again, ECO's community center demonstrates this clearly. Tempest purchased the *lien* on ECO's community center for $5,115. Tempest then sold the community center itself at public auction for $139,500. On the defendants' own theory, then, ECO's property should have been valued at $139,500.

Contrary to the defendants' contention, the plaintiffs' claims thus do not depend on the contention that a property's value can never be determined by a public auction of that *property*. They don't need to: The City did not conduct such an auction. The defendants do not cite a single case supporting the proposition that when determining what compensation is just, the value of the property can be determined not by auctioning the property itself but by auctioning a lien on that property. Indeed, the companies' primary authority states that "[t]he best evidence of a foreclosed property's value is the *property's* sales price." *Freed v. Thomas*, 81 F.4th 655, 658–59 (6th Cir. 2023)

(emphasis added). And that's the *only* Takings Clause case the defendants cite on this point.[6] Their other cases are bankruptcy cases, which, of course, didn't attempt to determine just compensation for purposes of the Takings Clause. And, even in the bankruptcy context, the investors don't cite a case that holds that a property's value can be determined by auctioning a *lien* on the property.

East Coast (at 11) and Tempest (at 8–9) seek refuge in the Supreme Court's decision in *Tyler*. But that decision says nothing about auctions at all—let alone that just compensation for property can be measured based on the highest bid for a lien on that property. And while East Coast notes (at 11) that *Tyler* cited Maryland law, it neglects to mention that it cited Maryland law from *1797*. Unlike what the defendants seek to justify here, that law provided that "only so much land be sold 'as may be sufficient to discharge the taxes thereon due.'" 598 U.S. at 641 (quoting 1797 Md. Laws ch. 90, §§ 4–5). In other words, it made clear that although the government may take property to discharge tax debt, it may not take more than the debt owed. That's precisely what the plaintiffs claim here.

There is thus no authority for the proposition that when property is taken, the just compensation required by the Takings Clause can be measured by the value of a lien on the property, rather than the property itself. To the contrary, the Supreme Court has repeatedly held that it is determined based on the value of the property. *See, e.g.*, *United States v. Reynolds*, 397 U.S.

---

[6] *See BFP v. Resolution Trust Corp.*, 511 U.S. 531, 534 (1994) (property sold, not lien, in bankruptcy case); *United States v. Dizelos*, 2000 WL 991662, at *7 (4th Cir. July 19, 2000) (property sold, not lien, in criminal case to value loss for sentencing purposes); *Serra Builders, Inc. v. John Hanson Sav. Bank* (*In re Serra Builders, Inc.*), 128 B.R. 615, 617 (Bankr. D. Md. 1991) (property sold, not lien, in bankruptcy case). The closest they come is East Coast's citation of a district court decision that *declined* to determine whether the winning bid in a tax-lien auction conveyed sufficient value on the property owner such that transferring the property to the tax investor was not a fraudulent transfer under the bankruptcy code. East Coast Br. 12 (citing *In re Tucker*, 653 B.R. 598 (D. Md. 2023)); *Tucker*, 653 B.R. at 611 ("This court, however, will not resolve whether the [highest tax-lien bid] should be deemed the value of the property at the time of the transfer.").

14, 16 (1970) ("'[J]ust compensation' means the full monetary equivalent of the *property* taken.") (emphasis added); *U.S. ex rel. & for Use of Tennessee Valley Auth. v. Powelson*, 319 U.S. 266, 284 (1943) (just compensation must be "measured by the value of the *property*") (emphasis added). That alone is sufficient to reject the defendants' argument.

And here, there's an additional, independent reason that the defendants cannot satisfy even their own rule: The City's auction didn't even properly value the *lien*. The City used minimal advertising, directed at repeat-player tax-lien buyers; listed over ten thousand liens at once; established no minimum bid beyond the amount of the tax debt; and imposed a high-bid premium. FAC ¶ 31. These practices predictably drove down bids. *See id.* So the City's auction doesn't represent the value of the plaintiffs' property, but it also doesn't even represent the value of the lien. To be clear, that doesn't mean that the City cannot conduct its auction that way. But it does mean that the bid at auction cannot be used as the property's value for purposes of the Takings Clause.[7]

This Court thus need not determine at this stage whether the defendants are correct that, for purposes of the Takings Clause, a property may be valued at the price it goes for at a forced

---

[7] East Coast and the City offer no response to allegations that the City's tax sale drives down bids. Tempest counters these allegations in only one way. According to Tempest (at 10), the high bid premium does not depress prices because the investor gets it back when the deed is taken. As an initial matter, this argument ignores the effect that the City's advertising and listing practices have on reducing prices. That's reason enough to reject the argument. But at any rate, the effect of the premium on bids is a factual allegation that the Court must take as true at this stage unless implausible. *Barnett v. Inova Health Care Servs.*, --- F.4th ---, 2025 WL 37237, at *3 (4th Cir. Jan. 7, 2025). And the idea that a company may offer a lower bid to avoid paying a premium upfront, leaving it more capital to pay for other liens, is hardly implausible—it's something that the Maryland courts have recognized imposes costs on investors. *See Heartwood 88,* 156 Md. App. at 351 n.6.

auction—even if that is not its "fair market value."[8] All it needs to hold is that just compensation is required and that basing the plaintiffs' payments on an auction of property liens, rather than the properties themselves—and even then, driving down the lien bids—plausibly alleges that they were not given just compensation. Put differently, the plaintiffs fail to state a claim only if $5,115 for a $139,500 building is, as a matter of law, just to ECO and if $69,500 for a home the City valued at $185,000 is, as a matter of law, just to Ms. Anderson.

**4.** Separate from Tempest and East Coast, the City offers a series of additional underdeveloped arguments about why it should not be held responsible for the violation of ECO's and Ms. Anderson's rights. None has merit.

**a.** The City's lead argument (at 13) is that the City did not "take more from Plaintiffs than they owed in tax." This wrongly equates whether the City took the plaintiffs' property with how much money the City *kept*. "[T]he question," however, "is what has the owner lost? not, What has the taker gained?" *Boston Chamber of Com. v. Boston*, 217 U.S. 189, 195 (1910); *see also Sioux Nation*, 601 F.2d at 1170 ("[T]he Supreme Court has recognized that if the United States takes Indian property for its own use *or to give to others*, it must pay just compensation.") (emphasis added). The Fifth Amendment "prohibits the government from 'tak[ing] for public use' privately-owned property. It does not limit this prohibition to situations where the government also *retains* the property." *Sharritt*, 2024 WL 4524501, at *11 (denying motion to dismiss claim for surplus value after property was sold to satisfy tax debt and taken by third parties); *see also, e.g.*, *Dorce v. City of New York*, 608 F. Supp. 3d 118, 140 (S.D.N.Y. 2022) (plaintiff stated taking claim even though city

---

[8] The Supreme Court has explained that for purposes of the Takings Clause, property should be given its "market value fairly determined." *United States v. Miller*, 317 U.S. 369, 374 (1943). But that value may be "measured in various ways depending upon the circumstances of each case." *Id.* at 373–74. What's required is that the property owner be given "the full and perfect equivalent in money of the property taken." *Id.* at 373.

transferred property for free); *Tarrify Properties, LLC v. Cuyahoga Cnty.*, 2020 WL 4043105, at *5 (N.D. Ohio July 17, 2020) (same). Were it otherwise, the government could generate income by taking property, while avoiding the Takings Clause, by giving one person's property directly to a third party for a fee. But, if anything, that raises, not ameliorates, constitutional problems. *See Kelo v. New London*, 545 U.S. 469, 486–87 (2005).

**b.** The City next argues that there is no "causal link" between its "designing its tax auctions to depress bids" and the "deprivation of federal rights." City Br. at 14. Although not entirely clear, the City's argument appears to be that because a forced auction does not yield fair market value anyway, it was the fact of the auction, not anything the City did to depress bid levels, that caused the winning bid to fall below fair market value. *Id.*

The City's argument is founded on a misunderstanding of the plaintiffs' claims. As explained above, whether ECO and Ms. Anderson have stated a claim for a taking does not turn on whether the City is obligated to pay the fair market value of their homes. Rather, all the Court needs to decide at this stage is that the plaintiffs have adequately alleged that by providing only the value of the lien, rather than the value of the property, the defendants have failed to justly compensate them. And, again, even if for purposes of the Takings Clause, the government could substitute the value of a lien on the property for the value of the property itself, the City artificially depressed even the lien value.

More to the point, the City's argument simply ignores its role in causing the plaintiffs' injuries. "[B]ackground" tort principles apply when evaluating constitutional violations. *Malley v. Briggs*, 475 U.S. 335, 344 n.7 (1986). Thus, a defendant is liable for the "natural consequences of his actions." *Id.* (holding that decision of magistrate to issue a warrant did not break causal chain when officers presented a facially deficient warrant); *see also, e.g., Johnson v. Scott Cnty. Sch. Bd.*, 2012

15

WL 4458150, at *5 (W.D. Va. July 31, 2012) (holding that school board that hired person with history of abuse proximately caused the injury to a victim of that person). Under this standard, the City caused ECO's and Ms. Anderson's injuries in multiple ways.

First, the City set the entire process in motion by choosing to sell its lien on ECO's and Ms. Anderson's properties. FAC ¶¶ 28–29, 39, 60. That predictably led to the City then completing the taking by issuing the deeds to Tempest and East Coast—"extinguishing" the property rights of ECO and Ms. Anderson. FAC ¶¶ 51, 64; *Thornton Mellon*, 478 Md. at 437. Because the issuance of a deed to a tax-lien investor—and thus, the taking of the property—is precisely what is supposed to happen (if the property owner doesn't redeem), the City cannot seriously claim the taking was not a natural consequence of its actions.

Second, when the City extinguished ECO's and Ms. Anderson's property rights, the City elected not to make up the shortfall in what East Coast and Tempest paid to provide just compensation. FAC ¶¶ 35, 76. Nothing in Maryland law prevented it from doing so, and as multiple courts have held, a municipality's decision not to provide just compensation when it has that option causes a violation of the Takings Clause for which it can be held liable. *See, e.g.*, *Sharritt v. Henry*, 2024 WL 4524501, at *16 (N.D. Ill. Oct. 18, 2024) (holding that Illinois counties could be held liable for taking because "[n]othing requires or compels any Defendant to refrain from paying just compensation to Plaintiffs and members of the Class"); *Tarrify Properties, LLC v. Cuyahoga Cnty.*, 2021 WL 164217, at *3 (N.D. Ohio Jan. 19, 2021) (county could be held liable because "Ohio law does not compel the County to refuse to reimburse the landowner for any excess property value").

**c.** The City next contends (at 17) that, because issuing a deed is "ministerial," it is "not a taking." The sole support the City offers for this interpretation of the Takings Clause is the Nebraska Supreme Court's decision in *Continental Resources v. Fair*, 317 Neb. 391 (2024).

The City misreads the case. Under Nebraska's system, statutes "direct" counties to sell tax liens and, after the redemption period has passed, to issue deeds to the tax-sale purchaser, leaving no discretion at any point. *Id.* at 393. The Nebraska Supreme Court thus found that the county was "statutorily obligated" to engage in its role in the taking at issue. *Id.* at 413. Still, it did not hold that the ministerial nature of that conduct meant there was no taking. To the contrary, the court held that if the value of Fair's property exceeded his tax debt, there *was* a taking. *Id.* at 405 ("[I]f, as some evidence in the summary judgment record indicates, the value of Fair's property exceeded his tax debt, a protected property interest was taken from Fair without payment of just compensation."). Then, after concluding that the tax purchaser was a state actor who *could* be held responsible, the court held that the county was not "*liable* to pay" because its conduct was ministerial. *Id.* at 409–10, 413 (emphasis added). In other words, there was a taking, but the county did not have to pay the damages—the tax-sale purchaser did. If, as the City says, there was no taking, the tax purchaser could not have been held liable either.

Here, both the tax-sale purchasers and the City are liable. That's because the City's conduct here was discretionary, not "ministerial." The City could have elected not to sell liens on the property of elderly and low-income homeowners at all—sparing Ms. Anderson. FAC ¶ 28. And it could have refrained from selling liens just months after they arose, including by first attempting the other tax-collection remedies that the City has at its disposal, TP §§ 14-865–867— a choice that would have given ECO and Ms. Anderson more time to raise the funds needed to pay their tax debts, as both eventually did (albeit, too late). FAC ¶¶ 29, 63. The City, however,

exercised its discretion to sell both liens immediately, invoking the process that culminated in it issuing the deed. FAC ¶¶ 39, 47, 60–61. That makes clear that issuing the deed was still the City's choice—had the City not chosen to start the process, it would have issued no deed at the end.[9]

The City's injury-causing conduct was also discretionary in other ways. As noted, nothing prevented the City from paying just compensation.. So it was the City's choice not to do so—and it can be held liable for that. *See, e.g.*, *Tarrify Properties*, 2021 WL 164217, at *3; *Sharritt*, 2024 WL 4524501, at *16. And separately, when it comes to the City artificially depressing lien-auction bids, all of the City's conduct was its own choice, not mandated—nothing required the City to advertise so minimally, to list so many properties at a time, or to use the high-bid premium. *Supra* at 2–3.

**d.** The City also claims that it did not take the plaintiffs' property because, although it issued deeds to that property to tax investors, those deeds did not "transfer" the plaintiffs' property interest. City Br. at 16. That is so, the City says, for two reasons. One is that the City issues a "new" deed rather than give the old one to the tax-lien investor; in the City's (misguided) view, this means that it is not responsible for the taking. *Id.* The other is that the foreclosure "judgment extinguishes the rights of . . . persons who have an interest in the property." *Id.* (quoting *Thornton Mellon*, 478 Md. at 421).

Each argument is wrong. First, it is of no relevance to the Takings Clause that the City issues a new deed rather than transfers the plaintiffs' old ones. What matters for the Takings Clause is that ECO's and Ms. Anderson's property rights have been eliminated, not the details of how state law describes the mechanics of vesting property rights in Tempest and East Coast. The City cannot evade the Constitution by drafting a new document rather than modifying an old one. *Cf.*

---

[9] And, as noted, the City has since stopped selling its liens on certain properties. FAC ¶ 29.

*Tyler*, 598 U.S. at 638–39 (rejecting argument that plaintiff had no takings claim because Minnesota law declared she had no property interest in surplus value).

Second, the City is wrong that the foreclosure judgment extinguishes all property rights. The judgment forecloses the *right of redemption*; it does not transfer ownership of the property. *See supra* at 5–6. As the Maryland Supreme Court has made clear, it is the City's issuance of a new deed that extinguishes "prior titles," not the judgment foreclosing the right of redemption. *Thornton Mellon*, 478 Md. at 437; *see also, e.g.*, *Legacy Funding*, 396 Md. at 517 n.3 (until purchaser takes deed, original owner remains the "legal owner"). The judgment "conveys an interest" that is "less than fee simple title." *Thornton Mellon*, 478 Md. at 412; *see also id.* at 451 ("[T]he judgment does not vest legal title to real property—it grants an equitable interest or the *right* to acquire legal title *upon the payment of the purchase price*.") (emphasis added). True, *Thornton Mellon* said at one point that the judgment "extinguishes the rights" of property owners, *id.* at 421, but read in context—and alongside the multiple other statements in *Thornton Mellon* and other cases that a *deed* is needed to extinguish a prior owner's title—that statement must be understood as referring to the fact that the judgment extinguishes the right of redemption, not all property rights.

And even if the City were correct that the foreclosure judgment extinguishes all property rights—and thus completes the taking—that would not change that, as just explained, the City is the one that sets that process in motion. So the City would still be the cause of the taking.

**e.** The City's final parry is to claim that the plaintiffs lack "constitutionally protected interests in the unrealized equity of real property after judgments foreclosed the right of redemption under an independent source such as state law." City. Br. at 19–20. To the extent the City means that ECO and Ms. Anderson had no property interest at all, that is both wrong (the

new deed extinguished their rights, not the judgment) and irrelevant (the City still set the course for foreclosure).

But the City also appears to be saying that the plaintiffs lack a right to a surplus because Maryland has taken property to satisfy tax debts since "the colonial days." City. Br. at 20. Setting aside that Maryland law did not operate then as it does now—indeed, *Tyler* recognized that Maryland prohibited taking more than was owed at the time of the founding, *see* 598 U.S. at 641 —*Tyler* squarely rejects the contention that state law can authorize avoidance of the Takings Clause simply by declaring that property protected by the constitution is not actually property. *See Tyler*, 598 U.S. at 638–39. So even if the City accurately described Maryland's historical practice (it doesn't), that would not change the result; because, as *Tyler* explained, the surplus value is property under the constitution, the plaintiffs are owed just compensation. *Id.* (explaining that "state law cannot be the only source" for determining whether a property right exists).

## II.    The plaintiffs have a claim directly under the Fourteenth Amendment.

The City argues (at 20) that the Constitution does not itself provide a cause of action for a Takings Clause claim, but the cases it cites do not say that. To the contrary, the Fourth Circuit has concluded that the "the Constitution itself authorizes suit" for a Takings Clause violation. *Mann v. Haigh*, 120 F.3d 34, 37 (4th Cir. 1997).[10]

That conclusion follows directly from the language of the Takings Clause, which explicitly requires that when the government takes private property, it pay "just compensation." U.S. Const., amend. V. As the Supreme Court has repeatedly held, that language makes clear that the

---

[10] Although *Mann* involved a claim against the federal government, "if a Bill of Rights protection," like the Takings Clause, "is incorporated [against the states], there is no daylight between the federal and state conduct it prohibits or requires." *Timbs v. Indiana*, 586 U.S. 146, 150 (2019).

Takings Clause is "self-executing . . . with respect to compensation." *Knick v. Twp. of Scott*, 588 U.S. 180, 192 (2019); *First Eng. Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 315 (1987). "[I]n the event of a taking, the compensation remedy is required by the Constitution." *Knick*, 588 U.S. at 193. For that reason, the Supreme Court has repeatedly "reject[ed] the view that 'the Constitution does not, of its own force, furnish a basis for a court to award money damages against the government.'" *Id.* (quoting *First Eng.*, 482 U.S. at 316 n.9). To the contrary, the Court has held that "claims for just compensation are grounded in the Constitution itself." *First Eng.*, 482 U.S. at 315 (citing cases).

The City doesn't even cite the Fourth Circuit's decision in *Mann*. Instead, it relies on the Supreme Court's decision in *Devillier v. Texas*, which noted that "*typically*," asserting constitutional rights "offensively" requires an independent cause of action. 601 U.S. 285, 291 (2024). But *Devillier* explicitly left open the question of whether the Takings Clause—which, again, the Court has already repeatedly held is "self-executing"—could be assimilated into the "typical" case. *Id.* The Court noted that its prior cases hadn't "*cleanly* answer[ed] the question." *Id.* at 292 (emphasis added). And it didn't need to do so to resolve the case in *Devillier*. So *Devillier* offers no reason for this Court to disregard the Fourth Circuit's conclusion.

The City notes (at 21) that "someone whose property has been taken by a local government has a claim under § 1983." *Knick*, 588 U.S. at 194. But that doesn't mean the property owner doesn't *also* have a claim directly under the Constitution. As the Fourth Circuit has already recognized, they do.

## III.    Tempest and East Coast are state actors.

Tempest and East Coast contend that they cannot be liable for a taking because they are not state actors, but that argument is foreclosed by Fourth Circuit precedent. Tempest Br. at 4–7; East Coast at 10–11. The Fourth Circuit has already held that a private party that takes property

under a system of selling tax liens akin to Baltimore's engages in state action and, thus, is subject to the Constitution's restraints. *See Plemons v. Gale*, 396 F.3d 569, 572 n.3 (4th Cir. 2005).

**1.** Under what is known as the "joint action test," private parties may be deemed state actors when they "make use of state procedures with the overt, significant assistance of state officials." *Tulsa Pro. Collection Servs. v. Pope*, 485 U.S. 478, 486 (1988). In *Plemons*, the Fourth Circuit held that this test is satisfied when a private party takes property under a system of selling tax liens materially indistinguishable from Baltimore's. 396 F.3d at 572 n.3.[11] *Plemons* concerned West Virginia's system, but it contained the same key features: the government was "the initial seller of the tax lien"; the government helped provide notice to interested parties (by preparing and mailing the notice based on the purchaser's list) before the process culminated in a taking; and the government "extinguishe[d]" the [original] owner's "rights to the property by issuing" a new "deed" to the purchaser. *Id.* Other courts have reached the same conclusion, including the Nebraska Supreme Court in *Fair. See* 317 Neb. at 409–10; *see also, e.g.*, *Wells Fargo Bank, N.A. v. UP Ventures II, LLC*, 223 W. Va. 407, 410 (2009).

Baltimore's system has the same characteristics. The City sells the lien, FAC ¶ 31; it provides assistance in sending the notice, TP § 14-833(a-1)(7) (directing that, although the purchaser sends the notice, the names and address of people to be notified be obtained from City records); and most important, the City "extinguishes" the original owners rights by issuing a deed, *Thornton Mellon*, 478 Md. at 437. Thus, under *Plemmons*, Tempest and East Coast are state actors.[12]

---

[11] Tempest claims that the joint-action test applies only to prejudgment attachment cases. *Plemons* disproves that. As do many other cases. *See, e.g.*, *Pope*, 485 U.S. at 486.

[12] Tempest cites *Wittstock v. Mark A. Van Sile, Inc.*, 330 F.3d 899, 902–03 (6th Cir. 2003), to argue that it is not a state actor. Tempest Br. at 5. Although *Wittsock* did involve property taken to satisfy a tax debt, Tempest overlooks that Michigan (from which the case arose) uses a different tax-sale system: The municipality forecloses on the property, and the municipality only ever assists

**2.** Although this Court need go no further, Tempest and East Coast are also state actors under a second test used to conduct the "necessarily fact-bound inquiry" into state action. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1982). Under the "nexus" text, "[s]tate action may be found if . . . there is such a close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001). "What is fairly attributable is a matter of normative judgment, and the criteria lack rigid simplicity." *Id.* "[A] host of facts . . . can bear on the fairness of such an attribution[,]" including "when the State provides significant encouragement, either overt or covert," or "when a private actor operates as a willful participant in joint activity with the State or its agents[.]" *Id.* at 296.

In *Fair*, the Supreme Court of Nebraska "f[ound] that such a nexus [was] present" because:

> Delinquent property tax collection occurs in Nebraska through an interdependent, mutually beneficial relationship between the State and its political subdivisions and tax certificate purchasers in which the State delegates to the tax certificate purchaser the job of collecting tax debts of delinquent taxpayers and offers a powerful incentive to the investor to request the issuance of a tax deed if the value of the property exceeds the tax debt.

317 Neb. at 411. "Given this relationship," the Nebraska Supreme concluded that, in its "normative judgment," the "tax certificate purchaser's decision to obtain a tax debt is 'fairly attributable' to the State and thus qualifies as state action." *Id.* (quoting *Brentwood Academy*, 531 U.S. at 295).

The same is true here. The City entices tax-lien investors like Tempest and East Coast by choosing to give them the right to obtain *property* (and, at a minimum, the right to collect interest

---

the purchaser (by issuing a deed) if the purchaser subsequently brings a quiet title action. As the Sixth Circuit explained, "a tax deed holder does not enforce a state tax lien through a quiet title action." *Id.* at 902–03. In Baltimore, investors like Tempest and East Coast do enforce the lien to take the property. And at any rate, the Fourth, not the Sixth, Circuit binds this Court.

on redemption payments at 12 or 18 percent) for the price of a *lien* and then further systematically drives down the price of that lien. FAC ¶¶ 28–31. What's more, the City benefits from this dynamic beyond the collection of a tax debt in an individual case: Low bids spread the investors' capital across as many liens as possible, thereby maximizing the number of liens purchased in the sale, thus maximizing the City's revenue. *Id.* ¶ 31. This process, in short, creates just as much a "mutually beneficial relationship" as the one in *Fair. See* 317 Neb. at 410-411; FAC ¶¶ 30, 32, 33, 44.[13]

**3.** Even if the complaint left room for doubt, dismissal would not be warranted if "more thorough factual development is needed to inform any judgment as to whether a private entity's involvement in Maryland's tax sale scheme . . . renders its actions and omissions state action." *Sallie v. Tax Sale Invs., Inc.*, 998 F. Supp. 612, 622–23 (D. Md. 1998) (explaining that, in Baltimore's tax-sale system, investors "act[] in concert and jointly with an admitted governmental actor," but delaying a final decision until further factual development).

## IV. The plaintiffs have stated a claim for unjust enrichment against Tempest and East Coast.

Even if Tempest and East Coast are not state actors, they would still be liable for unjust enrichment. The fundamental principle of unjust enrichment is that "[a] person who receives a benefit by reason of an infringement of another person's interest, or of loss suffered by the other, owes restitution." *Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 296 (2007). That's precisely

---

[13] The City (though not Tempest or East Coast) cites *Brusznicki v. Prince George's County*, 42 F.4th 413, 426 (4th Cir. 2022), for the proposition that tax-lien purchasers are not "state deputies." City. Br. at 15. The question in *Brusznicki* was whether Maryland's exclusion of out-of-state tax-lien investors (from buying liens in Prince George's County only) violated the Privileges and Immunities Clause or whether, as the Attorney General argued, it was permissible because it was the functional equivalent of a governmental "hiring" practice. *Id.* The court's comment that investors were not "deputies" reflected only that they did not function as employees; it had nothing to do with the state-action requirement, which was not at issue in the case.

what happened here: Tempest and East Coast each received more than $100,000 in equity from ECO's community center and Ms. Anderson's home because these properties were taken without providing them just compensation—an infringement of their constitutional rights. Tempest and East Coast, therefore, owe restitution.

The Maryland Supreme Court has identified three elements of an unjust enrichment claim:

> 1. A benefit conferred upon the defendant by the plaintiff;
>
> 2. An appreciation or knowledge by the defendant of the benefit; and
>
> 3. The acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value.

*Id.* at 295. But it has also made clear that "[u]njust enrichment . . . may not be reduced neatly to a golden rule." *Id.* "The theory of unjust enrichment 'is simply a rule of law that requires restitution to the plaintiff of something that came into defendant's hands but belongs to the plaintiff in some sense.'" *Martz v. Day Dev. Co.*, 416 F. Supp. 3d 517, 527 (D. Md. 2019), *aff'd,* 35 F.4th 220 (4th Cir. 2022) (quoting *Mass Transit Admin. v. Granite Const. Co.*, 57 Md. App. 766, 775 (1984)). "A successful unjust enrichment claim serves to deprive the defendant of benefits that in equity and good conscience he ought not to keep, even though he may have received those benefits quite honestly in the first instance." *Hill*, 402 Md. at 295−96.

Given that Tempest and East Coast both "benefit[ed] by reason of an infringement of another person's interest"—ECO and Ms. Anderson's right not to have their property taken without just compensation—they cannot "in equity and good conscience" keep the excess value of that property.

**1.** Tempest offers only a single paragraph of argument attempting to rebut this conclusion. Tempest Br. at 15. The company barely explains its arguments, and—besides a case that outlines the general unjust enrichment standard—doesn't cite any authority in support of them. This Court could, therefore, simply hold that they are waived. *See, e.g.*, *Penegar v. Liberty Mut. Ins. Co.*, 115 F.4th 294, 301 (4th Cir. 2024) ("[W]e will not hesitate to find that perfunctory and underdeveloped arguments are waived."); Local Rule 105.1 ("Any motion and opposition to a motion shall . . . be accompanied by a memorandum setting forth the reasoning and *authorities* in support of it." (emphasis added)).

But they are also wrong. Tempest's lead argument (at 15) is that "ECO did not confer anything on Tempest" because the "tax sale certificate" was the "only thing conferred on" it. That ignores that ECO's community center—which Tempest turned around and sold for $139,500— was also conferred on it. And it doesn't matter that ECO didn't itself hand Tempest the deed; the Maryland Supreme Court has repeatedly rejected the contention that "a benefit conferred in an unjust enrichment action [must] come necessarily and directly to the defendant from the plaintiff[]." *Hill*, 402 Md. at 298–99 (discussing *Plitt v. Greenberg*, 242 Md. 359, 364 (1966)). To the contrary, "[i]t is immaterial how the money may have come into the defendant's hands, and the fact that it was received from a third person will not affect his liability, if, in equity and good conscience, he is not entitled to hold it against the true owner." *Id.*

Tempest also asserts that ECO does not satisfy the third element of unjust enrichment— that it would be "inequitable" for Tempest to keep the surplus value of ECO's property—because Tempest paid for the tax sale certificate. Unsurprisingly, the company cites nothing to support its claim that it is equitable to pay a few thousand dollars to receive a windfall of over $130,000 at the expense of ECO's constitutional rights. And of course, it's not. As the Nebraska Supreme

Court explained, it is "consistent with principles of restitution" that a company that has gained a "windfall" from an unconstitutional taking "disgorge [that] benefit." *Fair*, 317 Neb. at 414.

Finally, Tempest criticizes ECO for being unable to pay its property taxes or redeem after the tax sale. But that just makes Tempest's conduct more inequitable. Tempest used the fact that a community organization could not afford a tax bill of a few thousand dollars to take its property worth nearly $140,000, sell it, and keep all of the profit for itself. That's precisely the kind of conduct unjust enrichment was designed to combat.

**2.** East Coast's argument is even less developed than Tempest's. This Court could therefore easily find that it, too, has waived its argument.

To the extent East Coast has adequately presented an argument, it lacks merit. It notes (at 13) that a Maryland state court rejected Ms. Anderson's challenge to the tax foreclosure on her house, based on the fact that she had, in fact, paid her taxes—ordering instead that East Coast repay those taxes to her. But that's not relevant to her unjust enrichment claim. Ms. Anderson's unjust enrichment claim is that East Coast used the fact that there was a tax lien on her house— and the failure of the City to require just compensation—to get windfall profits by taking her home. East Coast doesn't address that claim at all.

East Coast's only other argument (at 13) is that "the state court ensured that Ms. Anderson received adequate compensation for her property." But as explained above, that's not true. Indeed, the requirement to pay just compensation didn't even arise until *after* the court's judgment when the deed issued.

**V.    Neither the Tax Injunction Act nor principles of comity bar the plaintiffs' claims because the claims concern the surplus value of their properties, not taxes.**

The City contends that the Tax Injunction Act and related principles of comity bar the plaintiffs' claims. City Br. at 2–8. But both the Act and the comity doctrine are concerned with tax assessment and collection, not about the taking of the surplus value of a property in *excess* of the agreed-upon, and undisputed, tax debt. That is why courts routinely hold that they have the power to entertain lawsuits challenging the taking of private property, beyond that required to pay a tax debt, without just compensation. *See, e.g.*, *Dorce v. City of New York*, 2 F.4th 82, 99 (2d Cir. 2021); *Harrison v. Montgomery Cnty.*, 997 F.3d 643, 651–52 (6th Cir. 2021); *Freed v. Thomas*, 976 F.3d 729, 734 (6th Cir. 2020); *Tyler v. Hennepin Cnty.*, 505 F. Supp. 3d 879, 887 (D. Minn. 2020); *Coleman v. District of Columbia*, 70 F. Supp. 3d 58, 64–67 (D.D.C. 2014); *Anderton v. Bannock Cnty.*, 2015 WL 428069, at *4 (D. Idaho Feb. 2, 2015). This case is no different.

**A.    The Tax Injunction Act does not deprive this Court of jurisdiction because this case concerns the taking of property *beyond* that required to pay the taxes owed.**

**1.** The Tax Injunction Act provides that "district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. The Act thus limits the power of federal courts when "taxpayers seek federal-court orders enabling them to avoid paying state taxes." *Hibbs v. Winn*, 542 U.S. 88, 107 (2004). And it does so to prevent taxpayers from "disrupting state government finances" by "withholding large sums" with the aid of federal court lawsuits rather than paying first and then using state-created refund procedures. *Id.* at 104.

The Act's focus—protecting the assessment, levy, and collection of state taxes—is also its limit. As the Fourth Circuit has explained, "not every constitutional claim bearing even indirectly on the subject of state taxes is jurisdictionally barred." *Gwozdz v. HealthPort Techs., LLC*, 846 F.3d

738, 742 (4th Cir. 2017). "Congress did not enact the [Tax Injunction Act] to prevent federal-court interference with *all* aspects of state tax administration, but instead to stop litigants from using federal courts to circumvent States' 'pay without delay, then sue for a refund' regimes." *Freed v. Thomas*, 976 F.3d 729, 734–35 (6th Cir. 2020) (emphasis added). The Act thus does not kick in if a lawsuit seeks relief that merely "inhibits" the assessment, levy, or collection of taxes; to deprive a court of jurisdiction, the suit must seek relief that actually "to some degree *stops*" those activities. *Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 14 (2015) (emphasis added) (holding that the Act did not bar a suit seeking to enjoin a law that required online retailers who did not collect sales taxes to notify consumers of their tax obligations); *cf. CIC Servs., LLC v. IRS*, 593 U.S. 209, 211 (2021) (applying *Brohl* to hold that the Anti-Injunction Act does not bar suit to enjoin law requiring companies to report information that the IRS uses to prevent tax evasion).

Courts have repeatedly concluded that they have jurisdiction to hear claims to recover the surplus value of property taken to satisfy a tax debt for a simple reason: "surplus property" is "not tax proceeds." *Freed*, 976 F.3d at 736; *see also Harrison*, 997 F.3d at 652 ("[S]eizure and extinguishment of surplus equity is not an act of obtaining payment of taxes due[.]"). The surplus is the amount in "*excess*" of taxes. The plaintiffs in these cases, therefore, don't challenge tax collection. They challenge the "*post*-collection failure to reimburse" that excess value. *Freed*, 976 F.3d at 734.

Put in terms of the statute's text, the plaintiffs are "not challenging the *assessment* or *levy* of taxes" because they do not "dispute [their] tax liability or delinquency." *Id.* (emphasis added); *Coleman*, 70 F. Supp. 3d at 68 (Act did not apply because the plaintiff "concede[d] that those amounts were due"); *cf. Chamber of Com. of the U.S. v. Lierman*, 90 F.4th 679, 687 (4th Cir. 2024) (holding that the Act does not apply when the plaintiff does not challenge the "validity of the

underlying tax," but only contests the mechanism by which it is paid). And the plaintiffs do not contest the "*collection*" of taxes because there is no attempt to stop the tax sale used to "satisfy [the] tax debt," *Freed*, 976 F.3d at 734 (emphasis added), or "to get [their] [property] back" after the fact, *Harrison*, 997 F.3d at 651. Instead, they are challenging what happens "*after* the [government] ha[s] collected every penny of the delinquent taxes." *Tyler*, 505 F. Supp. 3d at 887.

   **2.** ECO and Ms. Anderson's claims are no different. They are not, therefore, barred by the Act. Consider first their damages claims. At the outset, the Fourth Circuit has stated that the Act applies only to claims for injunctive and declaratory relief. *Hutcherson v. Bd. of Sup'rs of Franklin Cnty.*, 742 F.2d 142, 145 (4th Cir. 1984). Other courts have held the same. *See, e.g.*, *Dorce v. City of New York*, 2 F.4th 82, 97 (2d Cir. 2021). That is a sufficient basis to reject its application to the plaintiffs' damages claims.

   In any event, neither ECO nor Ms. Anderson attempts in this action to challenge the amount of taxes they owed—the "assessment." *Freed*, 976 F.3d at 734. Neither asks for their property back. *Harrison*, 997 F.3d at 651. And neither seeks to "nullify[]" the City's collection by demanding payment for the part of the property value that went to taxes. *Coleman*, 70 F. Supp. 3d at 68.[14] Rather, both claim only a right to the "surplus"—the difference between the value of the property that was taken from them and the amount of taxes owed. FAC at 2 ("Under the surplus-value rule *Hennepin* reaffirmed, once the City and investor take the deed, the original property owner is entitled to the difference between the value of the property and the past-due taxes."). Indeed, the City's scheme tacitly acknowledges this does not concern "taxes" by allowing ECO

---

[14] Indeed, as East Coast observes, when Ms. Anderson did complain that the City wrongfully collected money as taxes, she litigated it (successfully) in state court. *See* East Coast Br. at 5; ECF 37-3.

and Ms. Anderson to obtain a (constitutionally deficient) fraction of the surplus pegged to the winning lien-auction bid. *See supra* at 6–7. If that were a "tax," even it would be withheld.

The timeline of the City's process confirms that the plaintiffs' claims do not concern "taxes." The City collects its taxes at the time of the tax-lien sale. FAC ¶¶ 17–18 (tax-lien investor must pay at least minimum bid of no less than the amount of taxes owed). But ECO's and Ms. Anderson's claims did not arise then because they still owned their property. *See supra* at 5–6. It was only when the City issued a deed to Tempest and East Coast—years after the City had collected all the taxes owed——that their property, and the surplus above the taxes, was taken. FAC ¶¶ 40, 51, 60, 64. The collection of taxes, in other words, was completed years prior to the taking, was undisputed, and remains undisputed. So, just like in *Harrison*, *Freed*, *Coleman*, *Hennepin*, and *Anderton*, the Tax Injunction Act does not deprive this Court of jurisdiction to entertain that claim.

Nor does it bar ECO's claim for injunctive and declaratory relief. ECO seeks prospective relief requiring "just compensation to the Baltimore City property owners who *lose* their properties through the tax sale." FAC at 28 (emphasis added). The request thus assumes that the property has been lost—which means taxes were validly assessed, the tax lien was sold, the investor forecloses, and the investor eventually obtains the deed—and only requests that, at that final point, the defendants provide the surplus value to the property owner. Thus, just like the claims for damages, the claims for prospective relief do not challenge the assessment of taxes or seek to halt the levy or collection of taxes.[15]

---

[15] The request for injunctive relief in the complaint's prayer for relief could be construed as seeking an order imposing certain procedures on the City before it conducts a tax sale. ECO does not seek such relief and, if the Court deems it appropriate, can amend the complaint to clarify that point. The prospective relief sought, as described above, is limited to an order requiring that, *if* the City takes property, then it must return the surplus value to the property owner.

**3.** The City's attempt to cast this case as barred by the Tax Injunction Act runs headlong into the well-established case law rejecting identical arguments—which the City never mentions. *See, e.g.*, *Freed*, 976 F.3d at 734; *Coleman*, 70 F. Supp. 3d at 64–67. First, the City contends (at 4) that ECO's and Ms. Anderson's claims are barred because they "challeng[e]" the "collection" of a "tax." But as just explained, the surplus value at issue here is not a "tax"; it's the property taken over and above the taxes owed. *See, e.g.*, *Freed*, 976 F.3d at 736.[16]

Second, citing *Sallie v. Tax Sale Invs., Inc.*, 998 F. Supp. 612, 618–19 (D. Md. 1998)—a case that did not involve the Tax Injunction Act at all—the City contends (at 5–6) that requiring property owners to "be compensated for unrealized equity" would "discourage prospective purchasers from participating in tax sales" and thus "frustrate[]" the City's collection efforts. As *Coleman* explained when faced with the same argument—that the plaintiff's "success would frustrate the 'collection' of taxes"—courts, including the Supreme Court, "have rejected the argument." 70 F. Supp. 3d at 68. Just because governmental action makes it easier to collect taxes by providing "incentive[s]" that align with tax collection—or because stopping that action may "inhibit" the collection of taxes, *supra* at 28–29—does not mean that the Act applies. *Coleman*, 70 F. Supp. 3d at 68; *see also, e.g.*, *Wells v. Malloy*, 510 F.2d 74, 77 (2d Cir. 1975) (holding that the Act does not bar a suit to stop practice of suspending delinquent taxpayers' drivers' licenses as a method of incentivizing payment of taxes); *Hibbs*, 542 U.S. at 109 (endorsing the analysis in *Wells*). Again, the Act only applies when the Act "stops" the collection of taxes. *Brohl*, 575 U.S. at 14. And

---

[16] The City cites (at 3) a single case, *Wright v. Pappas*, 256 F.3d 635 (7th Cir. 2001), involving the application of the Tax Injunction Act to tax sales. As *Coleman* explained, *Wright* is "easily distinguished." 70 F. Supp. 3d at 69. It was brought by a tax-sale investor (not a property owner) seeking a refund of the amount paid to purchase a lien—that is, the actual taxes that were collected. *Id.*

here, nothing about affording the plaintiffs relief requires that the City stop selling liens to collect taxes.

Finally, the City argues (at 5) that the Act should apply because the surplus value that has been taken from ECO and Ms. Anderson outstrips their tax debts and, as a result, the damages "would have to be paid from the City's revenues unrelated to tax sales." But that only demonstrates why the Act does not apply. The "revenues" from the tax sales are the *taxes*—what the Act protects. That they wouldn't cover the damages proves this case isn't about taxes.

Nor does the City cite anything for the proposition that, because its unconstitutional actions may yield a net loss, the Act applies. That would mean that the City is subject to suit when it keeps the full value of the property it takes, but that the Act bars a claim the moment the City turns the surplus over to a third party. Were that true, *Dorce*—where New York City turned over ownership to third parties "free of charge"—would be wrongly decided. 2 F.4th at 87. It would yield the bizarre result that the better the deal for the third party taking ownership of the property, the greater the barrier the Tax Injunction Act imposes. And it would mean that any time a government had to pay damages for unconstitutional conduct related to tax collection—for example, if it damaged property while executing a search warrant related to a tax investigation— the Act would apply. There's no reason to think that Congress would design a statute that way, and nothing in the Act's text suggests that it did.

At any rate, the City fails to prove the premise: that it will end up with a net loss. It can file cross-claims for contribution or unjust enrichment against Tempest and East Coast.

**B.    The comity doctrine does not warrant dismissal for the same reason: This Case is not about taxes, but about surplus value.**

**1.** The City's invocation of the comity doctrine fails for much the same reasons. The comity doctrine exists to limit federal courts' ability to "disrupt state tax collection." *DIRECTV,*

*Inc. v. Tolson*, 513 F.3d 119, 124 (4th Cir. 2008). Although the doctrine overlaps substantially with the Tax Injunction Act, it is, as the City observes, "more embracive than" the Act. There is no question, for instance, that it bars damages claims aimed at recovering unlawful taxes. *See, e.g., Fair Assessment in Real Est. Ass'n v. McNary*, 454 U.S. 100, 102 (1981). But the comity doctrine, like the Act, is still concerned with "taxes"; thus, as the Fourth Circuit has explained, it does not bar lawsuits challenging unconstitutional "fees" imposed by the states. *See DIRECTV*, 513 F.3d at 125.

And for that reason, just as courts have held that the Tax Injunction Act does not preclude claims to recover the taking of the surplus value of property, they have also rejected the contention that comity bars the claims. That's because lawsuits seeking to recover surplus value do not challenge the "taxing authority" of the local government or call into question the "validity of [the local government's] tax system" overall. *Freed*, 976 F.3d at 737. And a "favorable outcome" in such cases does not prevent the continued taking of property "to recover delinquent taxes." *Id.*; *see also Dorce*, 2 F.4th at 98 (agreeing with other courts that a "claim—limited to the excess value of the property—would not be barred by comity because it would not risk disruption of local tax administration"). All that a suit for surplus equity prohibits is the continued withholding of the excess *above* the tax delinquency. In short, "takings suits in federal courts to recover excess equity as a result of state tax foreclosure sales do not violate the principle of judicial federalism" underlying the comity doctrine. *Harrison*, 997 F.3d at 652.

**2.** The City's arguments in favor of dismissal under the comity doctrine are no more persuasive than its arguments that the Tax Injunction Act applies.

*First*, the City contends (at 7) that comity mandates abstention because ECO and Ms. Anderson "object to the way tax sales are conducted." Again, that misunderstands the plaintiffs' claim. The plaintiffs' claim is that the defendants owe them just compensation for taking their

property. The City is free to leave unchanged the way it sells tax liens—and the plaintiffs do not ask the court to change it—so long as, at the end, when it takes a Baltimore resident's property, it provides just compensation. The relevance of the tax sales is only that, because it sells liens, not *property*—and artificially depresses bids on the lien—providing ECO and Ms. Anderson with the remainder of the bid when the deed is taken does not provide just compensation.

*Second*, the City asserts (at 7) that, by seeking just compensation for the surplus value, the plaintiffs are engaged in "tax avoidance" because they seek "relief from the consequences of their failure to pay taxes on real property." This argument—that comity mandates dismissal because the taking of surplus value serves as a harsh consequence to incentivize the payment of taxes—has been repeatedly rejected. *See Coleman*, 70 F. Supp. 3d at 66, 68 (rejecting this argument when raised in support of argument that the Tax Injunction Act "and the related principles of comity" mandate dismissal of claim for surplus value); *Freed*, 976 F.3d at 736 (endorsing *Coleman*'s analysis). It also has no logical limit. The City could seize a delinquent taxpayer's car, subject them to warrantless searches or other harassment, or deny them the right to vote—all of this could be characterized as an "incentive" to pay taxes and, under the City's logic, federal courts would be barred from hearing constitutional claims under the comity doctrine. But the doctrine exists to allow state courts to address local tax matters that they are "better suited" to resolve. *Dorce*, 2 F.4th at 100. The scope of ECO's and Ms. Anderson's "fundamental constitutional right[]" to just compensation does not fit that description. *Id.* And tellingly, the City cites no authority in support of this argument. City Br. at 7.

Finally, the City argues (at 8) that the comity doctrine applies because state courts, not "constrain[ed]" by the Tax Injunction Act, have greater "remedial options." That doesn't work for ECO's and Ms. Anderson's claims for "monetary damages": "[S]tate courts would have no

greater leeway than federal courts to cure [that] alleged violation." *Dorce*, 2 F.4th at 101. Nor does it work for ECO's claim for prospective relief. As discussed above, the Tax Injunction Act imposes no barrier because the claims here are not about taxes; federal courts thus are no less able to order the City to pay just compensation when it takes its residents' property.[17]

* * *

One final point demonstrates that the City's appeal to both the Tax Injunction Act and comity is off base. Both apply only when the plaintiff can resort to a state-court remedy to vindicate federal rights. *See DIRECTV*, 513 F.3d at 124 (comity requires a "plain, adequate, and complete" remedy be "available in the state courts"); 28 U.S.C. § 1341 (providing that federal courts are only restrained in granting relief when there is a "plain, speedy, and efficient" remedy available in state courts). The City, pointing to *Mayor & City Council of Baltimore v. Vonage America Inc.*, 544 F. Supp. 2d 458, 465 (D. Md. 2008), says that this requirement is satisfied here. City Br. at 6. But the statutes in *Vonage* permitted suits for "refunds" or to challenge the "assessment" of a tax. *See* Md. Code, Tax-Gen. § 3-103. That's not what the plaintiffs are doing, so those statutes cannot provide their remedy.

For them to have a plain and speedy remedy in state court, then, Maryland must recognize a cause of action for takings claims. That's a problem for the City. That the remedy would be a takings claim, rather than a tax-refund suit, illustrates that this case is well beyond the scope of the Tax Injunction Act and the comity doctrine.

---

[17] Each of the cases that the City cites involved a straightforward challenge to a *tax*, not to punishment for not paying a tax. *See Levin v. Com. Energy, Inc.*, 560 U.S. 413, 419 (2010) (plaintiffs alleged discriminatory taxation); *Fair Assessment in Real Est. Ass'n, Inc. v. McNary*, 454 U.S. 100, 106 (1981) (plaintiffs challenged assessment on real property); *Wright*, 256 F.3d at 637 (plaintiff sought to recover money paid to satisfy tax debt).

**VI.    *Rooker-Feldman* does not bar the plaintiffs' claims because they do not ask this Court to conduct appellate review of their foreclosure orders.**

Tempest and the City—but not East Coast—argue that the *Rooker-Feldman* doctrine bars the plaintiffs' claims. Tempest Br. at 13–14; City Br. at 8–12. They are mistaken. Multiple courts have confronted *Rooker-Feldman* arguments in the context of takings claims for surplus value not provided after a tax sale, and every court has rejected the argument. *Dorce*, 2 F.4th at 105; *Sharritt*, 2024 WL 4524501, at *6; *Coleman*, 70 F. Supp. 3d at 74 (D.D.C. 2014).

**1.** "[U]nder what has come to be known as the *Rooker-Feldman* doctrine, lower federal courts are precluded from exercising appellate jurisdiction over final state-court judgments." *Lance v. Dennis*, 546 U.S. 459, 463 (2006). This rule derives from Congress's differing grants of jurisdiction to the Supreme Court and lower federal courts. Through 28 U.S.C. § 1257, "Congress vested" in the Supreme Court "the authority to exercise appellate jurisdiction over state-court judgments." *Hulsey v. Cisa*, 947 F.3d 246, 249–50 (4th Cir. 2020). "By contrast, Congress has given federal district courts original jurisdiction over various actions but has not authorized district courts to exercise appellate jurisdiction over state-court judgments." *Id. Rooker-Feldman* polices this division of jurisdiction by prohibiting lower courts from conducting "what in substance would be appellate review of the state judgment." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 287 (2005).

The doctrine is a "narrow" one. *Lance*, 546 U.S. at 464. It borrows its name from the "only two cases in which [the Supreme Court] ha[s] applied" it. *Id.* at 463. In *Rooker v. Fidelity Trust Co.*, the losing party in a state court case filed suit in federal court, complaining both that the state court failed to follow the "law of the case" under state law and that the judgment violated the constitution. 263 U.S. 413, 415 (1923). Because those arguments effectively sought to "reverse or

modify" the state court judgment, the Supreme Court held that the district court lacked jurisdiction. *Id.* at 416. Sixty years later, in *District of Columbia Court of Appeals v. Feldman*, the Court held that the same principles barred the claim of two individuals who argued that the D.C. court of appeals acted "arbitrarily and capriciously" in refusing to waive a bar-admission rule when acting on their petitions in state court. 460 U.S. 462, 486 (1983).

But despite being asked to apply the doctrine on many other occasions, the Court has repeatedly refused to do so. *See, e.g., Lance*, 546 U.S. at 464 (collecting cases); *Skinner v. Switzer*, 562 U.S. 521, 532 (2011) (where state court denied request for DNA testing, *Rooker-Feldman* did not bar federal challenge to the constitutionality of the state law upon which the decision was based). To the contrary, it has emphasized the "limited" reach of the doctrine and cautioned courts not to expand it, most notably in *Exxon. See* 544 U.S. at 291. There, the Court emphasized that *Rooker-Feldman* is not a "comity," "abstention," or "preclusion" doctrine; nor is it "triggered simply by the entry of judgment in state court." 544 U.S. at 292–93. And it does not apply even if the claim "denies a legal conclusion" of the state-court judgment—a concern of res judicata principles, not *Rooker-Feldman. Id.* at 293.

In the wake of *Exxon*, the Fourth Circuit recognized that it had been among the lower courts to give the doctrine an "expansive interpretation" that *Exxon* had "reined in." *Davani v. Va. Dep't of Transp.*, 434 F.3d 712, 718 (4th Cir. 2006) (*Rooker-Feldman* did not bar federal discrimination suit even though the plaintiff lost state court discrimination suit because he "did not allege that the state decision caused him injury"). "Since *Exxon*, [the Fourth Circuit] ha[s] never, in a published opinion, held that a district court lacked subject matter jurisdiction under the *Rooker–Feldman* doctrine." *Thana v. Bd. of License Comm'rs for Charles Cnty., Md.*, 827 F.3d 314, 320 (4th Cir. 2016). It has, instead, limited the doctrine, as *Exxon* directs, so that it is applied only in situations that

38

"mirror[]" *Rooker* and *Feldman*. *Jonathan R. by Dixon v. Just.*, 41 F.4th 316, 340 (4th Cir. 2022) (challenge to treatment of foster children not barred even though state court approved each child's placement).

In doing so, the Fourth Circuit has made clear that it is not sufficient that an "injury [i]s ultimately caused by [an] adverse state court judgments" in the but-for sense; rather, *Rooker-Feldman* bars a claim only if the relief sought "amount[s] to appellate reversal or modification." *Adkins v. Rumsfeld*, 464 F.3d 456, 464 (4th Cir. 2006); *Hulsey*, 947 F.3d at 249–50 (explaining that *Rooker-Feldman* applies only when the federal complaint "invit[es] district court review and rejection of those judgments").

As noted, multiple courts have confronted *Rooker-Feldman* arguments in the context of takings claims for surplus value not provided after a tax sale. The Second Circuit's decision in *Dorce v. City of New York*, 2 F.4th 82 (2d Cir. 2021), illustrates how *Rooker-Feldman* applies in this context. The plaintiffs in *Dorce* brought two takings claims challenging New York City's practice of foreclosing on distressed properties that owed taxes and then transferring the deed to third party developers free of charge. The first was that the foreclosure, and associated taking, was improper "because their properties did not meet the statutory definition of distressed." *Id.* at 105. *Rooker-Feldman* barred that claim because it required "review" of the state court's decision that the statutory requirements were met. *Id.* The second was that "their property was taken without just compensation because they were not compensated for the excess value of the property." *Id.* That claim, the court held, was not barred, because it did "not seek to void [the] state court foreclosure judgment," but instead focused on the lack of an "[]adequate mechanism" for providing just compensation. *Id.*

Other courts considering similar takings claims arising out of tax foreclosure schemes have reached the same conclusion. *See, e.g.*, *Sharritt*, 2024 WL 4524501, at \*6 (holding that *Rooker-Feldman* did not apply because the plaintiffs did "not challenge the outcome of any state court decision" or seek to "undo the tax deeds the tax buyers obtained" and challenged only the defendants' "failures to compensate them for the loss of any excess equity"); *Coleman*, 70 F. Supp. 3d at 74 (because the plaintiff "allege[d] no legal error by the Superior Court," "accept[ed] the Foreclosure Judgment, the loss of his real property, and the satisfaction of his 'tax' debts," *Rooker-Feldman* posed no barrier to plaintiff's claim that he was owed the surplus value above the tax debt).

Although the Fourth Circuit has not yet confronted a tax-sale case, its case law, if anything, represents a narrower view of the doctrine. Consider *Adkins v. Rumsfeld.* That case concerned the Armed Services' practice, pursuant to federal statute, of distributing retirement pay to non-military spouses when a state-court divorce decree ordered it. 464 F.3d at 464. Because state law controlled whether the non-military spouse was entitled to the benefits, the veterans argued that the distribution of benefits violated a constitutional mandate of nationally uniform military pay. *Id.* at 460. Although the plaintiffs' injuries were "ultimately caused by the adverse state court judgments" and relief for the plaintiffs "would certainly upset the enforcement of the state court decree[s]"—something that does not happen with surplus-value claims—the Fourth Circuit held that *Rooker-Feldman* did not preclude jurisdiction because the plaintiffs were not calling into doubt the correctness of the divorce decrees by seeking to "reverse or modify" them. *Id.* at 464.

**2.** Under these now-settled principles, *Rooker-Feldman* does not apply here. ECO and Ms. Anderson are in no sense asking this Court to conduct appellate review of the Maryland circuit court's orders foreclosing the right of redemption. Those orders held that Tempest and East Coast possessed tax sale-certificates and that neither ECO nor Ms. Anderson had timely "redeemed"

their property. FAC ¶¶ 23–24, 46, 64; *See* TP § 14-835. ECO and Ms. Anderson do not quarrel with any of that. They do not claim that the circuit court erred in any way or argue that foreclosure of the right of redemption was improper—they accept that is all final.

Rather, ECO and Ms. Anderson contend that, *after* the foreclosure order, when the City issued a deed to Tempest and East Coast—and thus finally extinguished their property rights—they had a right to just compensation. Evaluating whether that remedy is owed does not involve considering whether the state courts erred—and if a court does not "concern[] itself with the bona fides of the prior judgment," it "is not conducting appellate review." *Great W. Mining & Min. Co. v. Fox Rothschild LLP*, 615 F.3d 159, 169 (3d Cir. 2010). Nor would affording that relief result in "reversal or modification" of the state court orders: ECO and Ms. Anderson's rights of redemption would remain foreclosed, and an order requiring payment of just compensation would do nothing to impugn Tempest and East Coast's titles. Indeed, relief here would not even "upset the enforcement" of the foreclosure order—what happened in *Adkins* but was still insufficient to trigger the doctrine. *See* 464 F.3d at 464.

That makes the claims here like the *Dorce* plaintiffs' second claims. Win or lose, the foreclosure judgment will be left untouched. And win or lose, this Court will not be asked to evaluate whether the state law statutory requirements underpinning foreclosure of the right of redemption were met. *Rooker-Feldman* therefore does not apply.

**3.** To urge a different conclusion, Tempest and the City mischaracterize the plaintiffs' claims. Tempest contends (at 13) that ECO's claim is a challenge to the foreclosure order "predicated on th[e] tax sale being improper." But as explained, ECO's claim seeks to undo neither the foreclosure order nor the tax sale that preceded it. The City takes a similar tack. It contends (at 9) that the "amended complaint alleges that Plaintiffs were injured by the circuit

court's judgment foreclosing the right of redemption," but the City fails to cite the complaint for that proposition. That's because the complaint alleges no such thing. It was the lack of compensation once the City completed the taking that caused the injuries.

The City's confusion appears to stem from the plaintiffs' allegations concerning the City's conduct depressing the bids at auctions. The City contends that these allegations reveal that the plaintiffs seek to "set aside" the foreclosure orders. *See* City Br. at 10. But, again, the plaintiffs do not challenge the foreclosure. Nor do they contend that the City may not auction liens or that it has to do so in a different way. Their contention is that when the City—and the tax investors working with it—take property, they must provide just compensation. And in doing so, they may not use the highest bid in the *lien* auction as the value of the *property* they are taking. [18]

In the end, the City and Tempest are unable to explain how the plaintiffs' actual claims require appellate review of the foreclosure judgments. That is fatal to their arguments. [19]

**VII.    TP § 14-845 does not bar the plaintiffs' claims.**

Tempest's contention that ECO's claims are barred by Maryland Real Tax-Property Code Ann. § 14-845 fails for the same reason. Section 14-845(a) states that "an application to reopen a

---

[18] To the extent the City means to suggest that *Rooker-Feldman* applies because its auction conduct preceded the foreclosure action and the court still entered judgment, that, too, lacks merit. *Cf. Dorce*, 2 F.4th at 104 ("*Rooker-Feldman* does not bar claims based on . . . misconduct that precedes the state court proceeding, if the plaintiffs' alleged injuries were merely ratified by the state-court judgments rather than caused by them.").

[19] The City cites a single Fourth Circuit case finding that *Rooker-Feldman* barred a claim. *See Shooting Point, L.L.C. v. Cumming*, 368 F.3d 379, 384 (4th Cir. 2004). But in addition to being factually inapposite, *Shooting Point* has been singled out by the Fourth Circuit as an example of the "broad interpretation" of *Rooker-Feldman* that the Supreme Court in *Exxon* made clear was improper. *See Davani*, 434 F.3d at 717 n.5. The City's out-of-circuit authority, *Ritter v. Ross*, 992 F.2d 750 (7th Cir. 1993), is no more compelling. Although that case did concern a tax sale claim, the plaintiffs there made the "state court proceedings . . . the subject of th[e] case." *Id.* at 754. And, as another court has observed, *Ritter* (like *Shooting Point*) relied on an understanding of *Rooker-Feldman* that was "narrowed significantly" by *Exxon*. *Coleman*, 70 F. Supp. 3d at 74.

judgment" in a "tax sale foreclosure proceeding" must be filed within one year. But, again, ECO does not seek to "reopen" the proceeding that foreclosed its right to redemption. It doesn't challenge that foreclosure. Instead, ECO's claim is that having taken its property, the City and Tempest owed it just compensation.

## VIII.  The plaintiffs' claims are not barred by res judicata.

Tempest and East Coast (but not the City) argue that res judicata bars the plaintiffs' damages claims because they were not brought as defenses in the action to foreclose the right of redemption. Tempest Br. 10–12; East Coast Br. 7–9. Their arguments are wrong on multiple levels.

*First*, the *damages* claims here would not have served as a "defense" to anything in the foreclosure action. The foreclosure action evaluated whether Tempest and East Coast had a tax-sale certificate, whether the investors had provided notice, and whether ECO and Ms. Anderson had failed to redeem their properties. *See* TP § 14-835. Arguing that once Tempest and East Coast obtained the deed *post*-judgment, they had an obligation to pay just compensation and disgorge unjustly retained benefits would do nothing to undercut—that is, to operate as a defense against— a finding that those requirements had been satisfied.

Put in terms of res judicata's requirements, that means the second element is not satisfied: "the claim presented in the current action" must either be "identical to that determined" in the prior litigation or "could have been raised in the prior litigation." *Hall v. St. Mary's Seminary & Univ.*, 608 F. Supp. 2d 679, 684 (D. Md. 2009). Tempest and East Coast cite nothing for the proposition that an argument that would not defeat the claims in the prior action "could have been raised" in it.

*Second*, and relatedly, res judicata does not apply because the doctrine "cannot bar a claim that did not accrue prior to the litigation triggering the bar." *D'Ambrosio v. Wolf*, 295 Va. 48, 56

(2018); *see also, e.g.*, *Hughes v. Insley*, 155 Md. App. 608, 627 (2003) (claim not barred because critical fact of deed conveyance had not occurred at time of first action); *Harrison v. Montgomery Cnty., Ohio*, 997 F.3d 643, 650 (6th Cir. 2021) (res judicata did not bar takings claim for surplus value over tax debt because claim did not exist at the time foreclosure action was initiated); *Weckel v. Cole + Russell Architects, Inc.*, 2024-Ohio-5111, ¶¶ 44-46 (Ohio Ct. App. 2024) ("[R]es judicata does not apply to claims that were not ripe or had not accrued at the time of the first action."); *ACAS, LLC v. Charter Oak Fire Ins.*, 626 F. Supp. 3d 866, 878 (D. Md. 2022) (describing the consensus under Maryland law rejecting "the application of res judicata where the plaintiffs could not have obtained total relief in an earlier suit"). The claims here had not accrued when the foreclosure action began—or even when it ended. Rather, they accrued, as we explain below, when Tempest and East Coast obtained a deed—extinguishing the plaintiffs' property interests and allowing the investors to become owners. *See infra* at 47. East Coast and Tempest thus were not unjustly enriched, nor did ECO and Ms. Anderson have their property taken, when the foreclosure action began.

Tempest asserts that ECO should have raised a defense to secure an "injunction halting tax sales." Tempest Br. at 11. But putting aside that that would have been of little use (the sale of the lien on ECO's property happened two years before the foreclosure action), an injunction is not the same as a damages claim.[20] "[W]hen a certain remedy or form of relief is unavailable in an earlier action, res judicata does not preclude a subsequent claim for that form of relief even if the actions concerned the same transaction." *ACAS*, 626 F. Supp. 3d at 877. Thus, Tempest's insistence that ECO should have sought an *injunction* gives away the game: The damages claim was not yet available and res judicata doesn't bar it.

---

[20] Only ECO seeks injunctive relief and only against the City, which has not raised res judicata.

*Third*, Maryland law does not preclude a plaintiff from raising claims simply because they overlap with issues they could have raised when they were a defendant in a prior case. When a "defense is not litigated and determined so as to be precluded by collateral estoppel, the defendant in the previous action is not barred by res judicata from subsequently maintaining an action" based on the same set of facts. *Rowland v. Harrison*, 320 Md. 223, 235–36 (1990). "[T]he justification" for this rule is that the "defendant [in the first lawsuit] should not be required to assert his claim in the forum or the proceeding chosen by the plaintiff [in the first lawsuit] but should be allowed to bring suit at a time and place of his own selection." *Id.* at 232. That means that even if the claims here could have served as a defense—and they couldn't—Maryland law does not preclude the plaintiffs from bringing the claims now.

Tempest relies heavily on *Chaires v. Chevy Chase Bank, FSB*, 131 Md. App. 64 (2000), to argue otherwise, but it misreads the case. *See* Tempest Br. at 11–12. Unlike here, the plaintiff in *Chaires did* raise the defense in the first action, even expressly incorporating the complaint in the second case (which was filed before the first one ended) as "the sole support of their exceptions to the foreclosure sale." *See Chaires*, 131 Md. App. at 75–76 (explaining that, in articulating the defense, the plaintiffs pointed to the "facts and legal circumstances . . . specified in the Second Amendment to the Complaint, attached hereto, which has previously been filed in the Circuit Court for Prince Georges' County"). That meant that the "issues and factual circumstances" decided in the first action were "identical" to what was raised in the second action. *Id.* at 76–77. To sustain it would thus "nullify" the first judgment by "negat[ing]" the factual predicate that allowed foreclosure in the first action, so res judicata applied. *Id.* at 78.

That cannot be said here. For the same reasons that *Rooker-Feldman* does not apply (and that the claims would not have served as a defense at all), a judgment for the plaintiffs here would

not nullify the judgment foreclosing the right of redemption. ECO and Ms. Anderson would still have their right of redemption terminated, and no fact that the circuit court found would be called into doubt, let alone "nullified."

*Fourth*, for similar reasons, East Coast is wrong to argue (at 9) that because the plaintiffs' claims "arise out of the same transaction" as the foreclosure judgment, res judicata applies. Maryland law, by permitting defendants in a first action to bring affirmative claims in a second action, is clear that res judicata does not apply merely because the claim "grow[s] out of the same transaction" as a potential defense. *Rowland*, 320 Md. at 236; *see also, e.g.*, *Moore v. Nissan Motor Acceptance Corp.*, 376 Md. 558, 567 (2003) (where plaintiff in second action prevailed on defense of failure to provide notice in first action—so that the second action would not nullify the first—res judicata did not prevent bringing of affirmative claim based on lack of notice in second action).

And, at any rate, East Coast's premise is wrong: This case is not based on the same transaction. When "[m]aterial operative facts occur[] *after* the [first] decision"—here, Tempest and East Coast obtaining the deed and not paying just compensation—that means there is a new "transaction which may be made the basis of a second action not precluded by the first." *Hughes*, 155 Md. App. at 627 (quoting Restatement (Second) of Judgments § 24 cmt. f) (emphasis added). Indeed, those later-occurring "material operative facts" are why the claim had not accrued at the time of the first action.

*Finally*, Tempest (at 12) and East Coast (at 9) contend that the plaintiffs were obligated to raise their claims as defenses under TP § 14-842 and Maryland Rule 14-505. Those provisions concern defenses challenging the validity of the *tax sales* (and imposition of the tax in the first place). But again, the takings claims here would serve as a defense to neither—or to the foreclosure action more broadly. Res judicata does not apply.

### IX.    ECO's claims are timely.

Tempest and ECO agree that, to be timely, ECO's claims had to be filed within three years of the taking. *See* Tempest Br. at 14.[21] Tempest contends, however, that the taking was the "tax sale" that occurred in 2018. Tempest is wrong.

"A property owner has an actionable Fifth Amendment takings claim when the government takes his property without paying for it." *Knick v. Twp. of Scott*, 588 U.S. 180, 185 (2019). As courts routinely recognize, property is not "taken" for purposes of the Fifth Amendment when contingencies remain and the taking is not yet final: "A possible future taking of property cannot give rise to a present action for damages." *Nw. LA Fish & Game Pres. Comm'n v. United States*, 446 F.3d 1285, 1291 (Fed. Cir. 2006); *see also, e.g.*, *Harrison*, 997 F.3d at 650 (claim became ripe when county transferred property to private property, not when it initiated foreclosure proceedings); *Mildenberger v. United States*, 643 F.3d 938, 947 (Fed. Cir. 2011) (statute of limitations began to run only when erosion became "permanent and irreversible"); *Wharf, Inc. v. District of Columbia*, 133 F. Supp. 3d 29, 37–38 (D.D.C. 2015) (taking did not occur upon enactment of ordinance because "the [street] closure" at issue would not take place unless "the government [took] specific steps to effectuate the closure . . . and if those steps were never taken by the government, presumably the street would never close"). In short, only when there is "no question" about whether property has been seized is a taking complete. *Epcon Homestead, LLC v. Town of Chapel Hill*, 62 F.4th 882, 888 (4th Cir. 2023).

In this case, the taking of ECO's property occurred, and became final, when the City issued the deed to Tempest. That was the action that conferred title on Tempest and extinguished ECO's

---

[21] Tempest argues that laches governs ECO's unjust enrichment claim. ECO disagrees, but the dispute is academic at this stage because Tempest concedes that the laches period is at least three years.

rights. *Supra* 5–6. Until that point, there was no certainty that ECO's rights would ever be completely extinguished because "specific steps [required] to effectuate" the taking had not been completed. *Wharf, Inc.*, 133 F. Supp. 3d at 38. As discussed above, it is "not uncommon" that tax-sale certificate holders like Tempest choose not to obtain a deed. *Thornton Mellon*, 478 Md. at 425–26. And if they wait more than 90 days, the original property owner can move to reinstate its right to redeem if it is able to pay the taxes and penalties owed. *Id.*; *Midaro Invs. 2020, LLC v. Johnson*, 2024 WL 194134, at *8 (Md. App. Ct. Jan. 18, 2024). Here, Tempest waited over a year to obtain the deed, raising substantial questions and uncertainty (at the time) about whether it would ever take the steps required to permanently deprive ECO of its property. FAC ¶¶ 46, 51.[22]

Although Tempest argues that the taking occurred at the time of the tax-lien sale, it never explains why. And it can't. After the tax sale, ECO retained the right to redeem and thus unilaterally eliminate any possibility of its property being taken away. TP § 14-827. The mere possibility that it *may* not do so, that Tempest *may* then seek foreclosure of the right of redemption, and that Tempest *may* then obtain the deed leaves far too many contingencies for the taking to be final. Just consider if ECO had brought a claim for just compensation immediately after the sale; no court would consider that ripe. That may be why the City acknowledges that the "tax sale does not deprive Plaintiffs of a protected interest in real property." City Br. at 14.

The single case that Tempest cites, *Epcon Homestead*, lends it no support because there were no contingencies. The government there conditioned a permit on the owner either allocating certain building units to affordable housing or paying a fee when the land was developed; that

---

[22] Because Tempest had to take steps post-foreclosure to obtain the deed and, thus, the property, the foreclosure judgment didn't effectuate the taking either. But even if the clock did start to run at the time of that judgment, Tempest concedes (at 13) that ECO's claims would be timely.

completed a taking by (allegedly) depriving the land of its value immediately. 62 F.4th at 888; *see also Wharf, Inc.*, 133 F. Supp. 3d at 36 (distinguishing the precedent on which *Epcon* relied as not involving contingencies). In *Epcon Homestead*, as elsewhere, the key question was whether "no question" remained about whether the property was taken. 62 F.4th at 888. Because those questions did exist after the tax sale, ECO's claim is timely.

## X.    ECO has standing to seek declaratory and injunctive relief.

In the last section of its brief, the City briefly questions ECO's standing to seek prospective relief requiring the City to pay just compensation and declaring the failure to do so unconstitutional. The City focuses its argument entirely on whether ECO has "representational standing" to prevent injuries to its members. ECO, as explained below, does. But the City also overlooks that ECO has organizational standing to sue on its own behalf for injuries that the City's conduct causes to ECO itself. *See, e.g.*, *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (explaining that an organizational plaintiff may satisfy standing requirements either by claiming "injury in its own right" or by asserting "standing solely as the representative of its members").

### A.    ECO has organizational standing.

The City's motion does not challenge ECO's organizational standing, nor could it. As the Fourth Circuit recently explained, an organization has standing to sue for its own injuries when the defendant's "action perceptibly impairs [the] organization's ability to carry out its mission and consequently drains the organization's resources." *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 395–96 (4th Cir. 2024).; *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). Although an organization cannot manufacture standing through an "uncompelled choice to expend resources," an organization's diversion of resources in response "to a threat to the

organization's core mission" provides the necessary stake in the lawsuit to satisfy Article III. *Republican Nat'l Comm.*, 120 F.4th at 396.

Two cases help illustrate these principles. In the Fourth Circuit's recent decision in *Republican National Committee*, the North Carolina Republican Party's core mission included, among other things, "voter outreach." *Id.* at 396–97. The Fourth Circuit held that the Party had standing to challenge the state board of election's alleged violations of an election security law because those violations forced the Party to divert resources from its voter-outreach work to "combatting election fraud" instead. *Id.* The Supreme Court's decision in *Havens* provides another example. There, the plaintiff's mission was to "assist equal access to housing through counseling and other referral services." *Havens*, 455 U.S. at 379. The Supreme Court held that the defendant's "racial steering practices" caused the organization an Article III injury by forcing it away from that counseling to instead "devot[ing] significant resources to identify and counteract" the defendants' discriminatory practices. *Id.*

Under these decisions, ECO holds the necessary "personal stake in the outcome of the controversy as to warrant [the] invocation of federal-court jurisdiction." *Id.* at 378–79. ECO's core mission is the "equitable" "revitalization of [the] historically disinvested Midtown-Edmondson community." FAC ¶¶ 1, 72. Among the ways that ECO pursues that mission is through the careful preparation of development plans that are designed to further its mission, including by attracting developers aligned with ECO's mission. FAC ¶¶ 68–69. The transfer of property to tax-lien investors without just compensation to the original property owners deprives those owners of the ability to remain in the community—"driv[ing] them from the neighborhood" and undermining the "equitable" aims of ECO's mission—while also forcing ECO to "adjust[] its approach to [the development] master plan" and interfering with its ability to engage developers with shared

interests. FAC ¶¶ 1, 72. To combat that threat to its primary work, ECO has diverted significant time and resources to prevent community members from losing their properties without just compensation, including notifying community members who are on the tax-sale list—approximately 80 each year—helping them redeem properties, and working with government entities to reform the system. FAC at ¶¶ 71–72.

No meaningful distinction exists between the allegations that the Fourth Circuit held were sufficient in *Republican National Committee*, those the Supreme Court found supported organizational standing in *Havens*, and the allegations that ECO has set forth here.

### B. ECO also has associational standing to seek declaratory and injunctive relief on its members' behalf.

Although this Court need not reach the issue, ECO also has associational (or representational) standing to seek injunctive and declaratory relief. An organization can sue on behalf of its member when its members (1) "would otherwise have standing to sue in their own right;" (2) "the interests [ECO] seeks to protect are germane to the organization's purpose;" and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). All three factors are satisfied here.

**1.** First, ECO community members whose right of redemption has been foreclosed (or against whom foreclosure proceedings have been started) would have standing to sue in their own right. They face a "substantial risk" threat that the investor will obtain the deed and thereby extinguish their property rights while leaving them without just compensation. FAC ¶¶ 71–73; *see, e.g.*, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (a plaintiff has injury sufficient for standing if "there is a substantial risk that the harm will occur") *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 160 (4th Cir. 2000) ("The Supreme Court has consistently

recognized that threatened rather than actual injury can satisfy Article III standing requirements.").

The City, citing *Summers v. Earth Island Institute*, 555 U.S. 488, 498 (2009), contends that this is insufficient because the plaintiffs have not "identified" the members by name. City Br. at 22. That misunderstands the purpose of the "identification" requirement. It does not exist as a formal, code-pleading like rule. Instead, its purpose is to allow courts to ensure that Article III standing exists. *Summers*, 555 U.S. at 499. Thus, there is no requirement that members be identified by their names, but only that they be identified with sufficient specificity—for whatever stage of the case at which it is considered (in *Summers*, a preliminary injunction)—that this Court can be satisfied that it has jurisdiction. As courts in this district have held, that means there is no rigid requirement at the pleading stage that members be identified by name. *See, e.g.*, *Students for Fair Admissions v. United States Naval Acad.*, 707 F. Supp. 3d 486, 501 (D. Md. 2023) ("To require an organization to name the member who might have standing in his or her own right overreads the word "identified" in this context."); *La Union del Pueblo Entero v. Ross*, 353 F. Supp. 3d 381, 391 (D. Md. 2018) ("Although it is true that organizations cannot rely on a 'statistical probability that some of [its] members are threatened with concrete injury,' Summers[,] 555 U.S. [at] 497 . . . , Defendants cite no Fourth Circuit precedent that suggests Plaintiffs must identify a particular affected member by name at the pleading stage); *see also, e.g.*, *Ass'n of Am. Physicians & Surgeons, Inc. v. Sebelius*, 901 F. Supp. 2d 19, 31 (D.D.C. 2012) (collecting cases demonstrating that "[a]t the pleading stage, the Court presumes that general allegations encompass the specific facts necessary to support the claim, so the plaintiff need not identify an affected member by name"). And here, the complaint provides sufficient assurance that the Court has Article III standing by alleging that nearly a hundred liens on properties in the community are auctioned each year, and those who are about

to "lose their properties"—i.e., those for whom a foreclosure action has been initiated (or completed) but the deed has not yet been obtained—face the risk of injury of losing their properties without just compensation. FAC ¶¶ 71, 73. In other words, the members with standing are the defendants in the publicly filed foreclosure actions, so this is nothing like the "statistical probabilities" (advanced in pursuit of a preliminary injunction) that some member of an environmental organization may some day use a portion of a forest in *Summers*.[23]

The City also argues that the complaint fails to allege that any member "faces the threat of loss of unrealized equity for more than one property." City Br. at 23. The City cites nothing to explain why a person must be threatened to lose more than one property without just compensation to have standing. The threat of a single violation of a constitutional right is enough.

**2.** The City does not contest the second *Hunt* factor. Plainly, the interests ECO seeks to protect are germane to its purpose of "revitaliz[ing] . . . [the] historically disinvested Midtown-Edmondson community[,]" FAC ¶ 72, which naturally encompasses avoiding vacancies and blight while promoting the neighborhood's development and collective accumulation of wealth. ECO's mission "also includes protecting members . . . from the tax sale process, which, by leaving people without just compensation, drives them from the neighborhood." FAC ¶ 1.

**3.** As to the third factor, the City's use of *Warth v. Seldin* to assert that ECO's individual members must participate in this suit is inapposite because, as *Warth* itself recognized:

> If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. Indeed, in all cases in which we have expressly recognized standing in associations to represent their members, the relief sought has been of this kind.

---

[23] If the Court deems it necessary to identify people by name—and concludes that ECO lacks organizational standing—ECO requests leave to amend the complaint to add those names.

422 U.S. 490, 515 (1975). *See also, e.g.*, *Ass'n for Educ. Fairness v. Montgomery Cnty. Bd. of Educ.*, 560 F. Supp. 3d 929, 945 n.11 (D. Md. 2021) ("[B]ecause [plaintiff] seeks injunctive relief, individual member participation in the litigation is unnecessary." (citing *Hunt*, 432 U.S. at 343, and *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996)). Unlike in *Warth*, where "an association [sought] relief in damages for alleged injuries to its members[,]" *Warth*, 422 U.S. at 515, ECO asserts representational standing solely to obtain declaratory and injunctive relief on behalf of its members.

## XI.    The plaintiffs do not necessarily object to the dismissal of the Director of Finance.

The City contends (at 21) that Michael Mocksten, who has been sued for prospective relief in his official capacity as the City's Director of Finance, should be dismissed because the claims against him are duplicative of the claims against the City. This appears to be a concession that Mr. Mocksten's conduct is attributable to the City. That being so, the plaintiffs do not object to his dismissal. If the City backtracks in its reply brief, however, then the claims are not duplicative and dismissal would be improper.

## XII.    The Court should grant leave to amend if it does not deny the defendants' motions.

In the event that the Court concludes that the plaintiffs have not adequately alleged any part of their claims, the plaintiffs respectfully request leave to amend in accordance with Local Rule 103.6.

### CONCLUSION

For the foregoing reasons, the motions should be denied.

Dated: January 24, 2025                         Respectfully submitted,

                                                */s/ Robert D. Friedman*
                                                ROBERT D. FRIEDMAN*
                                                DEEPAK GUPTA*

GUPTA WESSLER LLP
2001 K Street NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
*robert@guptawessler.com*

JENNIFER BENNETT *
GUPTA WESSLER LLP
505 Montgomery Street
Suite 625
San Francisco, CA 94111
(202) 888-1741

LEE H. OGBURN (MD Bar 00018)
Maryland Legal Aid
500 E. Lexington Street
Baltimore, Maryland 21202
(410) 951-7777
*logburn@mdlab.com*

*Counsel for Plaintiff*

* Admitted pro hac vice