## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

EDMONDSON COMMUNITY               *
ORGANIZATION, INC., ET AL.,
                                  *
        Plaintiffs,
                                  *
v.
                                  *       Civil No. 24-1921-BAH
MAYOR AND CITY COUNCIL OF
BALTIMORE, ET AL.,                *

        Defendants.               *

*       *       *       *       *       *       *       *       *       *       *       *       *       *

## <u>MEMORANDUM OPINION</u>

Edmondson Community Organization, Inc. ("ECO") and Bonita Anderson ("Anderson") (collectively "Plaintiffs") brought suit against the Mayor and City Council of Baltimore (the "City"), Tempest LLC ("Tempest"), East Coast Tax Auction LLC ("ECTA"), and Michael Mocksten in his official capacity as the Director of Finance for Baltimore City ("Mocksten") (collectively "Defendants") alleging a claim for violation of the Fifth Amendment to the United States Constitution under 42 U.S.C. § 1983 (Count I), a claim brought directly under the Constitution for a violation of the Fifth and Fourteenth Amendments (Count II), a claim for declaratory relief under 28 U.S.C. § 2201 (Count III), and a claim for unjust enrichment (Count IV). ECF 22 (amended complaint).[1]  Pending before the Court are Defendants' three Motions to Dismiss (the "Motions."). ECF 35 (Tempest); ECF 37 (ECTA); ECF 39 (City). Plaintiffs filed an

---

[1] The initial complaint can be found at ECF 1.

opposition, ECF 47[2], and each Defendant filed a reply, ECF 48 (Tempest); ECF 49 (City); ECF 50 (ECTA). All filings include memoranda of law.[3] The Court has reviewed all relevant filings and considered the parties' arguments at the motions hearing on June 23, 2025. Accordingly, for the reasons stated below, Defendants' Motions are **GRANTED** in part and **DENIED** in part.

## I.   BACKGROUND

### A.   Maryland's Tax Sale System

Maryland's Tax-Sale laws are codified in Title 14, Subtitle 8 of the Tax Property Article of the Maryland Code ("TP"). ECF 22, at 6 ¶ 10. Under that Title, "all unpaid taxes on real property" are treated as liens on the property. *Id.* ¶ 11 (citing TP § 14-804(a)(1)). State law, as a general matter, requires Maryland's municipalities to sell their liens in a public auction, but gives each municipality discretion to decide when to conduct the auction.[4] *Id.* ¶ 12 (citing TP § 14-808(a)(1)).

When it chooses to conduct an auction, the City must advise the general public by publishing at least twice in newspapers of general circulation in the City a notice of the date and place at which each lien will be auctioned. *Id.* at 7 ¶ 14 (citing TP § 14-813(a)(1)). Under TP § 14-817(a)(2), when the City auctions a lien, it must sell the lien to the person who makes the highest

---

[2] The Court granted Plaintiffs' request to file one memorandum not to exceed 60 pages in opposition to the Defendants' three pending motions to dismiss. ECF 46.

[3] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

[4] According to the Amended Complaint, "[s]tate law imposed (and continues to impose) no deadline [on Baltimore] by which [it had to sell a lien], and therefore no limit on the amount of time Baltimore may give its residents to become current on their taxes before risking losing their property." ECF 22, at 6 ¶ 12. State law also allegedly "explicitly allows the City to refrain entirely from auctioning properties owned by people over age 65, properties owned by 'low income' individuals, and properties owned by disabled individuals." *Id.* ¶ 13 (citing TP § 14-811(h)(2)).

"good faith accepted bid." *Id.* ¶ 15. Section 14-817(b)(2) permits—but does not require—the City

to impose a high-bid premium that is 20% of the amount the winning bid exceeds 40% of the

property's "full cash value" or, if it's greater, the value of the lien.[5] *Id.* ¶ 16. The City has

discretion to set a minimum bid for each lien so long as the minimum bid is not less than the

amount of taxes due on the property, together with penalties and interest. *Id.* ¶ 17 (citing TP § 14-

817(b)(1)).

When a tax investor places the winning bid on a tax lien at auction, it need not turn over to

the City the full amount of its bid. *Id.* ¶ 18 (citing TP § 14-818(a)(1)). Instead, it is required to

pay only the amount of the outstanding tax bill and the high bid premium, if any. *Id.* (citing TP

§ 14-818(a)(1)). It only needs to pay the rest of its bid if the property owner fails to redeem the

property and the investor chooses to obtain a deed from the City. *Id.* (citing TP § 14-818(a)(4)).

Following the tax sale, a "redemption" period begins during which the original property

owner can extinguish the lien—now held the by the winning bidder—by paying not only the past

due taxes but also the interest, penalties, and costs of the sale claimed by the City, plus the

investor's attorneys' fees and costs. *Id.* at 8 ¶ 19 (citing TP § 14-828). Redemption is not complete

unless the taxpayer pays interest to the lien purchaser.[6] *Id.* ¶ 20 (citing TP § 14-828(a)(1)(i)). The

---

[5] Plaintiff provides the following example: "if a property with a lien for $5,000 in past due taxes
is listed as having a full cash value of $100,000 and the winning bid is $80,000, the investor must
pay an additional $8,000 penalty. That's because the bid exceeds 40% of the property's listed value
($40,000) by $40,000, and 20% of $40,000 is $8,000." ECF 22, at 7 ¶ 16. East Coast maintains
that "[t]he high-bid premium serves as a critical mechanism for mitigating speculative bidding and
ensuring bidder commitment, analogous to the non-refundable deposits standard in foreclosure
sales." ECF 37-2, at 12; *see also* ECF 35-1, at 10 (defining the high bid premium as an "earnest
money deposit").

[6] Although state law sets the interest rate at 6%, it gives municipalities discretion to set a higher
rate. ECF 22, at 8 ¶ 20 (citing TP § 14-820).

interest on the lien, if redeemed, goes to the investor, not to the City. *Id.* ¶ 21. According to the Amended Complaint, at the tax sale auction, "[i]nvestors are buying the right to collect the property-owner's debt with interest, secured by a lien on the property . . . [i]n other words, they are buying the lien from the City, not the property itself." *Id.* ¶ 22.

If the property owner is unable to redeem within the time provided, the investor may bring an action to foreclose the right of redemption. *Id.* ¶ 23. Before doing so, the investor, not the City, is responsible for providing notice to the property owner of their rights, including how to redeem the property to prevent foreclosure. *Id.* (citing TP § 14-833(a-1)).

According to the Amended Complaint, "[a] judgment foreclosing the right of redemption does not give title to the investor." *Id.* at 8–9 ¶ 24. Rather, it is the City that gives title to the investor. *Id.* And the City will transfer clear legal title to the investor only in exchange for the investor paying the remainder of its bid, plus any accrued taxes. *Id.* (citing TP § 14-818(a)(3)). If the investor fails to fulfill these requirements within 90 days of the judgment, the original owner may file a motion to strike the judgment of foreclosure. *Id.* (citing TP § 14-847(d)(1)). If the investor fulfills its obligations to obtain title, the original property owner loses title and is entitled to only the difference between the tax bill and the winning bid. *Id.* ¶ 25 (citing TP § 14-818(a)(4)).

Plaintiffs allege that "[b]y selling the liens for far less than the assessed value of the property—and, in fact, penalizing bids that approach even half the assessed amount—the City values the property much higher for purposes of assessing taxes than it does for purposes of paying just compensation when the property is taken for failure to pay those same taxes." *Id.* at 13 ¶ 34.

### B.   Edmondson Community Organization

Edmondson Community Organization ("ECO") is a nonprofit dedicated to revitalizing the Midtown-Edmondson neighborhood of West Baltimore. ECF 22, at 13 ¶ 36. In 1995, Baltimore

4

City assigned ownership of 2114 Edmondson Avenue to ECO. *Id.* ¶ 37. According to the Amended Complaint, "ECO put the building to good use, making it the place where the Edmondson community convened." *Id.* at 14 ¶ 38. However, ECO fell behind on taxes in the amount of $2,543.47, so the City sold the tax lien on the building at the City's 2018 tax sale. *Id.* at 14–15 ¶¶ 39, 40. The winning bid on the property, made by Tempest, a California-based professional tax-sale investment company, was $5,115.[7] *Id.* at 14–15 ¶ 40. Tempest paid the City the amount of the tax lien on May 15, 2018. *Id.*

According to the Amended Complaint, "[t]he City listed approximately 20,000 properties in its single listing of properties in the 2018 tax sale," "[t]he City advertised the liens once in The Sun and once in The Daily Record," "[t]he City charged a high-bid premium," and "[t]he City did not require a minimum bid beyond the lien amount on ECO's building." *Id.* at 15 ¶¶ 41, 42. Plaintiffs allege that these factors "enabled Tempest to bid $5,115 for a building on which the City listed the 'Base Value' as $101,200 and which Tempest later sold at public auction for $139,500 without making any improvements to the property." *Id.* ¶ 42.

Tempest filed suit to foreclose ECO's right of redemption on February 21, 2019. *Id.* at 16 ¶ 46. On July 9, 2021, the Circuit Court for Baltimore City entered a judgment foreclosing ECO's right of redemption. *Id.* Plaintiffs allege that "[f]rom June 10 to June 14, 2022, Tempest conducted a public auction of the building using the Ashland Auction Group," and "Tempest sold the same building that it acquired from Baltimore City for $5,115 to Crown Quality Concept, LLC for $139,500." *Id.* ¶ 49. According to the Amended Complaint, Tempest did not complete the

---

[7] According to the Amended Complaint, "Tempest is a professional tax sale investor that bought 85 properties in the 2018 sale," and "[n]inety-four percent of those properties were redeemed at interest rates of either 12% or 18%—all paid to Tempest. On the five unredeemed properties to which Tempest took title, it paid a total of $55,045 for the liens on properties it has now sold for a total of $642,970." ECF 22, at 15 ¶ 44.

necessary steps to obtain the deed from the City until October 27, 2022. *Id.* ¶ 51. Tempest recorded its deed from the City on February 2, 2023. *Id.* ¶ 52. It recorded its deed transferring the building to Crown Quality Concept Tax Investor the same day. *Id.* Plaintiffs allege that "[f]or [ECO's] equity in the building, ECO was only entitled to receive from the City $2,571.53 (the difference between the tax lien and Tempest's winning tax-sale bid of $5,115)—approximately 1.8% of its equity in the building, as measured by Tempest's public auction of the building." *Id.* at 17 ¶ 54.

### C. Bonita Anderson

Similarly, in 2019, after being diagnosed with cancer, Anderson fell behind on her taxes in the amount of $5,428. ECF 22, at 18 ¶ 59. The City sold its tax lien on her property at the 2020 auction. *Id.* ¶ 60. According to the Amended Complaint, the City listed approximately 13,000 properties in small print in a 48-page single spaced list in the 2020 tax sale, advertised the liens in 2020 once in The Sun and once in The Daily Record, charged a high-bid premium, and did not require a minimum bid beyond the lien amount on Anderson's home. *Id.* ¶ 61. Plaintiff alleges that those factors "enabled [ECTA] to bid $69,500 for a building on which the City listed the 'Base Value' as $185,500." *Id.*

Anderson was unable to immediately redeem her property, though she attempted to do so. *Id.* at 19 ¶ 63. In July 2020, she made $400 in payments, and beginning in July 2022, Anderson was able to make "more substantial payments." *Id.* According to the Amended Complaint, "[o]ver the next six months, she paid the City more than $18,900—nearly four times her delinquency," and "[t]he City accepted these payments, including more than $16,000 before her right of redemption was foreclosed, but applied them solely to taxes that became due after the tax sale even though those are not part of the redemption requirement." *Id.* (citing TP § 14-828(a)(2)). As a

6

result, Anderson was unable to redeem her property, and ECTA was allegedly relieved of having to pay those taxes. *Id.*

ECTA obtained a judgment foreclosing the right of redemption in December 2023. *Id.* ¶ 64. ECTA then completed the steps necessary to obtain a deed, and the City deeded clear title to ECTA in March 2024. *Id.* The Director of Finance transferred the deed on behalf of the City to ECTA. *Id.*

## II.     LEGAL STANDARD

### A.     12(b)(1)

Under Rule 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction. *See Demetres v. East West Const., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015); *see also The Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty.*, 523 F.3d 453, 459 (4th Cir. 2008). A challenge to subject matter jurisdiction under Rule 12(b)(1) may proceed "in one of two ways": either a facial challenge, asserting that the allegations pleaded in the complaint are insufficient to establish subject matter jurisdiction, or a factual challenge, asserting "'that the jurisdictional allegations of the complaint [are] not true.'" *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citation omitted); *accord Durden v. United States,* 736 F.3d 296, 300 (4th Cir. 2013).

In a facial challenge, "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns*, 585 F.3d at 192. On the other hand, in a factual challenge, "the district court is entitled to decide disputed issues of fact with respect to subject matter jurisdiction." *Id.* In that circumstance, the court "may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco*

7

*v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004); *see also United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347–48 (4th Cir. 2009).

Defendants appear to raise a facial challenge to the Court's subject matter jurisdiction. Therefore, the Court looks to the four corners of the Amended Complaint.

**B.    12(b)(6)**

Federal Rule of Civil Procedure 12(b)(6) governs dismissals for failure to "state a claim upon which relief can be granted." In considering a motion under this rule, courts discount legal conclusions stated in the complaint and "accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus,* 551 U.S. 89, 94 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court then draws all reasonable inferences in favor of the plaintiff and considers whether the complaint states a plausible claim for relief on its face. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

"The complaint must offer 'more than labels and conclusions' or 'a formulaic recitation of the elements of a cause of action[.]'" *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x 745, 747 (4th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). At the same time, a "complaint will not be dismissed as long as [it] provides sufficient detail about [the plaintiff's] claim to show that [the plaintiff] has a more-than-conceivable chance of success on the merits." *Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 396 (4th Cir. 2014).

**III.    ANALYSIS**

Under TP § 14-818(a)(4), if a sale yields any surplus beyond what is necessary to satisfy unpaid taxes and associated costs, such surplus must be returned to the property owner. The crux

of the parties' dispute in this action is over how surplus should be calculated and defined.

Plaintiffs' fundamental argument is that "[t]here is [] no authority for the proposition that when property is taken, the just compensation required by the Takings Clause can be measured by the value of a lien on the property, rather than the property itself." ECF 47, at 22. While there is some case law to guide this Court's analysis, Plaintiffs' underlying theory of the case appears to be a matter of first impression. The Court will first address Defendants' arguments under Rule 12(b)(1) before turning to the arguments under Rule 12(b)(6).

### A.    The Court has Jurisdiction over Plaintiffs' Claims.

#### 1.    Tax Injunction Act

The Tax Injunction Act (TIA) provides that "district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. The Act thus limits the power of federal courts when "taxpayers seek federal-court orders enabling them to avoid paying state taxes." *Hibbs v. Winn*, 542 U.S. 88, 107 (2004). The Act has been interpreted to bar not only injunctions, but also actions seeking declaratory judgments regarding the validity of tax collection. *See Great Lakes Dredge & Dock Co. v. Huffman*, 319 U.S. 293, 299 (1943).

The City contends that "[u]nder the TIA, this Court lacks 'jurisdiction over a claim for damages under § 1983 challenging a state tax.'" ECF 39-1, at 10 (citing *Lawyer v. Hilton Head Pub. Serv. Dist. No. 1*, 220 F.3d 298, 301–02 (4th Cir. 2000)). The City also maintains that injunctive relief is barred by the TIA because the Court does not have jurisdiction "to take actions that 'suspend or restrain' the assessment and collection of state taxes." ECF 39-1, at 11 (first quoting *California v. Grace Brethren Church*, 457 U.S. 393, 408–09 (1982); and then quoting 28 U.S.C. § 1341). The City further argues that the TIA extends to declaratory judgments and thus

9

the declaratory relief sought under Count III is barred. *Id.* Plaintiffs respond that "[c]ourts have repeatedly concluded that they have jurisdiction to hear claims to recover the surplus value of property taken to satisfy a tax debt for a simple reason: 'surplus property' is 'not tax proceeds.'" ECF 47, at 39 (first citing *Freed v. Thomas*, 976 F.3d 729, 736 (6th Cir. 2020); and then citing *Harrison v. Montgomery Cnty. Ohio*, 997 F.3d 643, 652 (6th Cir. 2021)).

In *Freed v. Thomas,* the Sixth Circuit addressed similar circumstances and ultimately held that the TIA does not bar suit. 976 F.3d at 735–36. In *Freed*, the defendants argued, like the City does here, that "allowing [plaintiff] to file suit for the surplus equity of his property in federal court amounts to a challenge to the State's tax collection procedures." *Id.* at 735. In short, the defendants maintained that plaintiff's "recovery of the excess sale proceeds and surplus equity is part of a comprehensive tax-collection procedure," and thus the TIA bars suit. *Id.* The Sixth Circuit held that plaintiff's "feud with the State arises from *post-collection* actions, specifically Michigan's refusal to refund the excess proceeds of the sale of [plaintiff's] property and failure to reimburse [plaintiff] for the surplus equity in his home." *Id.* (emphasis in original). In reaching this decision, the court reasoned that the "excess sale proceeds at issue in this lawsuit arise from a tax-foreclosure sale, but they are not tax proceeds." *Id.*

The Court adopts the reasoning of *Freed* and *Coleman*[8] (a case *Freed* relied on) here. *See Freed*, 976 F.3d at 736 ("[T]he logic of *Coleman*—that the TIA does not bar a takings suit in federal court where a taxpayer seeks to recover only after-tax equity—applies with equal import in this case as well."). As Plaintiffs point out, "neither ECO nor [] Anderson attempts in this action to challenge the amount of taxes they owed," "[n]either asks for their property back," and "[n]either seeks to nullify the City's collection by demanding payment for the part of the property

---

[8] *Coleman ex rel. Bunn v. District of Columbia*, 70 F. Supp. 3d 58, 69 (D.D.C. 2014).

value that went to taxes." ECF 47, at 40 (cleaned up). Rather, both claim "only a right to the 'surplus'—the difference between the value of the property that was taken from them, and the amount of taxes owed." *Id.* (citing ECF 22, at 2). The excess proceeds at issue in this lawsuit are not tax proceeds. As the Sixth Circuit explained in *Freed*, "[i]f [plaintiff] succeeds in recovering the excess sale proceeds as a result of this lawsuit . . . no tax proceeds will be removed from [Maryland's] coffers." 976 F.3d at 736. While the City maintains that "[t]he tax revenues collected by the City from tax sales would be more than offset by the asserted obligation to compensate former property owners for the unrealized market value of their tax foreclosed property," this argument, which may have some weight from a policy perspective, is insufficient to invoke the TIA.[9] As Plaintiffs point out, there is no support in the case law cited by Defendants for the proposition that "because [the City's] [allegedly] unconstitutional actions may yield a net loss, the Act applies." ECF 47, at 43. Such a rule would unreasonably inoculate the City from suit because "the City [would be] subject to suit when it keeps the full value of the property it takes, but [] the Act [would] bar a claim the moment the City turns the surplus over to a third party." *Id.*

---

[9] Plaintiffs note that this argument merely "demonstrates why the [TIA] does not apply," because "[t]he 'revenues' from the tax sales are the *taxes*—what the [TIA] protects," and the fact that the revenues "wouldn't cover the damages proves this case isn't about taxes." ECF 47, at 43 (emphasis in original). The Court agrees that Defendants' "net-loss" argument appears to transcend the scope of the inquiry at this stage of the litigation because the Supreme Court has interpreted the scope of the TIA narrowly, encompassing claims "in which state taxpayers seek federal-court orders enabling them to avoid paying state taxes," or phrased slightly differently, where the relief granted would "operate to reduce the flow of *state tax* revenue." *Hibbs*, 542 U.S. at 106–07 (emphasis added). Here, Plaintiffs do not dispute the amount of taxes owed or challenge the City's right to auction a tax lien to satisfy outstanding tax debt or dispute the City's right to retain the taxes owed as part of their state tax revenue. Therefore, the narrow reach of the TIA does not apply because Plaintiffs do not seek to avoid paying state taxes and the claims at issue would not disrupt the flow of state tax revenue.

Additionally, to the extent the City argues that the TIA bars a claim if success on the claim would "reduce state revenues" in the aggregate, the Court finds this argument unconvincing. ECF 39-1, at 12 (citing *Hibbs*, 542 U.S. at 108). If that were true, any claim for surplus proceeds would be barred, including the claims at issue in *Freed* and *Coleman*, because a successful claim would necessarily reduce the state's overall revenue by taking money the state previously obtained from a property sale and awarding the surplus to the original property owner. The TIA does not bar such claims because "seizure and extinguishment of surplus equity is not an act of obtaining payment of taxes due[.]" *Harrison*, 997 F.3d at 652.

The City also maintains that "the monetary remedies sought in counts I and II of the amended complaint would 'in every practical sense operate to suspend collection of the state taxes.'" ECF 39-1, at 10–11 (first quoting *Great Lakes*, 319 U.S. at 299; and then citing ECF 22, at 25 ¶¶ 96-97). Courts have already rejected this argument, and this case presents no reason to depart from those holdings. *See Harrison*, 997 F.3d at 651–52 (finding TIA does not bar plaintiff's claims where she "does not challenge [the state's] collection of delinquent taxes," "does not seek to halt foreclosures of tax-delinquent property or even to get her home back," but rather "challenges only [the State's] seizure of surplus equity"); *Coleman ex rel. Bunn v. District of Columbia*, 70 F. Supp. 3d 58, 69 (D.D.C. 2014) (finding TIA does not bar claim where plaintiff "does not challenge the District's right to collect the tax owed; the amount of the tax, interest, expenses or penalties owed; or the right of the District's taxing authorities to foreclose on his property to recover that debt," but rather challenges only "the taking of property that was indisputably not owed for taxes . . . the amount in excess of the tax owed").

Finally, the City argues that "[f]inding that the former owner of tax-foreclosed real property must be compensated for unrealized equity would be extraordinarily burdensome, and would very

likely discourage prospective purchasers from participating in tax sales." ECF 39-1, at 12–13 (citation and quotation marks omitted). Plaintiffs respond that "[j]ust because governmental action makes it easier to collect taxes by providing incentives that align with tax collection—or because stopping that action may inhibit the collection of taxes—does not mean that the Act applies." ECF 47, at 42 (cleaned up). Indeed, in *Coleman*, the District of Columbia argued that success on the claims at issue would frustrate the collection of taxes because "the law's treatment of a homeowner's surplus equity is inextricably intertwined with the process by which a tax lien is sold to a third party and a former homeowner's right to redeem the property itself is foreclosed upon . . . In essence, forfeiting the equity is an extra incentive for the payment of taxes." 70 F. Supp. 3d at 68. But the court pointed out that "[c]ourts have rejected the argument that the Tax Injunction Act bars challenges to such independent incentives." *Id.* Because the plaintiff challenged the District's "taking of the surplus equity in his home, above and beyond the amounts the District ha[d] defined as the 'tax,'" the claim was not barred by the TIA. *Id.* at 68–69. The same result is warranted here: potentially disincentivizing prospective purchasers from participating in tax sales does not bring the claim within the scope of the TIA.

In sum, Plaintiffs are not challenging Maryland's assessment, levy, or collection of a tax.[10] They merely challenge the State's taking of their property without just compensation.[11] Therefore, the TIA does not bar the suit.

      2.   Comity

The principle of comity is an independent doctrine that "prohibits 'taxpayers . . . from asserting § 1983 actions against the validity of state tax systems in [the lower] federal courts.'" *Chippewa Trading Co. v. Cox*, 365 F.3d 538, 541 (6th Cir. 2004) (alterations in original) (quoting *Fair Assessment in Real Est. Ass'n, Inc. v. McNary*, 454 U.S. 100, 116 (1981)). While the principle of comity is a practice of abstention, and is not jurisdictional, the Supreme Court has "long recognized that principles of federalism and comity generally counsel that [federal] courts should adopt a hands-off approach with respect to state tax administration." *Nat'l Priv. Truck Council, Inc. v. Okla. Tax Comm'n*, 515 U.S. 582, 586 (1995).

---

[10] The Court notes that Plaintiffs clarify that the prospective relief they seek "is limited to an order requiring that, if the City takes property, then it must return the surplus value to the property owner," but Plaintiffs do not "seek[] an order imposing certain procedures on the City before it conducts a tax sale." ECF 47, at 41 n.15. As noted at the hearing, the Court remains concerned that such relief would effectively be an "obey the law" injunction, which is highly "disfavored," and courts across the country have expressed doubt about the enforceability and propriety of such injunctions. *See City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019) (obey-the-law injunctions are "disfavored"); *S.E.C. v. Goble*, 682 F.3d 934, 949 (11th Cir. 2012) ("We have repeatedly questioned the enforceability of obey-the-law injunctions . . . ."); *E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 841 (7th Cir. 2013) ("An injunction that does no more than order a defeated litigant to obey the law raises several concerns."). However, given the posture of the case, the Court need not conclusively resolve whether appropriately tailored declaratory relief could be crafted.

[11] While Defendants maintain that Plaintiffs were given the equity they were entitled to—namely, the difference between the winning bid on the tax lien at the auction and the amount owed in taxes and associated costs, the Court is obligated to accept all facts in the Complaint as true and draw all reasonable inferences in favor of Plaintiffs. As such, and as discussed in more detail below, Plaintiffs have plausibly alleged that this amount was not, as a matter of law, just under the Takings Clause.

The City argues that "Plaintiffs object to the way tax sales are conducted," and "[c]omity restrains this Court from hearing Plaintiffs' claims that will disrupt the collection of property taxes through the tax sale and foreclosure process." ECF 39-1, at 14. Plaintiffs respond that Defendants "misunderstand[] the plaintiffs' claim," and clarify that, "[t]he City is free to leave unchanged the way it sells tax liens—and the plaintiffs do not ask the court to change it—so long as, at the end, when it takes a Baltimore resident's property, it provides just compensation." ECF 47, at 45.

The Sixth Circuit addressed a similar argument in *Freed*, and this Court again finds its reasoning persuasive. In *Freed*, the Michigan Attorney General argued that "Plaintiff's claims 'not only attempt to frustrate state tax collection, the entire tax statute collapses under Plaintiff['s] theory.'" 976 F.3d at 737. However, the Court found "that [the argument] appears to be hyperbole," and "[t]o the extent that this suit does impose negative consequences on Michigan's tax scheme, those consequences will be indirect and more related to Michigan's tax refund procedures." *Id.*; *see also Dorce v. City of New York*, 2 F.4th 82, 98 (2d Cir. 2021) (finding that a "claim—limited to the excess value of the property—would not be barred by comity because it would not risk disruption of local tax administration"). The same is true here. Plaintiffs' claims do not attack the validity of the property tax collection system, but rather, seek just compensation after the tax sale process is complete. If Plaintiffs prevail on their claims, nothing in the federal litigation would require the City to change their tax collection process. The City can still put liens on properties, sell those liens at a tax sale, and recover taxes owed through the sale of the tax lien. *See Freed*, 976 F.3d at 737 (finding that the principle of comity does not bar suit where "[a] favorable outcome for [plaintiff] . . . will not prevent [the state] from foreclosing on and selling property to recover delinquent taxes").

Next, the City asserts that "by arguing that the tax sale and foreclosure process is a taking of unrealized equity, without payment of just compensation, Plaintiffs seek relief from the consequences of their failure to pay taxes on real property, which amounts to tax avoidance." ECF 39-1, at 14. The Court has already rejected this argument in the TIA analysis above. *See Coleman*, 70 F. Supp. 3d at 67 (holding that plaintiff's claim was not barred by the TIA or the related principle of comity despite defendant's argument that forfeiting equity is an incentive for the payment of taxes). Plaintiffs do not dispute the amount of taxes owed or the City's taxing authority. And other courts have repeatedly held that "takings suits in federal courts to recover excess equity as a result of state tax foreclosure sales do not violate the principle of judicial federalism." *Freed*, 976 F.3d at 737; *Harrison*, 997 F.3d at 652 (same); *Dorce*, 2 F.4th at 98 ("Comity does not bar Plaintiffs' claims here because their claims do not challenge their tax liability, and do not challenge or disrupt any aspect of the City's administration, calculation, or collection of any tax.").

Additionally, the City argues that Maryland state courts are "better positioned than their federal counterparts to correct any violation because they are more familiar with state legislative preferences and because the TIA does not constrain their remedial options." ECF 39-1, at 15. But the case the City cites for this proposition, *Levin v. Commerce Energy, Inc.*, involved a claim of discriminatory state taxation, not a surplus equity claim, and thus the Supreme Court held comity considerations required that the complaint proceed originally in state court given that an adequate state-court forum was available to hear and decide the constitutional claims. 560 U.S. 413, 421 (2010). Here, the challenge is not to the taxation or the tax scheme. *See Dorce*, 2 F.4th at 100 (finding that comity does not control where plaintiff's claims do not risk disrupting state tax administration). Moreover, the Court already found that the TIA does not apply to Plaintiffs'

16

claims, thus "state courts would have no greater leeway than federal courts to cure the alleged

violation." *Levin*, 560 U.S. at 431.

In the Reply, the City contends that "[t]here is a state law remedy in state court for taking

private property without providing just compensation under Article III, § 40 of the Constitution of

Maryland." ECF 49, at 13.  But comity is not invoked simply because there is an analogous

constitutional provision under state law.[12]  Comity in tax-related cases is invoked when exercising

jurisdiction over a claim for damages under § 1983 challenges the assessment of a state tax or the

validity of the tax system. *See Fair Assessment in Real Estate Ass'n, Inc. v. McNary*, 454 U.S.

100, 116 (1981) ("[T]axpayers are barred by the principle of comity from asserting § 1983 actions

against the validity of state tax systems in federal courts . . . [s]uch taxpayers must seek protection

of their federal rights by state remedies, provided of course that those remedies are plain, adequate,

and complete[.]").  But the principle of comity does not bar a suit in this case because as described

above, Plaintiffs do not challenge the validity of Maryland's tax system or dispute the amount

owed in taxes.

Accordingly, the Court declines to dismiss the claims based on comity. *See Freed*, 976

F.3d at 737–38 (finding a claim under § 1983 was authorized despite the fact that plaintiff's lawsuit

"[arose] as an ancillary result of and [was] related to [the state's] tax foreclosure scheme" because

---

[12] To the extent the City points out the state law remedy to illustrate the adequacy of state procedures and remedies, *Freed* made clear that "[h]aving found that neither the TIA nor principles of comity prevent the exercise of federal jurisdiction in this case, [the court] need not consider whether [state] courts afford aggrieved taxpayers with 'plain, adequate, and complete' remedies to challenge allegedly unconstitutional takings," because the court "would only consider whether adequate state-court remedies exist if [the court] had found that either the TIA or comity counsel that we abstain from exercising federal jurisdiction." *Freed*, 976 F.3d at 740 (citing *Fair Assessment*, 454 U.S. at 116).

"at bottom, [plaintiff's] suit seeks compensation from an alleged unconstitutional taking and excessive fine").

### 3.    The *Rooker-Feldman* Doctrine

Tempest and the City argue that Plaintiffs' claims implicate the *Rooker-Feldman* doctrine, which bars federal courts from sitting "in direct review of state court decisions." *D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462, 482 n.16 (1983) (quoting *Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 296 (1970)).  The *Rooker-Feldman* doctrine applies to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005); *see Skinner v. Switzer*, 562 U.S. 521, 531–33 (2011); *Thana v. Bd. of License Comm'rs for Charles Cnty.*, 827 F.3d 314, 318–20 (4th Cir. 2016).  For the doctrine to apply, the party seeking relief in federal court must be asking the federal court to "reverse or modify the state court decree." *Adkins v. Rumsfeld*, 464 F.3d 456, 464 (4th Cir. 2006) (quotation omitted); *see Thana*, 827 F.3d at 318– 20.  Accordingly, the court "examine[s] whether the state-court loser who files suit in federal district court seeks redress for an injury caused by the state-court decision itself.  If [the state-court loser] is not challenging the state-court decision, the *Rooker-Feldman* doctrine does not apply." *Davani v. Va. Dep't of Transp.*, 434 F.3d 712, 718 (4th Cir. 2006) (footnote omitted); *see Thana*, 827 F.3d at 318–20.  In making this determination, courts consider "not only [] issues actually presented to and decided by a state court, but also [] constitutional claims that are inextricably intertwined with questions ruled upon by a state court, as when success on the federal claim depends upon a determination that the state court wrongly decided the issues before it." *Plyler v. Moore*, 129 F.3d 728, 731 (4th Cir. 1997) (quotations omitted); *see Jordahl v. Democratic Party*

*of Va.*, 122 F.3d 192, 199 (4th Cir. 1997).  Importantly, however, "[i]t has been repeatedly and emphatically emphasized by higher courts that *Rooker-Feldman* is a narrow doctrine." *United States ex rel. Prince v. Va. Res. Auth.*, No. 13-cv-00045, 2014 WL 1463786, at *2 (W.D. Va. Apr. 15, 2014) (collecting cases).

Tempest maintains that ECO is trying to "obtain appellate review of the state court's order foreclosing the right of redemption by asking for relief predicated on that tax sale being improper," ECF 35-1, at 13, but this mischaracterizes ECO's claims. ECO alleges no legal error by the state court. *See* ECF 47, at 50–51 (explaining that the state court orders "held that Tempest and [ECTA] possessed tax sale-certificates and that neither ECO nor [] Anderson had timely 'redeemed' their property," and explicitly noting that Plaintiffs "do not quarrel with any of that," and "do not claim that the circuit court erred in any way or argue that foreclosure of the right of redemption was improper—they accept that is all final"). Plaintiffs accept the judgment foreclosing their right to redemption, the loss of their property, and the satisfaction of their tax debts. In the instant case, Plaintiffs' claims for compensation for the taking of surplus equity in the property survives *Rooker-Feldman* because the Plaintiffs do not challenge the underlying state court judgment. As Plaintiffs explain, "a judgment for the plaintiffs here would not nullify the judgment foreclosing the right of redemption.  ECO and [] Anderson would still have their right of redemption terminated, and no fact that the circuit court found would be called into doubt, let alone nullified." ECF 47, at 56 (quotation marks omitted).

In short, the narrow *Rooker-Feldman* doctrine does not bar review here.  Success on Plaintiffs' claims would not change anything about the state court judgment. *See Dorce*, 2 F.4th at 105 ("Plaintiffs do not seek to void that state court foreclosure judgment; rather, they seek compensation only for the excess value of their property above the taxes and fees that they owed,

not the return of their property or the full value of their property."). Thus, Plaintiffs are not seeking

appellate review of the judgment because they are not contesting the merits of the judgment or

requesting that the amount of taxes owed be altered in any way. Accordingly, Plaintiffs' "claim

for compensation for the taking of [] surplus equity in the property survives *Rooker-Feldman*

because [plaintiff] does not challenge the [state court] Judgment, but the District's allegedly

unconstitutional enforcement of the statute providing for a taking of his surplus equity." *Coleman*,

70 F. Supp. 3d at 74.[13]

Tempest relies on *Smalley v. Shapiro & Burson, LLP*, 526 F. App'x. 231, 236 (4th Cir.

2013) to argue that in *Smalley*, "the Fourth Circuit noted that even though the borrower was not

expressly seeking reversal of the state court judgment, a ruling in the borrower's favor would be

predicated on the fact that the underlying judgment should not have been entered in the first place."

ECF 48, at 11. As another district judge in this Circuit recognized, however, "*Smalley* represents

a highly extreme and unique scenario in which part of the relief awarded by the state court—legal

fees and commissions—would have been negated by a favorable judgment in the federal action,

such that the federal action was inextricably intertwined with the prior state court action even

where it would not 'undo' it directly." *United States ex. rel. Prince*, 2014 WL 1463786, at *4.

The same is not true here. As the Court previously explained, a favorable outcome for Plaintiffs

would not negate any part of the state court judgment or hinge on whether the state court judgment

was rightfully entered. Rather, Plaintiffs' claims are limited to whether, after the state court

---

[13] The Court notes that this case differs from *Coleman* because here a statute does provide that the former property owner is entitled to surplus equity. Rather than challenging the unconstitutional enforcement of a statute providing for a taking of surplus equity, Plaintiffs challenge the way in which surplus equity is calculated. Nonetheless, the Court finds *Coleman's* reasoning persuasive because in both cases, the challenge to the surplus equity, albeit on different grounds, is insufficient to trigger *Rooker-Feldman* because the Plaintiffs are not challenging a state court decision.

judgment was entered, they were justly compensated for the equity. Moreover, while Tempest relies heavily on *Smalley*, the Court agrees with Judge Urbanski that "*Smalley* very likely rests within the outer-most limits of the doctrine," and "[t]o extend its holding any further would permit *Rooker-Feldman* to escape the narrow confines repeatedly delineated by the Supreme Court and trespass into the realm of preclusion law." *Id.* Accordingly, because the outcome in this case has no bearing on the state court judgment, *Rooker-Feldman* is no bar.

Separately, the City relies on *Shooting Point, LLC v. Cumming*, 368 F.3d 379, 385 (4th Cir. 2004) to argue that "[e]ven if a federal court decision finding that Plaintiffs are entitled to compensation for this interest 'might not explicitly declare the state judgment invalid, when the effect of its decision would carry the same import and would clearly render the state court judgment ineffectual, *Rooker-Feldman* is a bar to federal jurisdiction.'" ECF 39-1, at 19 (quoting *Shooting Point*, 368 F.3d at 385). Plaintiffs respond that "*Shooting Point* has been singled out by the Fourth Circuit as an example of the 'broad interpretation' of *Rooker-Feldman* that the Supreme Court in *Exxon* made clear was improper." ECF 47, at 52 n.19 (citing *Davani*, 434 F.3d at 717 n.5). The Court agrees, and notes that because *Shooting Point* was decided pre-*Exxon*, its significance is not self-evident. But in any event, the Court finds that Plaintiffs' claims have no bearing on the state court judgment, directly or indirectly. The City's reliance on *Ritter v. Ross*, 992 F.2d 750 (7th Cir. 1993) is similarly unpersuasive given the Supreme Court's clarification of the *Rooker-Feldman* doctrine in *Exxon*. *See Coleman*, 70 F. Supp. 3d at 74 (explaining that *Ritter* was "narrowed significantly in 2005 by the Supreme Court's *Exxon* decision"). In short, while Plaintiffs' injuries are related to the state court judgment, Plaintiffs do not allege that the state court committed legal error, nor do they seek relief from the judgment itself. *See, e.g., Sharritt v. Henry*, No. 23-C-15838, 2024 WL 4524501, at *6 (N.D. Ill. Oct. 18, 2024) (holding that *Rooker-Feldman* did not

21

apply because the plaintiffs did "not challenge the outcome of any state court decision" or seek to "undo the tax deeds the tax buyers obtained" and challenged only the defendants' "failures to compensate them for the loss of any excess equity"). Therefore, the Court declines to dismiss the action based on the *Rooker-Feldman* doctrine.[14]

### 4.    Res Judicata

Tempest contends that "[i]t was incumbent upon ECO to raise *as a defense* in the tax sale case that there should be no judgment foreclosing the right of redemption because the auction price was not going to result in what ECO feels would be fair compensation . . . [t]hose facts were all available at the time that suit was filed." ECF 48, at 12 (emphasis in original). ECTA similarly maintains that "Anderson's claims are a 'disguised attack' on the validity of the tax sale proceedings, and res judicata bars her from filing a separate suit alleging that ECTA's alleged improper actions caused the purchase price to be inadequate." ECF 50, at 7 (citing *Tri-Towns Shopping Ctr., Inc. v. First Fed. Sav. Bank of W. Md.*, 688 A.2d 998, 1004 (Md. App. 1997)). Plaintiffs argue that "res judicata does not apply because the doctrine 'cannot bar a claim that did not accrue prior to the litigation triggering the bar.'" ECF 47, at 53–54 (first quoting *D'Ambrosio v. Wolf*, 295 Va. 48, 56 (2018); and then collecting cases). According to Plaintiffs, "when '[m]aterial operative facts occur[] after the [first] decision'—here, Tempest and [ECTA] obtaining

---

[14] Additionally, the City appears to misunderstand the significance of Plaintiffs' statements about the City allegedly depressing bids. *See* ECF 39-1, at 17 ("Plaintiffs seek to set aside the circuit court's judgments foreclosing the right of redemption by asserting that the City 'did not provide public notice of the sale twice in a newspaper of general circulation;' 'listed tens of thousands of liens . . . in a single auction;' and 'imposed a high-bid premium.'" (quoting ECF 22, at 12, 22 ¶¶ 31.d, 77)).  However, as Plaintiffs explain in the response, they "do not challenge the foreclosure . . . [n]or do they contend that the City may not auction liens or that it has to do so in a different way . . . [t]heir contention is that when the City—and the tax investors working with it—take property, they must provide just compensation . . . [a]nd in doing so, they may not use the highest bid in the *lien* auction as the value of the *property* they are taking." ECF 47, at 52 (emphasis in original).

the deed and not paying just compensation—that means there is a new 'transaction which may be made the basis of a second action not precluded by the first.'" ECF 47, at 56 (first citing *Hughes v. Insley*, 155 Md. App. 608, 627 (2003); and then quoting Restatement (Second) of Judgments § 24 cmt. f). The Court agrees. The claims for just compensation, as pled, had not accrued at the time the state court litigation to foreclose the right of redemption began, or ended.

Tempest avers that "ECO cannot re-litigate the propriety of the sale tax by recasting what should have been a foreclosure defense into a claim for damages." ECF 35-1, at 12–13. But Plaintiffs are not challenging the constitutionality of the tax sale system; they are challenging whether the compensation they received from the forced sale of their properties was just. ECO and ECTA had not yet obtained title at the time of the state court suit, thus Plaintiffs had no viable argument at that point that they had been unjustly compensated. In fact, based on the facts alleged in the Amended Complaint, it was possible that ECO and ECTA would not actually receive title to the property even after the court issued the order foreclosing the right to redemption. *See* ECF 22, at 8–9 ¶ 24 ("If the investor fails to fulfill [specific] requirements within 90 days of the judgment, the original owner may file a motion to strike the judgment of foreclosure." (citing TP § 14-847(d)(1))).[15] As the Sixth Circuit has previously held, "[u]ntil it became clear the State would seize [plaintiff's] surplus equity by transferring title—a decision reached only when the Board adjudicated the foreclosure—no taking occurred." *Harrison*, 997 F.3d at 651.

Both ECTA and Tempest argue that facts were available to Plaintiffs at the time of the tax sale case that made them aware that they were not going to receive surplus beyond the difference

---

[15] Tempest and ECTA maintain that Plaintiffs were obligated to raise their claims as defenses under TP § 14-842 and Maryland Rule 14-505. But, as Plaintiffs point out, "[t]hose provisions concern defenses challenging the validity of the tax sales (and imposition of the tax in the first place) . . . the takings claims here would serve as a defense to neither—or to the foreclosure action more broadly." ECF 47, at 56.

between the winning bid on the tax lien and the tax debt they owed. ECF 48, at 12; ECF 50, at 8. But it is not at all clear from the facts alleged in the Amended Complaint why that would be the case. Nothing in the Amended Complaint states that the "balance" referred to in TP § 14-818(a)(4) is the difference between a winning bid on a tax lien and the outstanding taxes owed. Rather, the surplus amount is undefined, which makes sense because, for instance, if the property was sold directly by the City at a foreclosure auction instead of a tax sale auction, the surplus balance would vary. Indeed, that seems to be Plaintiffs' entire point in bringing this case. Thus, the Court declines to hold that res judicata bars the claim based on Defendants' conclusory assertions that Plaintiffs "knew" at the time of the tax sale case that they were not going to receive just compensation for the surplus.[16]

The Court finds that because Plaintiffs plausibly allege that Tempest and ECTA had not obtained a deed extinguishing Plaintiffs' property interests at the time of the state court lawsuit, res judicata does not bar Plaintiffs' claim under the Takings Clause because the damages claim had not yet accrued.[17] *See ACAS, LLC v. Charter Oak Fire Ins.*, 626 F. Supp. 3d 866, 878 (D. Md. 2022) (describing the consensus under Maryland law rejecting "the application of res judicata where the plaintiffs could not have obtained total relief in an earlier suit"); *see also Sikorsky v.*

---

[16] The instant case is distinguishable from *Chaires v. Chevy Chase Bank, FSB*, 131 Md. App. 64 (2000), which involved the assessment of illegal fees. Here, nothing in the resolution of this case would affect the state court judgment. The plaintiff in *Chaires* raised the defense in the first action, thus the "issues and factual circumstances" decided in the first action were "identical" to the affirmative arguments raised in the second action. *Id.* Here, the claim had not yet accrued at the time of the state court action, thus the issues and factual circumstances are not identical and therefore not barred by res judicata.

[17] The Court agrees with Plaintiff that "Tempest's insistence that ECO should have sought an injunction [halting tax sales based on the existing statutory scheme] gives away the game," as arguing that ECO should have sought an injunction reveals that the damages claim was not yet available. ECF 47, at 54.

*City of Newburgh*, 136 F.4th 56, 62–63 (2d Cir. 2025) ("Claim preclusion does not bar a claim that could not have been brought in the earlier action[.]"). Moreover, only ECO seeks injunctive relief and only against the City, which has not raised res judicata, thus the Court finds that the injunctive relief sought by ECO is also not barred by res judicata.

In the alternative, the Court finds that regardless of when the claim accrued, the claims asserted in the present case could not have been asserted as viable or legitimate defenses in the state court litigation. Plaintiffs contend that "[t]he foreclosure action evaluated whether Tempest and [ECTA] had a tax sale certificate, whether the investors had provided notice, and whether ECO and [] Anderson had failed to redeem their properties." ECF 47, at 53 (citing TP § 14-835). According to Plaintiffs, "[a]rguing [in the state court litigation] that once Tempest and [ECTA] obtained the deed post-judgment, they had an obligation to pay just compensation and disgorge unjustly retained benefits would do nothing to undercut—that is, to operate as a defense against—a finding that those requirements had been satisfied." *Id.* The Court finds this persuasive given the facts alleged in the Amended Complaint, and thus holds in the alternative that res judicata does not bar the damages claims because the claims could not have served as a defense to the claim in the foreclosure action.

### 5.    ECO Standing

The City argues that ECO does not have representational standing to sue on behalf of the owners of 80 properties within the Midtown-Edmondson neighborhood that appeared on the tax sale list during fiscal years 2021-2023. ECF 39-1, at 29. Plaintiffs respond by maintaining that they do have representational standing to sue on behalf of ECO's members, but additionally, Plaintiffs indicate that "the City [] overlooks that ECO has organizational standing to sue on its own behalf for injuries that the City's conduct causes to ECO itself." ECF 47, at 59.

25

Standing is an essential component to a justiciable "case" under Article III. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998). In order to establish standing, the plaintiff must show three basic elements: (1) the plaintiff must have suffered an "injury in fact," (2) the injury must be "fairly traceable" to the defendant's challenged conduct, and (3) it must be likely that the plaintiff's injury would be redressed by the requested relief. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). When assessing standing before a federal court, "[t]he party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* at 561.

Organizations, like ECO, can assert standing in two different ways. An organization can assert standing in its own right based on an injury to the organization, or it can assert standing as the representative of its members who have been harmed. *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 155 (4th Cir. 2000). Plaintiffs assert that they have standing to sue under both theories. As described below, Plaintiffs have sufficiently established direct organizational standing, and therefore the Court need not address whether they have sufficiently established representational standing. *See, e.g.*, *Harrison v. Spencer*, 449 F. Supp. 3d 594, 601 (E.D. Va. 2020).

In determining whether organizational standing exists, "a court conducts the same inquiry as in the case of an individual." *Md. Highways Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1250 (4th Cir. 1991). That means courts evaluate whether the organization meets the three elements mentioned above—injury in fact, causation, and redressability. *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. Open Band & Broadlands, LLC*, 713 F.3d 175, 182 (4th Cir. 2013).

"An organization may suffer an injury in fact when a defendant's actions impede its efforts to carry out its mission." *Lane v. Holder*, 703 F.3d 668, 674 (4th Cir. 2012). One impediment that the Supreme Court and Fourth Circuit have recognized as an injury is a "drain on the

26

organization's resources" that frustrates the organization's purpose. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *PETA v. Tri-State Zoological Park of W. Md., Inc.*, 843 F. App'x. 493, 496 (4th Cir. 2021).

ECO's core mission is "the 'equitable' 'revitalization of [the] historically disinvested Midtown-Edmondson community,'" through "the careful preparation of development plans that are designed to further its mission, including by attracting developers aligned with ECO's mission." ECF 47, at 60 (first quoting ECF 22, at 4, 21 ¶¶ 1, 72; and then citing ECF 22, at 20 ¶¶ 68–69). According to ECO, Defendants' actions have forced Plaintiff to divert resources away from mission-based projects. For example, the City "appointed ECO to prepare a 'community managed' master plan for the Midtown-Edmondson community," and "[t]hat master plan will eventually be submitted to the City Planning Commission for formal adoption, at which point it will become the official City planning document." ECF 22, at 20 ¶ 68. Additionally, "[t]he City Department of Housing and Community Development [DHCD] has also partnered with ECO to further the Midtown-Edmondson community's new designation as a Community Asset Builder Neighborhood," and "[t]his work involves ECO reviewing the neighborhood—parcel by parcel and block by block—with DHCD to generate a development plan and identify potential developers." *Id.* at 20–21 ¶ 69. ECO argues that the organization has direct standing because "[t]he City frustrates ECO's organizational mission—the revitalization of an historically disinvested Midtown-Edmondson community—through its unconstitutional tax sale system," and "ECO has diverted time and resources to combatting the tax-sale system, including notifying community members who are on the tax-sale list, helping them redeem properties, and working with government entities to reform the system[,] [a]nd it has diverted time and resources to adjusting

its approach to the master plan and struggling to attract developers." *Id.* at 21 ¶ 72. Defendants do not respond to ECO's organizational standing argument in the Reply.

The Court finds that ECO's organizational standing allegations are sufficient to establish a theory of organizational injury. ECO has alleged a diversion of resources for research, community outreach, and public advocacy to address the challenged tax sale system practices. ECO also identifies specific projects and areas of interest that have suffered as a result of this diversion of resources. Moreover, the Court finds that this diversion of funds and resources to counteract the alleged harm is not voluntary because "the transfer of property to tax-lien investors without just compensation to the original property owners deprives those owners of the ability to remain in the community—'driv[ing] them from the neighborhood' and undermining the 'equitable' aims of ECO's mission—while also forcing ECO to 'adjust[] its approach to [the development] master plan' and interfering with its ability to engage developers with shared interests." ECF 47, at 60–61 (citing ECF 22, at 5, 21 ¶¶ 1, 72). Because Defendants' alleged conduct has "perceptibly impaired" ECO's ability to carry out its mission and because ECO used resources to counteract that impairment, ECO has plausibly alleged injury. *See Havens Realty Corp.*, 455 U.S. at 379.

Additionally, ECO has plausibly alleged that the transfer of property to tax-lien investors without just compensation has caused ECO's injury and that enjoining such a practice would cure the harm to ECO's mission and eliminate the need to divert resources from other projects delegated to ECO by the City and the DHCD. Accordingly, Plaintiffs have alleged organizational standing to sue.

**B.    Challenges Under 12(b)(6)**

1.    The § 1983 Claim is Not Barred by the Statute of Limitations

It is well-established that a federal court hearing a 42 U.S.C. § 1983 claim borrows the statute of limitations provided in the most analogous state-law cause of action. *See Burnett v. Grattan*, 468 U.S. 42, 49–50 (1984). The parties do not dispute that the applicable limitations period is three-years. ECF 47, at 57; ECF 35-1, at 14. However, federal law determines when a 42 U.S.C. § 1983 claim accrues. *See Wallace v. Kato*, 549 U.S. 384, 388 (2007). Generally, "the limitations period commences when the plaintiff knows or has reason to know of his injury." *Epcon Homestead, LLC v. Town of Chapel Hill*, 62 F.4th 882, 886 (4th Cir. 2023) (citations omitted).

The dispute here is over when the property was deemed "taken" for the purposes of the Fifth Amendment. Plaintiffs argue that "the taking of ECO's property occurred, and became final, when the City issued the deed to Tempest." ECF 47, at 57–58. According to Plaintiffs, "[u]ntil that point, there was no certainty that ECO's rights would ever be completely extinguished because 'specific steps [required] to effectuate' the taking had not been completed." *Id.* at 58 (citing *Wharf, Inc. v. District of Columbia*, 133 F. Supp. 3d 29, 38 (D.D.C. 2015). Tempest maintains that "ECO does not complain that the judicial process violated due process or had any effect on the amount that ECO would receive in surplus. Rather, ECO's complaint is that that tax sale did not result in enough surplus to pay ECO the value of the Property. Thus, the date of the sale itself, in 2018, is the starting point for limitations." ECF 35-1, at 14.

"A taking occurs when governmental action deprives the owner of all or most of its property interest." *Nw. LA Fish & Game Preserve Comm'n v. United States*, 446 F.3d 1285, 1291 (Fed. Cir. 2006). In *Northwest LA Fish & Game Preserve Commission*, the Federal Circuit held

that "a claim does not accrue until the claimant suffers damage," and more specifically, "[a] possible future taking of property cannot give rise to a present action for damages." *Nw. LA Fish & Game Preserve Comm'n*, 446 F.3d at 1291; *see also Harrison*, 997 F.3d at 650 ("The taking, so far as federal law is concerned, happened when the Board adjudicated the foreclosure of [plaintiff's] property through the land bank process, not before."); *Wharf, Inc.*, 133 F. Supp. 3d at 37–38 (holding that taking did not occur upon enactment of ordinance because "the [street] closure" at issue would not take place unless "the government [took] specific steps to effectuate the closure . . . and if those steps were never taken by the government, presumably the street would never close").

The Court is unpersuaded by Tempest's argument that the date of the tax sale in 2018 is the starting point for limitations. Plaintiffs allege that at the tax sale, "[i]nvestors are buying the right to collect the property-owner's debt with interest, secured by a lien on the property . . . [i]n other words, they are buying the lien from the City, not the property itself." ECF 22, at 8 ¶ 22 (citation omitted). According to the Amended Complaint, "[f]ollowing the tax sale, a 'redemption' period begins during which the original property owner can extinguish the lien—now held [] by the winning bidder—by paying not only the past due taxes but also the interest, penalties, and costs of the sale claimed by the City, plus the investor's attorneys' fees and costs." *Id.* ¶ 19 (citing TP § 14-828). However, "[i]f the property owner is unable to redeem within the time provided, the investor may bring an action to foreclose the right of redemption." *Id.* ¶ 23. According to the Amended Complaint, "[a] judgment foreclosing the right of redemption does not give title to the investor. Rather, it is the City that gives title to the investor. And the City will transfer clear legal title to the investor only in exchange for the investor paying the remainder of its bid, plus any accrued taxes." *Id.* ¶ 24 (citing TP § 14-818(a)(3)). Importantly, Plaintiffs allege that "[i]f the

30

investor fails to fulfill these requirements within 90 days of the judgment, the original owner may file a motion to strike the judgment of foreclosure." *Id.* at 9 ¶ 25 (citing TP § 14-847(d)(1)).

According to the Complaint, ECO retained the right to redeem the property after the tax sale and thus eliminate any possibility of its property being taken away. Thus, the property was not taken for the purposes of the statute of limitations at the time of the tax sale. Rather, the alleged harm—namely, the loss of property without just compensation—was still unquantifiable and speculative at the time of the 2018 tax sale. In *Epcon Homestead*, the plaintiff claimed that the town's special use permit condition requiring that it set aside a portion of its development for low-income residents or pay a fee in lieu of that condition amounted to an unconstitutional taking. 62 F.4th at 884. The Fourth Circuit held that the claim accrued when plaintiff began purchasing land subject to the special use permit because plaintiff knew at that time the permit condition would affect the use of its property. *Id.* at 887. Such certainty about the effect of the sale of the tax lien on Plaintiffs' property was not present here. Where an alleged injury is "contingent upon additional facts undertaken by the government and [is] not immediate as of the date of the [statute]," the "completion of the future conditions . . . [are] the final events that fix[] the [defendant's] liability and it [is] at that time that the alleged taking occur[s]." *Wharf, Inc.*, 133 F. Supp. 3d at 39. As Plaintiffs explain, the "mere possibility that [Plaintiffs] may not [redeem their right to the property], that Tempest may then seek foreclosure of the right of redemption, and that Tempest may then obtain the deed leaves far too many contingencies for the taking to be final."[18] ECF 47, at 58. The Court will only dismiss a claim at this early stage of the litigation if it is clear

---

[18] Additionally, according to ECO, "Tempest waited over a year to obtain the deed, raising substantial questions and uncertainty (at the time) about whether it would ever take the steps required to permanently deprive ECO of its property." ECF 47, at 58 (citing ECF 22, at 16 ¶¶ 46, 51).

31

from the face of the Complaint that the claim is time barred. There is no such evidence here that the taking was final at the time of the tax sale, and thus the Court declines to hold that the claim is time barred.

2.    Plaintiffs State a Claim under § 1983 for a Takings Clause Violation

i.    *Defendants Tempest and ECTA are state actors under § 1983*

Tempest and ECTA contend that they are not state actors and therefore cannot be held liable under § 1983. Plaintiffs aver that "[i]n *Plemons*, the Fourth Circuit held that th[e] [state actor] test is satisfied when a private party takes property under a system of selling tax liens materially indistinguishable from Baltimore's." ECF 47, at 32 (citing *Plemons v. Gale*, 396 F.3d 569, 572 n.3 (4th Cir. 2005)). In *Plemons*, plaintiff failed to pay property taxes because she mistakenly believed the bank was paying them. 396 F.3d at 571. Thus, the Sheriff of the County sold a tax lien on the property to a private party, and that private party then sought the issuance of a tax deed. *Id.* The private party then, as required by state law, filed a list of those to be served with notice to redeem with the Clerk of the County, so the Clerk could send plaintiff a notice of her right to redeem the tax lien. *Id.* The Clerk then subsequently issued a deed to the private party. *Id.* Contrary to Defendants' assertion that *Plemons* did not involve a state action determination, the Fourth Circuit noted that "[a]ppropriately, neither party disputes that the tax-sale procedure in this case *constitutes state action*, although state law charges a private party with providing notice." *Id.* at 572 n.3 (emphasis added). The Fourth Circuit then explained West Virginia's statutory scheme: "the State is the initial seller of the tax lien; thereafter, the State provides the tax lien purchaser with the mechanism to provide notice to interested parties. The State also extinguishes the owner's rights to the property by issuing the tax deed to the property." *Id.* The Fourth Circuit thus endorsed a state actor finding by stating: "In order to accomplish a tax sale . . . private parties

must 'make use of state procedures with the overt, significant assistance of state officials,' and, thus, there is state action." *Id.* (citing *Tulsa Prof'l Collection Servs., Inc. v. Pope*, 485 U.S. 478, 486 (1988)).

So too here. As Plaintiffs point out, "[t]he City sells the lien, it provides assistance in sending the notice, and most important, the City 'extinguishes' the original owners rights by issuing a deed." ECF 47, at 32 (internal citations omitted). The Court takes note of Tempest's objection that this case focused on whether a taxpayer was given due process through proper notice in a tax sale, not whether a tax sale purchaser was a state actor for Takings Clause purposes. ECF 48, at 8. However, at least at this stage, the Court finds this distinction immaterial. The import of *Plemons* stems from the Court's analysis of the interdependent relationship between the government and the private party through West Virginia's tax-sale process. Accepting the allegations in the Complaint as true, the Court finds that Maryland's tax-sale process is substantially similar to the tax-sale process described in *Plemons*, and thus the Court declines to dismiss the Complaint on the ground that Tempest and ECTA are not state actors for the purposes of § 1983.

To be sure, the opinion in *Wittstock v. Mark A. Van Sile, Inc.*, 330 F.3d 899, 902–03 (6th Cir. 2003) does give this Court pause. Plaintiffs argue that "[a]lthough *Wittstock* did involve property taken to satisfy a tax debt, Tempest overlooks that Michigan (from which the case arose) uses a different tax-sale system: The municipality forecloses on the property, and the municipality only ever assists the purchaser (by issuing a deed) if the purchaser subsequently brings a quiet title action. As the Sixth Circuit explained, 'a tax deed holder does not enforce a state tax lien through a quiet title action.'" ECF 47, at 32 n.12 (citing *Wittstock*, 330 F.3d at 902–03). Plaintiffs contend that the distinction is that "[i]n Baltimore, investors like Tempest and [ECTA] do enforce the lien

33

to take the property. And at any rate, the Fourth, not the Sixth, Circuit binds this Court." *Id.* It appears, however, that Tempest and ECTA do not "enforce the tax lien" any more than the *Wittstock* private parties. Both tax sale systems require private parties to seek action through the court (either through an action to foreclose the right to redemption or a quiet title action) to obtain their property. Thus, the Court is not necessarily convinced that *Wittstock* is distinguishable in the way Plaintiff contends.

However, the Nebraska Supreme Court's decision in *Continental Resources v. Fair* provides yet another framework to consider. 317 Neb. 391, 410 (2024). In *Continental Resources*, the Nebraska Supreme Court held that a private tax certificate purchaser's decision to obtain a tax debt is fairly attributable to the State and thus qualifies as state action. *Id.* In conducting a hybrid analysis of both joint action and the nexus test[19], the Court reasoned that "[w]hile [the court] find[s] that Continental engaged in state action as a result of its use of state procedures and state assistance, this conclusion is reinforced by the overall character of Nebraska's delinquent property tax collection system and the relationship between governmental parties and tax certificate purchasers it creates." *Id.* at 409. To support this finding, the court emphasized that "[t]he State incentivizes [] private investors to purchase the [tax] certificates by offering what can only be characterized as a very generous interest rate on the purchase," the State "avoid[s] the expense of foreclosure proceedings, because the statutes that create the tax collection system delegate to the private investors the common governmental function of seizing properties to satisfy a tax debt," and

---

[19] The Nebraska Supreme Court, after noting that the "Supreme Court has articulated different formulations of what must be present for a relationship between a governmental and private party to amount to state action," recognized that "[w]hether these are separate tests or merely different ways of asking whether 'there is a sufficiently close nexus between the State and the challenged action of the [private party] so that the action of the latter may be fairly treated as that of the State itself,' we find that such a nexus is present here." *Continental Res.*, 317 Neb. at 410–11 (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)).

ultimately, "if the private investor requests a tax deed, it can obtain title to the property free and clear of any liens or encumbrances, and it is not required to compensate the original owner for the lost equity," even when significant windfalls result. *Id.* at 410. Based on this relationship between the government and the private actors, the court held that, "[d]elinquent property tax collection occurs in Nebraska through an interdependent, mutually beneficial relationship between the State and its political subdivisions and tax certificate purchasers in which the State delegates to the tax certificate purchaser the job of collecting tax debts of delinquent taxpayers and offers a powerful incentive to the investor to request the issuance of a tax deed if the value of the property exceeds the tax debt." *Id.* at 411.

The Court finds this reasoning persuasive as applied to the circumstances here. Specifically, Plaintiffs maintain that "[t]he City entices tax-lien investors like Tempest and [ECTA] by choosing to give them the right to obtain property (and, at a minimum, the right to collect interest on redemption payments at 12 or 18 percent) for the price of a lien and then further systematically drives down the price of that lien." ECF 47, at 33–34 (citing ECF 22, at 10 ¶¶ 28–31). Plaintiffs also argue that "the City benefits from this dynamic beyond the collection of a tax debt in an individual case [because] [l]ow bids spread the investors' capital across as many liens as possible, thereby maximizing the number of liens purchased in the sale, thus maximizing the City's revenue." *Id.* (citing ECF 22, at 10 ¶ 31).

At this early stage of litigation, the Court is satisfied that Plaintiffs have plausibly alleged facts showing joint action and a "close nexus" between the City, Tempest, and ECTA, such that the behavior by the private parties may fairly be attributed to the City. *See* ECF 22, at 10–13 ¶¶ 30, 32, 33; *see also id.* at 15 ¶ 44 (alleging that Tempest "bought 85 properties in the 2018 sale," and "[n]inety-four percent of those properties were redeemed at interest rates of either 12% or

18%—all paid to Tempest," and "[o]n the five unredeemed properties to which Tempest took title, it paid a total of $55,045 for the liens on properties it has now sold for a total of $642,970"). The tax-sale process, at least as alleged by Plaintiffs, creates an "interdependent, mutually beneficial relationship" between the City, Tempest, and ECTA, and thus the Court finds that Plaintiffs have plausibly alleged that Tempest and ECTA are "state actors" for the purposes of § 1983. *See Continental Resources*, 317 Neb. at 410–11.

ii.    *Plaintiffs Plausibly Allege a Claim under § 1983*

The Fifth Amendment prohibits government taking without just compensation. Accepting the allegations in the Complaint as true, as the Court must at this stage, Plaintiffs plausibly allege that basing the Plaintiffs' entitlement to surplus on the price of the bid on the tax liens, rather than the properties themselves, did not constitute just compensation. *See, e.g., United States v. Reynolds*, 397 U.S. 14, 16 (1970) ("'[J]ust compensation' means the full monetary equivalent of the *property* taken." (emphasis added)); *United States ex rel. & for Use of Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 284 (1943) (just compensation must be "measured by the value of the *property*" (emphasis added)).

Tempest argues that ECO seeks to "claim more than the surplus sale proceeds in the hope of benefit[ting] from their tax delinquency." ECF 35-1, at 8. ECTA makes a similar argument, and additionally contends that "Maryland's tax sale process complies with the standard set forth in *Tyler v. Hennepin Cnty.*, 598 U.S. 631, 642 (2023)." ECF 37-2, at 11. Plaintiffs argue that "[d]efendants do not cite a single case supporting the proposition that when determining what compensation is just, the value of the property can be determined not by auctioning the property itself but by auctioning a lien on that property." ECF 47, at 21. Plaintiffs further contend that "whether ECO and [] Anderson have stated a claim for a taking does not turn on whether the City

36

is obligated to pay the fair market value of their homes.  Rather, all the Court needs to decide at

this stage is that the plaintiffs have adequately alleged that by providing only the value of the lien,

rather than the value of the property, the defendants have failed to justly compensate them." *Id.* at

25.  The Court agrees and finds that such a holding would not be out of line with *Freed* or *Tyler*.

The Court readily acknowledges that property may be valued at the price it sells for at a

forced auction, even if it is not the "fair market value" of the property.  However, the Complaint

plausibly alleges that the surplus amount received by Plaintiffs was not based on the value of the

property as determined by auctioning off the property itself, but by auctioning a lien on that

property. ECF 22, at 8–9 ¶¶ 24, 26. As Plaintiffs explain, "ECO's community center demonstrates

this clearly . . . Tempest purchased the lien on ECO's community center for $5,115[,] Tempest

then sold the community center itself at public auction for $139,500 . . .[o]n the defendants' own

theory, then, ECO's property should have been valued at $139,500." ECF 47, at 22.

The Court finds that the facts in *Freed* are not directly analogous to the circumstances here,

at least at this stage, because in *Freed*, the *property* sold at a public auction, rather than a *lien* being

sold at an auction.[20]  In the Amended Complaint, Plaintiffs allege that in Baltimore, "the City and

the investor hand over only the difference between the auction price for the *lien* and the past-due

taxes.  That distinction is substantial: The auction price of the lien is far lower than the value of

the property itself." ECF 22, at 2 (emphasis in original).  In other words, according to Plaintiffs,

---

[20] *Freed* is distinguishable because there, the county foreclosed on plaintiff's property and sold it a public auction for $42,000. *Freed*, 81 F.4th 657. The district court held that plaintiff was owed the difference between the foreclosure sale amount and his debt, plus interest. *Id.* at 658. Plaintiff argued on appeal that he was "entitled to an additional $56,800 because the purported fair market value of the property was $98,800 and the property sold for only $42,000." *Id.* Here, by contrast, "[t]he City provided ECO and [] Anderson the difference between what the lien on their property sold for at the City's auction and their tax debt—not the difference between the auction price of their property and their taxes." ECF 47, at 21.

37

"the property owner gets, at most, whatever is left over from the sale price of the *lien* after their

tax bill is paid—not the difference between the value of the *property* and their outstanding taxes."

*Id.* at 9 ¶ 26 (emphasis in original). Accepting these allegations as true, Plaintiffs plausibly allege

that the value of the tax lien is not equivalent to the value of the property—it is, according to

Plaintiffs, "far lower." ECF 22, at 2. Therefore, Plaintiffs have plausibly pled a claim for a

violation of the takings clause.

In short, the Court's holding comports with, rather than contradicts, *Freed*. In *Freed*, the

Sixth Circuit found that "neither this court nor the Supreme Court has ever held that a plaintiff

whose property is foreclosed and sold at a public auction for failure to pay taxes is entitled to

recoup the fair market value of the property." ECF 50, at 9 (citing *Freed*, 81 F.4th at 658). But

Plaintiffs' claims do not depend on a holding that they are entitled to the fair market value of the

property; rather, their claims survive so long as they have plausibly alleged that the difference

between the auction price of the lien and the amount of taxes owed was not just compensation.

Indeed, in *Freed*, the court noted that "the best evidence of a foreclosed property's value is the

*property's* sales price, not what it was worth before the foreclosure." *Id.* at 659 (emphasis added).

As Plaintiffs note, "[o]n the defendants' own theory, then, ECO's property should have been

valued at $139,500." ECF 47, at 21.

At the motion to dismiss stage, the Court expresses no opinion on the ultimate "calculation"

of just compensation for the purposes of the Takings Clause. Notably, allowing Plaintiffs' claims

to survive at this early stage of the litigation does not, as Defendants contend, endorse the

proposition that Plaintiffs are entitled to the fair market value of their properties. Rather, the

Court's holding is merely this: Plaintiffs plausibly allege that the amount of surplus equity they

received was not just compensation. Whether the City can substitute the value of a lien on the

property for the value of the property itself is a question that is neither answered by this opinion nor appropriately resolved at this stage of the litigation. It may well be the case that the value of a lien can be substituted for the value of a property. But for the purposes of a motion to dismiss, the Court's inquiry is a narrow one. Plaintiffs must only *plausibly allege* that these particular substitutions did not constitute just compensation under the Takings Clause given the factual circumstances of this case. After reviewing the Complaint in depth, the Court finds that Plaintiffs have met threshold pleading requirements, and thus, the Court's inquiry under 12(b)(6) is at an end.

Additionally, Defendants repeatedly argue that Plaintiffs are seeking the difference between the fair market value of the property and the tax lien, plus interest and penalties. However, the Complaint, and the response in opposition to the motion to dismiss, make clear that Plaintiffs are seeking "just compensation" for each Plaintiff, ECF 22, at 27, based on the theory that receiving only the difference between the tax-lien and the winning tax-sale bid, which was allegedly not equivalent to the value of the property, was unjust compensation, *id.* at 22 ¶ 76 ("Tempest and [ECTA] took the deeds for the plaintiffs' properties, with the City's assistance, but paid only the auction price of the lien at the auction, which does not measure the value of the property."); *id.* ¶¶ 78, 79 (explaining that neither the City nor bidder ever paid Plaintiffs the difference between the amount of the winning bid and the value of the property). ECTA argues that "Anderson's allegation that the value of the property exceeds the auction price of the lien lacks merit." ECF 37-2, at 11. In support of this proposition, ECTA argues that "[a] property is 'simply worth less' when sold at foreclosure as opposed to the open market, largely because a foreclosure sale is a forced transaction lacking favorable market conditions, such as negotiation, mutual agreement, and the time needed to find a willing buyer." *Id.* at 11–12. But as Plaintiffs

acknowledge, their claims "do not depend on the contention that a property's value can never be determined by a public auction of that property." ECF 47, at 21. Rather, Plaintiffs' complaint centers on whether "the value of the property can be determined not by auctioning the property itself but by auctioning a lien on that property." *Id.* That argument, which was neither addressed nor squarely foreclosed by *Tyler* or *Freed*, is a narrower, and as best this Court can tell, unsettled question. And therefore, ECTA's contention that fair market value cannot be calculated in a traditional sense at foreclosure sales does not squarely address the arguments at issue here because the City never auctioned the property; it only auctioned the lien on that property.

ECTA asserts in the Reply brief that "Maryland's tax sale statutes expressly state that the tax sale process results in the sale of the property—not just the lien." ECF 50, at 4 (citing TP §§ 14-808, 14-809 ("the municipal corporation collector . . . may use the provisions and procedures of this subtitle to sell the property . . . .")). According to ECTA, TP § 14-818(a)(4) "requires the municipality to pay the taxpayer the difference between the tax debt and the winning bid at the tax sale and ensures that the taxpayer receives just compensation for the sale of the property." *Id.* at 5 (citing TP § 14-818(a)(4)). However, the plain language of the statute does not say that specifically. Section 14-818(a)(4) states: "Any balance over the amount required for the payment of taxes, interest, penalties, and costs of sale shall be paid by the collector to [] the person entitled to the balance." How the balance is determined is not dictated by statute, and therefore the Court declines to dismiss the claim because Plaintiffs have plausibly alleged that the balance they received based on the difference between their tax liens and the winning bid on the liens at the tax sale was not just compensation.[21]

---

[21] The Court is satisfied that Plaintiffs have a protected property interest in the equity of their property in excess of their tax debt. *See Continental Resources*, 317 Neb. at 405 ("[Plaintiff] had a protected property interest to the extent the value of the property exceeded his tax debt" because

Moreover, ECTA cannot legitimately maintain that the tax sale itself constituted a final sale of property. The Complaint makes clear, and the City acknowledges, that after the tax certificate is purchased, "the tax sale purchaser has the *right to acquire* fee simple title by filing a complaint in the circuit court to 'foreclose all rights of redemption of the property.'" ECF 49, at 5 (emphasis added) (first citing *PNC Bank, Nat'l Ass'n v. Braddock Props.*, 81 A.3d 501, 506 (Md. 2013); and then quoting TP § 14–833). Critically, Plaintiffs had the right to "redeem the property at any time until the right of redemption has been finally foreclosed under the provisions of this subtitle." TP § 14-827. This right allowed Plaintiffs to retain title to the property until the circuit court entered judgment foreclosing the right of redemption under TP § 14-833. Thus, while the tax sale process gave a tax sale purchaser the right to acquire title in the future if the original property owner failed to redeem, the Court is unpersuaded by ECTA's argument that "the tax sale process results in the *sale* of the property—not just the lien." ECF 50, at 4 (emphasis altered). Plaintiffs have plausibly alleged that at the tax sale auction, "[i]nvestors are buying the right to collect the property-owner's debt with interest, secured by a lien on the property . . . [i]n other words, they are buying the lien from the City, not the property itself." ECF 22, at 8 ¶ 22.

The question remains, however, whether the value of the property can be determined by auctioning the lien. The Court, as noted above, finds this question inappropriate to resolve at the motion to dismiss stage. Rather, the Court's inquiry is limited at this stage to whether Plaintiffs have plausibly alleged that the value of the lien is lower than the value of the property. ECTA argues that "the price received at a properly conducted foreclosure sale constitutes 'reasonably

---

traditional property principles and Nebraska law "generally recognize a property right"); *Grady v. Wood Cnty.*, No. 24-cv-00214, 2025 WL 1234111, at *4 (S.D. W. Va. Apr. 29, 2025) ("[T]his Court leans on the analysis conducted by the Supreme Court in *Tyler* and the Sixth Circuit in *Hall* in finding that traditional property principles establish a protected interest in Plaintiffs' equity in excess of their tax debt.").

41

equivalent value' as a matter of law." ECF 37-2, at 13 (citing *BFP*, 511 U.S. at 548–49). However, this argument misconstrues Plaintiff's argument, and *BFP* dealt with the sale of *property* at a foreclosure sale. Here, Plaintiffs allege that there is a "substantial" distinction between auctioning a lien on a property and auctioning the property itself. ECF 22, at 2. The Court accepts this allegation as true at this stage of the litigation and thus finds that Plaintiffs have plausibly alleged that the auction price of the lien did not qualify as just compensation under the Fifth Amendment.

To explain why the value of the lien is allegedly lower than the value of the property, Plaintiffs allege that "[t]he City's auction didn't even properly value the lien," because "[t]he City used minimal advertising, directed at repeat-player tax-lien buyers; listed over ten thousand liens at once; established no minimum bid beyond the amount of the tax debt; and imposed a high-bid premium."[22] ECF 47, at 23 (citing ECF 22, at 10–12 ¶ 31). Thus, accepting these allegations as true, Plaintiffs have plausibly alleged that the auction price of the tax lien is lower than the value of the property itself, ECF 22, at 9 ¶ 26, and that receiving only the difference between the sale price of the *lien* after their tax bill is paid, not the difference between the value of the *property* and their outstanding taxes, was not just compensation under the Takings Clause, *id.*[23]

---

[22] By including these allegations, Plaintiffs are not arguing that the value of the lien should have been higher or that the bid should have been higher. Their argument is only that for the purposes of the present federal constitutional claim, the price of the lien cannot be used as the property's "value" for the purposes of just compensation under the Takings Clause. *See* ECF 47, at 23 ("To be clear, that doesn't mean that the City cannot conduct its auction that way. But it does mean that the bid at auction cannot be used as the property's value for purposes of the Takings Clause.").

[23] ECTA also argues that "[t]he high-bid premium serves as a critical mechanism for mitigating speculative bidding and ensuring bidder commitment, analogous to the nonrefundable deposits standard in foreclosure sales." ECF 37-2, at 12. Regardless of the merits of that argument, it is irrelevant for the purposes of the motion to dismiss, where the Court's inquiry is limited to whether Plaintiffs have stated a plausible claim for relief. Accepting the facts in the Complaint as true, Plaintiffs have plausibly alleged that the high-bid premium depressed bids. *See* ECF 22, at 10 ¶ 31.a (alleging that the high-bid premium "elevates [the City's] interests above its residents' by inducing bidders to make low bids on a large number of liens rather than higher bids on fewer

3.    Plaintiffs Fail to State a Claim Directly Under the Constitution

The City argues that "Plaintiffs do not have a cause of action against the City directly under the Fourteenth Amendment to the Constitution," and "42 U.S.C. § 1983 provides the exclusive remedy for a violation of the Takings Clause of the Fifth Amendment." ECF 39-1, at 28 (citing *DeVillier v. Texas*, 601 U.S. 285, 291 (2024)). Plaintiffs respond that "the Fourth Circuit has concluded that [] 'the Constitution itself authorizes suit' for a Takings Clause violation." ECF 47, at 30 (citing *Mann v. Haigh*, 120 F.3d 34, 37 (4th Cir. 1997)).

The full sentence Plaintiffs reference in *Mann* states: "Excepting the situation in which the Constitution itself authorizes suit against the federal government, *e.g.*, *First English Evangelical Lutheran Church v. Cnty. of Los Angeles*, 482 U.S. 304, 316 n.9 (1987) (Just Compensation Clause), suit against a NAFI or any part of the federal government is permissible only if Congress has consented to suit . . . ." *Mann*, 120 F.3d at 37. Based on this language, Plaintiffs ask the Court to hold that the Fourth Circuit has authorized a cause of action to vindicate rights directly under the Constitution. Importantly, however, in 2024, the Supreme Court examined this precise question—whether a property owner may sue for just compensation directly under the Takings Clause—and ultimately declined to decide it because the plaintiff had a separate cause of action under state law. *DeVillier*, 601 U.S. at 293. In *DeVillier*, the plaintiff relied on *First English* to "assert that the just-compensation requirement of the Takings Clause is 'self-executing' and that '[s]tatutory recognition [is] not necessary' for takings claims because they 'are grounded in the

---

liens," and [w]ith that practice, the City sells more liens, satisfying its interest in recovering tax revenue, while making its property owner residents the victims of low winning bids that provide unjustly small compensation for the owner's lost equity"). In short, ECTA's argument that "rather than drive down the price of bids, these practices encourage tax investors to participate in the tax sale process," ECF 50, at 10, is premature, as the Court is bound to accept Plaintiffs' allegations as true.

Constitution itself.'" *Id.* at 291 (citing *First English*, 482 U.S. at 315). In responding to that argument, the Supreme Court explained that the cases cited by plaintiff "do not directly confront whether the Takings Clause provides a cause of action for just compensation," and specifically, "*First English* itself proceeded under a state-law cause of action." *Id.* Given the Supreme Court's recent examination of *First English* in *DeVillier*, the Court finds that the Fourth Circuit's passing reference to *First English* in *Mann* for the proposition that the Constitution itself authorizes suit for Takings Clause violations does not, as Plaintiffs contend, provide a dispositive answer as to whether Plaintiffs can bring a cause of action under *both* § 1983 and the Constitution. The Court notes, however, that *DeVillier* is helpful insofar as the Court recognized that "[the Court's] precedents do not clearly answer the question whether a plaintiff has a cause of action arising directly under the Takings Clause." *Id.* at 292.

In support of their argument, Plaintiffs contend that the fact that a property owner has a claim under § 1983 "doesn't mean the property owner doesn't also have a claim directly under the Constitution." ECF 47, at 31. The City responds only in a footnote, indicating: "[f]or the claims against the City, 42 U.S.C. '§ 1983 provides the exclusive remedy for the constitutional violations that Plaintiff alleges, and thus Plaintiffs do not have a cause of action directly under the Constitution.'" ECF 49, at 2 n.1 (first citing *Beahn v. Gayles*, 550 F. Supp. 3d 259, 273 n.7 (D. Md. 2021); then citing *Hacienda Valley Mobile Ests. v. City of Morgan Hill*, 353 F.3d 651, 655 (9th Cir. 2003); and then citing *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690–91 (1978)).

Perhaps most instructive in the Supreme Court's *DeVillier* opinion is the fact that the Court avoided answering the question of whether a cause of action arises directly under the Constitution precisely *because* there was another avenue to vindicate the constitutional right. *See DeVillier,*

601 U.S. at 292 ("[T]he absence of a case relying on the Takings Clause for a cause of action does not by itself prove there is no cause of action . . .[i]t demonstrates only that constitutional concerns do not arise when property owners have other ways to seek just compensation."). In *DeVillier*, the plaintiff sued Texas, which has sovereign immunity that § 1983 did not abrogate. Here, Plaintiffs sued the City of Baltimore, which has not claimed sovereign immunity and thus can be sued under § 1983.

Ultimately, this Court interprets *DeVillier* as entertaining the possibility of a claim directly under the Constitution when no other viable cause of action exists. With this in mind, it is not clear to this Court, and Plaintiffs do not address, why they should be allowed to maintain a suit under § 1983 *and* directly under the Constitution. Simply claiming that the Supreme Court has not squarely foreclosed the direct cause of action is not enough, at least in this Court's view, to expand the case law to affirmatively allow a claim directly under the Takings Clause when a § 1983 claim is also available. Therefore, the Court will dismiss Count II without prejudice. *See Knick v. Twp. of Scott*, 588 U.S. 180, 194 (2019) ("[S]omeone whose property has been taken by a local government has a claim under § 1983 for a 'deprivation of [a] right[ ] . . .secured by the Constitution' that he may bring upon the taking in federal court." (quoting 42 U.S.C. § 1983)).

### 4. Plaintiffs Fail to State a Claim for Unjust Enrichment

The Maryland Supreme Court has identified three elements of an unjust enrichment claim: 1) a benefit conferred upon the defendant by the plaintiff; 2) an appreciation or knowledge by the defendant of the benefit; and 3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value. *Hill v. Cross Country Settlements, LLC*, 936 A.2d 343, 351 (Md. 2007). Both Tempest and ECTA aver that there are no inequitable circumstances sufficient to give rise to

an unjust enrichment claim. ECTA maintains that it "was not inequitable for ECTA to retain the value of the property it rightfully purchased at the tax auction" because "the state court already determined that the tax sale complied with the requirements of Maryland's tax sale laws, and the state court ensured that [] Anderson received adequate compensation for the property." ECF 37-2, at 13–14. Tempest argues that it "paid for the tax sale certificate, it was not simply bestowed on Tempest by the City," and additionally, "Tempest notified ECO of the tax sale proceedings and gave it an opportunity to redeem." ECF 35-1, at 15. Both Defendants also point to *Johnson v. Zwolak*, Civ. No. 08-4854, 2009 WL 928563 (E.D. Pa. Apr. 7, 2009) to support their arguments.

Plaintiffs respond that "Tempest and [ECTA] each received more than $100,000 in equity from ECO's community center and [] Anderson's home because these properties were taken without providing them just compensation—an infringement of their constitutional rights," and therefore, "Tempest and [ECTA] [] owe restitution." ECF 47, at 35.

In *Johnson v. Zwolak*, defendant moved to dismiss plaintiff's claims that defendant's purchase of plaintiff's real property at a tax sale constituted unjust enrichment. *Johnson*, 2009 WL 928563, at *1. The Court, in dismissing the claim, held that plaintiff had "not alleged that he conferred a benefit on [defendant]," because the "Complaint itself recounts [that] [plaintiff] failed to pay his taxes and exposed his property to a tax sale in the first instance." *Id.* at *5. The court found that "[r]egardless of whether [defendant] knew he was enjoying an extraordinary deal, that [plaintiff] contested the tax assessment, or that [plaintiff] was residing at the property, [defendant] did not play any role in creating [plaintiff's] loss. Thus, [plaintiff] has put forth no reason why it would be inequitable for [defendant] to retain the property under such circumstances." *Id.* The court also noted that "there is nothing to distinguish [defendant's] situation from that of any other tax sale purchaser . . . [t]o allow a claim of unjust enrichment against [defendant] could establish

an unwarranted precedent that could open floodgates of litigation, such that every person losing property at a tax sale for less than alleged market value (which likely could implicate virtually every tax sale) could pursue such a claim against an innocent third party purchaser." *Id.* The Court finds the reasoning of *Johnson* persuasive.

ECTA and Tempest's participation in the tax sale, and later, the filing of suits to foreclose the right of redemption, does not give rise to a separate claim for unjust enrichment. In short, Plaintiffs fail to plausibly allege inequitable circumstances under the third element of unjust enrichment. As ECTA points out, "it was not inequitable for ECTA [and Tempest] to retain the value of the property it rightfully purchased at the tax auction," because "the state court already determined that the tax sale complied with the requirements of Maryland's tax sale laws." ECF 37-2, at 13. The Court interprets the question of whether Plaintiffs were given just compensation under the Fifth and Fourteenth Amendments as distinct from a quasi-contractual claim alleging that bidders at a tax sale auction could be held independently liable from the City for obtaining a tax-lien at a sale in accordance with state tax-system procedures. In a separate part of their brief, Plaintiffs suggest that the City may "file cross-claims for contribution or unjust enrichment against Tempest and [ECTA]," to avoid a net loss. ECF 47, at 43. The Court expresses no opinion on the propriety of such claims, as they are not currently before the Court. However, for the purposes of Count IV, which is an unjust enrichment claim asserted by Plaintiffs directly against ECTA and Tempest, the Court finds that Plaintiffs have failed to plausibly allege circumstances that make it inequitable for Defendants to retain the benefit. Accordingly, Count IV is dismissed.

5.   Claims Against the Director of Finance are Dismissed as Duplicative

The City maintains that "[t]he official-capacity claims in the amended complaint against Defendant Mocksten, as the City's Director of Finance, 'should be dismissed as duplicative' of the

claims against the City," because "[a]n official-capacity suit is 'essentially a claim against the' City." ECF 39-1, at 28 (citing *Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004)). Plaintiffs do not object to Defendant Mocksten's dismissal as they interpret Defendants' position as "a concession that [] Mocksten's conduct is attributable to the City." ECF 47, at 64. Accordingly, the Court dismisses the claims against Defendant Mocksten.

IV.    **CONCLUSION**

For the foregoing reasons, Defendants' motions are granted in part and denied in part. A separate implementing Order will issue.

Dated: <u>August 22, 2025</u>                                    <u>            /s/            </u>
                                                                          Brendan A. Hurson
                                                                          United States District Judge

48